IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Elias Gipp, SG 1 (minor), and SG 2 (minor), through Corrine Kopp, their Natural and/or Legal Guardian,<br><br>    Plaintiffs,<br><br>    v.<br><br>Raymond Webb, Gary Sandland, Jr., and United States of America,<br><br>    Defendants. | Case No. 1:19-cv-00213<br><br>**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL DISMISSAL OF SECOND AMENDED COMPLAINT** |

Defendant the United States of America ("United States") by Drew H. Wrigley, United States Attorney for the District of North Dakota, and James Patrick Thomas, Tara Vavrosky Iversen, and Sarah E. Wall, Assistant United States Attorneys, submits this memorandum in support of its motion for partial dismissal of the Second Amended Complaint and Demand for Jury Trial ("Second Amended Complaint"). Doc. 24.

The Second Amended Complaint asserts two negligence claims. Doc. 24 at 8–9. Count III - Negligence ("Negligence"), alleges the United States negligently failed to protect the health and safety of George "Ryan" Gipp, Jr. ("Gipp"), causing his death. Count IV - Direct Negligence of BIA ("Negligent Training") alleges the United States negligently failed to train the law enforcement officers involved in the incident leading to Gipp's death. The Court should dismiss the Negligent Training claim pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, because the discretionary function exception to the Federal Tort Claims Act ("FTCA") bars the claim. Additionally, this Court should dismiss the Negligence and Negligent Training claims

pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## PROCEDURAL HISTORY

Plaintiffs Elias Gipp, SG 1 (a minor), and SG 2 (a minor), through Corrine Kopp, (collectively "Plaintiffs"), filed a complaint in this matter against Bureau of Indian Affairs ("BIA") officers Raymond Webb ("Webb") and Gary Sandland, Jr. ("Sandland") pursuant to Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics, 403 U.S. 388, 396 (1971). See Doc. 1. In a second case, Plaintiffs filed a complaint against the United States alleging three claims under the FTCA: (1) assault and battery, (2) negligence, and, (3) negligent selection, training, supervision, and retention by the Bureau of Indian Affairs ("BIA"). Doc. 1:19-cv-233 1. The United States moved to dismiss the FTCA case for failure to exhaust administrative remedies. Plaintiffs agreed to dismiss the case without prejudice (Doc. 1:19-cv-233 11), and later re-alleged the same FTCA claims as part of the First Amended Complaint in this action. Doc. 10.

Plaintiffs filed a Second Amended Complaint on August 18, 2020, alleging four Counts. Doc. 24. Count I is a Bivens excessive force claim against Webb and Sandland. Doc. 24 at ¶¶ 35–44. The remaining three counts are FTCA claims against the United States: Count II - Assault and Battery, Count III - Negligence, and Count IV - Negligent Training. Id. ¶¶ 45–66.[1] All of Plaintiffs' claims relate to the shooting death of Gipp

---

[1] The Second Amended Complaint dropped Plaintiffs' previous claims of negligent selection, supervision, and retention of employees.

during a high-risk stop on October 23, 2017. See id. ¶¶ 11–34. The instant motion seeks

dismissal of the Negligence and Negligent Training claims.

## ARGUMENT

I.    **The Negligent Training Claim is Subject to the FTCA's Discretionary Function Exception and Must be Dismissed Under Federal Rule of Civil Procedure 12(b)(1) for Lack of Subject-Matter Jurisdiction.**

    A.    **Legal Standard Fed. R. Civ. P. 12(b)(1).**

Jurisdiction is a threshold question and must be decided at the outset of a case.

Green Acres Enters., Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005) (citing

Osborn v. United States, 918 F.2d 724, 728–30 (8th Cir. 1990)). "[S]ubject matter

jurisdiction cannot be waived by the parties, conferred by consent or ignored by the

court." Babcock & Wilcox Co. v. Parsons Corp., 430 F.2d 531, 540 (8th Cir. 1970). It is a

plaintiff's burden to prove subject-matter jurisdiction exists. Herden v. United States, 726

F.3d 1042, 1046 (8th Cir. 2013) (quoting Green Acres, 418 F.3d at 856). When a federal

court concludes it lacks subject-matter jurisdiction with respect to a claim, the court must

dismiss that claim. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). "[T]the court may

look outside the pleadings in order to determine whether subject matter jurisdiction

exists." Green Acres, 418 F.3d at 856.

> In evaluating a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of undisputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Mentz [v. United States, 359 F. Supp. 2d 856, 858 (D.N.D. 2005)](quoting Osborn, 918 F.2d at 730). A court may make credibility determinations and weigh conflicting evidence in resolving a motion to dismiss under Rule 12(b)(1). See T.L. ex rel. Ingram v. United States, 443 F.3d 956, 961 (8th Cir. 2006); see also Mentz, 359 F. Supp. 2d at 858.

Vinje v. United States, No. 1:16-CV-024-CSM, 2016 WL 3248238, at *2 (D.N.D. June 10, 2016).

### B.  Sovereign Immunity is Not Waived by the United States for Acts Encompassed by the Discretionary Function Exception of the FTCA.

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941) (citations omitted). Lawsuits for money damages against the United States are barred by sovereign immunity, except when the United States explicitly waives its sovereign immunity and consents to be sued. See, e.g., United States v. Testan, 424 U.S. 392, 400 (1976). Accordingly, "the terms of the United States' 'consent to be sued in any court define that court's jurisdiction to entertain the suit.'" Brown v. United States, 151 F.3d 800, 803–04 (8th Cir. 1998) (quoting FDIC v. Meyer, 510 U.S. 471, 475 (1994)).

The FTCA is an act by Congress creating a limited waiver of sovereign immunity. 28 U.S.C. §§ 1346, 2671–2680. The waiver is not absolute. Congress crafted exceptions to the FTCA, to which courts must give "due regard." United States v. Orleans, 425 U.S. 807, 814 (1976). As a waiver of sovereign immunity, the FTCA and its exceptions must be strictly construed in favor of the United States. See McMahon v. United States, 342 U.S. 25, 27 (1951) ("statutes which waive immunity of the United States from suit are to be construed strictly in favor of the sovereign"). Specifically, sovereign immunity is not waived for FTCA claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Skellham v.

4

United States, Doc. 1:17-cv-91 56 at 20 (D.N.D. May 27, 2020) (quoting Herden, 726

F.3d at 1046-47); 28 U.S.C. § 2680(a). This exception is commonly called the

"discretionary function exception." United States v. Gaubert, 499 U.S. 315, 322 (1991).

"If a case falls within this statutory exception to the Federal Tort Claims Act, the Court

lacks subject matter jurisdiction." Demery v. U.S. Dep't of Interior, 246 F. Supp. 2d

1060, 1063 (D.N.D. 2003); Walters v. United States, 474 F.3d 1137, 1139 (8th Cir. 2007)

("If the FTCA's discretionary function exception applies, it is a jurisdictional bar to

suit.").

### C.     Applicability of the Discretionary Function Exception is Determined Through the Use of a Two-Part Test.

Courts analyzing the discretionary function exception ("DFE") apply a two-part

test to determine its application. See Berkovitz by Berkovitz v. United States, 486 U.S.

531, 536 (1988); Metter v. United States, 785 F.3d 1227, 1230 (8th Cir. 2015). "The first

inquiry is whether the challenged conduct or omission is truly discretionary, that is,

whether it involves an element of judgment or choice instead of being controlled by

mandatory statutes or regulations." Skellham, Doc. 1:17-cv-91 56 at 20–21 (quoting

Herden, 726 F.3d at 1046). "The Supreme Court has recognized that the requirement of

judgment or choice is not satisfied if there is a statute, rule, regulation or administrative

policy that specifically prescribes a course of action for an employee to follow." Demery,

246 F. Supp. 2d at 1064. However, "[e]ven when some provisions of a policy are

mandatory, governmental action remains discretionary if all of the challenged decisions

involved 'an element of judgment or choice.'" Compart's Boar Store, Inc. v. United

States, 829 F.3d 600, 605 (8th Cir. 2016) (quoting Hart v. United States, 630 F.3d 1085, 1086 (8th Cir. 2011)). "Conversely, when no federal mandate is found, the employee's conduct is considered to be the product of judgment or choice and the Court's initial inquiry is satisfied." Demery, 246 F. Supp. 2d at 1065.

Accordingly, the existence of a general mandate to an agency to achieve a general goal does not preclude the existence of DFE, so long as the mandating authority does not specifically dictate how the general mandate is to be achieved. The details are left to the discretion of the agency.[2]

> Where Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs. In addition, the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected.

Gaubert, 499 U.S. at 323. Indeed, under such a scenario the Supreme Court has further explained that "if a regulation mandates particular conduct, and the employee obeys the

---

[2] A good illustration of this concept can be found in Archambault v. United States:

> Plaintiff contends that there is a Congressional mandate to provide health care to Native Americans. The United States clearly agrees that there is a broad mandate to do so. Implementation of that mandate, however, is left to the discretion of the agencies charged with delivering the health care . . . . The cases and mandates cited by the plaintiff do not mandate any particular conduct as to the manner in which health care is delivered to Native Americans. Therefore, it is left to the clinics to best determine how to use the resources effectively.

82 F. Supp. 3d 961, 965–66 (D.S.D. 2015).

direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." Id. at 324 (citing Dalehite v. United States, 346 U.S. 15, 36 (1953)).

If the conduct in question involves judgment or choice, the second part of the DFE test is an inquiry into whether the government employee's judgment or choice was "based on considerations of social, economic, and political policy." Layton v. United States, 984 F.2d 1496, 1499 (8th Cir. 1993) (citing Berkovitz, 486 US at 536–37). The discretionary function exception was enacted to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Gaubert, 499 U.S. at 323 (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984). "[W]hen properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" Id. (quoting Berkovitz, 486 U.S. at 537). "When established governmental policy allows a Government agent discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Demery, 357 F.3d at 833 (quoting Gaubert, 499 U.S. at 324). "The plaintiff must rebut this presumption. Otherwise, the court will 'presume the decision was based on public policy considerations.'" Id. When a discretionary decision is "susceptible to policy analysis," the exception applies whether or not the defendant actually conducted a policy analysis. Herden, 726 F.3d at 1047 (quotations omitted).

**D.      The Discretionary Function Exception Bars Plaintiffs' Negligent Training Claim Asserting that BIA Failed to Properly Train the Officers.**

Plaintiffs' Negligent Training claim is that "BIA had a duty to <u>properly</u> train the officers involved in the above-described incident in order to protect the health and safety of others. . . . By its negligence, the BIA breached this duty."[3] Doc. 24 at ¶¶ 59, 62 (emphasis added). The claim explicitly and necessarily turns on the allegation that through its negligence, the BIA failed to "properly" train Webb and Sandland. <u>Id.</u> A close reading of the Second Amended Complaint compels the conclusion that Plaintiffs are in fact challenging the sufficiency and execution of the training that occurred; however, the sufficiency and execution of the training are subject to the DFE.

The discretionary function exception prevents a negligence claim premised on whether the required training was "properly" performed because the BIA has discretion to implement the training as they see fit to advance policy objectives. The determination of what means and methods constitute "proper" training is a discretionary function of the

---

[3]Plaintiff's Second Amended Complaint alleges the following training is mandatory:

> 60.      The Bureau of Indian Affairs (BIA) Law Enforcement Handbook (last revised: October 1, 1999) mandates certain pre-service and in-service training for all BIA law enforcement officers. <u>See</u>, <u>e.g.</u>, BIA Handbook LES-4-1-1 (mandatory pre-service training requirements), LES-4-1-3 (mandatory in-service training)
> 61.      The mandated training includes training in "use of force" and firearms. <u>See</u>, <u>e.g.</u>, BIA Handbook LES 5-1-2, LES 4-1-6.

Doc. 24 at ¶¶ 60-61. Plaintiffs, incidentally, fail to plead how the BIA was negligent in the officers' training, or how the alleged negligence proximately caused Gipp's death. <u>See Id.</u> at ¶¶ 59-66. Count IV lacks any specific factual allegations to identify for the Court or the United States any non-conclusory basis for the claim.

BIA. So long as the specific means and methods of accomplishing the training are not explicitly mandated, and those training decisions involve policy judgments, the DFE defeats Plaintiffs' Negligent Training claim that the training was not done properly. Under the circumstances, Plaintiffs simply cannot challenge the content of the training. Second, Webb and Sandland completed the "mandatory" training requirements. Having done so, the DFE protects the United States because such compliance is deemed in furtherance of the BIA's policy to employ properly-trained officers. Under <u>Gaubert</u> the discretionary function exception applies and bars Plaintiffs' Negligent Training claim.

### 1. BIA "Mandatory" Training Requirements.[4]

The Secretary of the Interior ("the Secretary"), acting through the BIA, is "responsible for providing, or for assisting in the provision of, law enforcement services in Indian country[.]" 25 U.S.C. § 2802(a). Under the supervision of the Secretary, the BIA Office of Justice Services ("OJS") is responsible for "carrying out the law enforcement functions of the Secretary in Indian country." 25 U.S.C. § 2802(b)(1). "The Secretary shall establish appropriate standards of . . . training . . . for law enforcement personnel of the Office of Justice Services[.]" 25 U.S.C. § 2802(e)(1)(A). Congress required that such "training standards" "shall be consistent with standards accepted by the Federal Law Enforcement Training Accreditation commission for law enforcement

---

[4] The United States assumes, <u>arguendo</u>, that certain training is "mandatory" for purposes of this DFE analysis. The United States does not concede that all the referenced training is, in fact, legally mandatory; but, the Court need not find that it is or is not. Even if such training were to be deemed mandatory, the Negligent Training claim is still barred by the discretionary function exception because the officers met all such training requirements.

officers attending similar programs and shall include, or be supplemented by, instruction

regarding Federal sources of authority and jurisdiction . . . to bridge the gap between

State training and Federal requirements." 25 U.S.C. § 2802(e)(1)(B)(i)-(ii).

> The implementing regulations for 25 U.S.C. § 2802 provide:

> The Director of the Office of Law Enforcement Services[5] for the Bureau
> of Indian Affairs (Director) has been delegated the responsibility for . . .
> management of Bureau of Indian Affairs (BIA) criminal investigations,
> drug enforcement, <u>training</u>, internal affairs, inspection and evaluation,
> emergency response forces, and other national level Indian country law
> enforcement initiatives. The Director publishes these policies and standards
> in law enforcement manuals and handbooks.

25 C.F.R. § 12.2 (emphasis added). Specifically, 25 C.F.R. Part 12 requires BIA officers

complete initial basic law enforcement training; annual code of conduct and ethics

training; annual use of force training, to include use of non-lethal measures; and initial

instruction in firearms.  <u>See</u> 25 C.F.R. § 12.11 ("You must follow the minimum standards

outlined in the regulation in this part if you are part of a BIA or tribal law enforcement

program[.]"); 25 C.F.R. § 12.35 ("Law enforcement personnel of any program funded by

the Bureau of Indian Affairs must not perform law enforcement duties until they have

successfully completed a basic law enforcement training course prescribed by the

---

[5] The 2010 Amendments to 25 U.S.C. §§ 2801-02 renamed the "Division of Law
Enforcement Services," making it "Office of Justice Services." However, this change
does not appear to be reflected in the implementing regulations. Regardless, the statutory
amendments make clear that the regulations' reference to DLES (also sometimes referred
to as the Office of Law Enforcement Services (OLES)) is synonymous with use of the
term "OJS." Protection of Indian Arts and Crafts, sec. 211, § 2 ¶ 9 and § 3(b), Pub. L. No.
111-211, 124 Stat. 2258, 2264 (2010); Declaration of Joel Chino Kaydahzinne in Support
of United States' Memorandum in Support of Motion for Partial Dismissal of Second
Amended Complaint ("Chino Decla.") at ¶ 2.

Director. The Director will also prescribe mandatory supplemental and in-service training courses."); 25 C.F.R. § 12.51 ("Training will be conducted on this code of conduct and other ethics issues at least once each year."); 12 C.F.R. § 12.55 ("Training in the use of force, to include non-lethal measures, will be provided annually. All officers will successfully complete a course of instruction in firearms, to include judgement pistol shooting, approved by the Indian Police Academy before carrying a firearm on or off duty.").

Further, the BIA publishes an internal "Indian Affairs Manual" ("IAM") that "documents the current authorities, policies, and procedures of the activities under the jurisdiction of the Assistant Secretary – Indian Affairs . . . ." Chino Decla. at ¶ 3, Exhibit A at 2 (Part 0 IAM § 1.3.)[6] Part 40 of the IAM, "Law Enforcement and Detention," provides "[a]ll law enforcement officers are to successfully complete proper training from initial basic training to specialized, advanced and in-service training as careers progress and duty assignments change." Id., Exh. A at 9 (40 IAM § 2.12(B)).

Part 40 of the IAM further identifies handbooks to be used in law enforcement and detention operations, including the principal guidance, the "Law Enforcement Operations Handbook," formally known as the "Bureau of Indian Affairs Office of Justice Services Law Enforcement Handbook 3rd Edition (2015)" ("Handbook").[7] Chino Decla. at ¶ 4;

---

[6] Relevant portions of the IAM are attached to Chino Decla., at Exh. A; the complete IAM can be accessed at https://www.bia.gov/policy-forms/manual.

[7] Note in the Second Amended Complaint, Plaintiffs refer to the Handbook as "Bureau of Indian Affairs (BIA) Law Enforcement Handbook (last revised: October 1, 1999)" and abbreviate it "BIA Handbook." Doc. 24 at ¶ 60. Plaintiffs are, in fact, referring to the

Exh. A at 3 (Part 40 IAM § 1.2(C)(6)). The Handbook ███████████████████████████

███████████████████████████████████████████ Id. at Exh. B at 7. The

third edition of the Handbook, issued in 2015, is the current edition of the Handbook and

supersedes any former Handbook editions. Id. at ¶ 4, Exh. B at 2. The 2015 version of the

Handbook was in effect at the time of the Gipp shooting. Id. at ¶ 4. The Handbook

provides



Id. at Exh. B at 7.

The Handbook sets out certain law enforcement officer training requirements,

consistent with the relevant statutes and regulations cited above, and is intended to

encapsulate and condense into an accessible form the statutory and regulatory

requirements for Indian Country law enforcement staff. Chino Decla. at ¶ 4. The

Handbook also explains that BIA law enforcement officers are subject to the Department

---

Handbook, but wrongly reference a prior, out-of-date version of the Handbook. For
convenience of the Court, the following serves as a cross-reference from Plaintiffs'
citations in the Second Amended Complaint to the correct provisions in the Handbook:
Plaintiffs' LES-4-1-1 (mandatory pre-service training requirements) is located at
Handbook 6-01 (Chino Decla. at Exh. B at 16-17); Plaintiffs' LES-4-1-3 (mandatory in-
service training) is located at Handbook 6-02 (Chino Decla. at Exh. B at 18); Plaintiffs'
LES 5-1-2, LES 4-1-6 ("use of force" and firearms) are located at Handbook 1-23, 1-24,
2-0. (Chino Decla. at Exh. B at 16-17).

of the Interior's Departmental Manual ("DM") regarding law enforcement, which also contains training requirements. Chino Decla. at ¶ 5, Exh. B at 5, 9-10, 13 (Handbook, at Law Enforcement Code of Conduct at ¶ 8, 1-22-01, 1-23-01(A), 1-24-01(A)). The Departmental Manual provisions regarding law enforcement officer training either mirror those of the Handbook, or are consistent with the Handbook, as displayed in the chart below. See Chino Decla. at ¶ 5, Exh. C at 1 (446 DM 2.1) ("This chapter establishes the standards, qualifications and procedures for selection, training, performance evaluation, conduct and discipline of its law enforcement personnel."). The BIA also has the authority to issue supplementary standards to comply with its specific policy objectives. See id. (446 DM 2.2(A)) ("As appropriate, bureaus/offices are responsible for establishing necessary supplementary standards to comply with laws, regulations and the specific bureau/office mission objectives.").

The following chart identifies, in the first column, the relevant training requirements applicable to this case. These regulations will be analyzed under the two-part test for DFE. The second column identifies how both Webb and Sandland were current and in compliance with respect to the training requirements at the time of the Gipp traffic stop. This proof of compliance information will be of particular relevance, infra, when discussing application of the DFE protections where compliance with mandatory regulations are established.

| TRAINING REGULATION/POLICY PROVISION | PROOF OF COMPLIANCE |
|---|---|
| **Basic Training** | |
| • "Law enforcement personnel of any program funded by the Bureau of Indian | • Sandland joined the BIA-OJS Standing Rock Agency in |

Affairs must not perform law enforcement duties until they have successfully completed a basic law enforcement training course prescribed by the Director. The Director will also prescribe mandatory supplemental and in-service training courses." 25 C.F.R. § 12.35.

- "All requests for evaluation of equivalent training must be submitted to the Indian Police Academy for review, with final determination made by the Director. Requests for a waiver of training requirements to use personnel before completing the required courses of instruction must be submitted to the Director and approved or disapproved by the Commissioner of Indian Affairs. In no case will such a waiver allow personnel to be used in any position for more than one year without achieving training standards. Failure to complete basic training requirements will result in removal from a law enforcement position." 25C.F.R. § 12.36.

- █████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████ Chino Decla. at Exh. B at 16 (Handbook § 6-01).

- █████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████
█████████████████████████ Chino Decla. at Exh. B at 17 (Handbook § 6-01-02).

October 2004, having completed the North Dakota Basic Law Enforcement Training Academy on June 28, 2002. Chino Decla. at ¶ 7, Exh. D. Sandland briefly left service at Standing Rock Agency for a correctional position in April 2007, but returned in October 2007. Id. Officer Sandland also completed the BIA Basic Police Officer Bridge Training Program in 2012. Id., Exh. D. Pursuant to 25 U.S.C. §§ 2802(e)(1)(B) and (C), Officer Sandland's completion of both programs satisfies his basic training requirements because the North Dakota basic training program is an accepted state program, and his completion of the Bridge Training Program bridged the gap between his state training and federal requirements. Id.

- Webb joined the BIA-OJS Standing Rock Agency in March 2009, having completed the Basic Law Enforcement Course at the Mississippi Law Enforcement Officers' Training Academy on March 17, 2005, and the BIA Basic Police Officer Training Program with the United States Indian Police Academy on April 27, 2007. Chino Decla. at ¶ 8, Exh. E. The Indian Police Academy is an approved training curriculum by Federal Law Enforcement Training Center

| | |
|---|---|
| | ("FLETC").[8] Id. at ¶ 8, Exh. B at 16 (Handbook § 6-01-01(A)). |
| **Code of Conduct Training** | |
| • "Training will be conducted on this code of conduct and other ethics issues at least once each year." 25 C.F.R. § 12.51.<br><br>• ███████████████████████████ ███████████████████████████ ████████████████ Chino Decla. at Exh. B at 8 (Handbook § 1-01-01). | • In early 2017, both Webb and Sandland received training on the BIA-OJS code of conduct, code of ethics, and signed the Oath of Office, Law Enforcement Code of Conduct, and Law Enforcement Code of Ethics. Chino Decla. at ¶ 9, Exh. F and G. |
| **Use of Force Training** | |
| • "Training in the use of force, to include non-lethal measures, will be provided annually. All officers will successfully complete a course of instruction in firearms, to include judgement pistol shooting, approved by the Indian Police Academy before carrying a firearm on or off duty." 25 C.F.R. § 12.55<br><br>• ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████ Chino Decla. at Exh. B at 15 (Handbook § 2-01-08).<br><br>• ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████ | • In early 2017, Webb and Sandland completed use of force training pursuant to the Handbook policy 2-01 Use of Force. Chino Decla. at ¶ 10, Exh. H and I.<br>• Webb and Sandland also received the biannual use of force policy training in September 2017, meeting the requirements of the Handbook policy 2-01. Id.<br>• Both use of force trainings that Webb and Sandland received in 2017 discussed a range of types of force, including the use of deadly force as well as non-lethal, or intermediate levels of force. See id. |

---

[8] The Handbook refers to the FLETC throughout its provisions, which is an abbreviation the Federal Law Enforcement Training Center. See Chino Decla. at Exh. B at 16 (Handbook § 6-01-01).

---

[9] ██████████████████████████████████████████████████████████ Chino Decla. at Exh. B at 10 (Handbook § 1-23-01(C).

| | |
|---|---|
| ██████████████████████ Id. at 10 (Handbook § 1-23-01(C)).<br>• "Bureaus and offices will ensure that LEOs and AFSGs are trained in alternative methods and tactics for handling resisting subjects." Id. at Exh. C at 15 (446 DM 20.8(A)).[10] | |
| **Firearms** | |
|  | • In September 2017, Webb and Sandland were certified and authorized to carry firearms by a FLETC-certified instructor in the BIA PPC for Pistols, 6139 Colt AR-15, and Advanced Shotgun courses of fire, meeting the requirements of the Handbook policy 1-23 and related provisions in the DM. Chino Decla. at ¶ 11, Exh. J and K. |

---

[10] In the Departmental Manual, LEO refers to Law Enforcement Officer and AFSG refers to Armed Federal Security Guard. Chino Decla. at Exh. C at 14 (446 DM 20.1).

███████████████████████████████████

███████████████████████████████████ _Id._
(Handbook § 1-23-03(A)-(B)).

- ███████████████████████████████

  ████████████████████████████ _Id._
  at 10 (Handbook § 1-23-01(D)).

- "All law enforcement officers required to carry handguns shall fire, a minimum of twice a year, for record, on an approved firearms course of fire using the government-issued and/or personally owned firearms, which he/she is authorized to carry by the bureau/office head. A proficiency test meeting the standards of the FLETC qualification course for shotguns and rifles shall be conducted a minimum of twice a year for those officers authorized to use and/or carry such weapons. The shotguns or rifles fired during the course should be similar to those issued by the bureau/office. Departmental law enforcement officers must attain a score of 70 percent or better for each firearm they are authorized to carry." _Id._ at Exh. C at 5 (446 DM 2.4(B)).

- "All law enforcement officers authorized to carry firearms shall qualify at least semiannually, participating in an approved course of fire, with any and all Departmental-issued and/or approved personally-owned firearms, carried with the concurrence of the bureau/office. Departmental law enforcement officers must attain a score of 70 percent or more with each firearm they are authorized to carry." _Id._ at Exh. C at 11 (446 DM 10.7(B)).

- "All firearms qualifications shall be conducted and documented by a qualified firearm instructor. The documentation shall be recorded in the employee's training records." Id. (446 DM 10.7(B)(1)).
- "All firearms training shall be conducted and supervised by qualified firearms instructors. Firearms instructors, so designated by bureaus/offices within the Department, will be trained and certified according to standards established and approved by the Federal Law Enforcement Training Center (FLETC) or the Federal Bureau of Investigation (FBI). However, if no instructors with these certifications are available, an instructor certified by the State in which the firearms training is being conducted may supervise the employee's participation in a course of firearms approved by the Director, MRPS. Courses and training presented by other Federal agencies may be substituted, pending the approval of the Director, MRPS." Id. (446 DM 10.7(B)(2)).
- "Bureaus/offices shall develop defensive weapons guidelines to ensure that law enforcement officers are properly trained and certified in the use of the defensive weapons they are authorized to carry." Id. at 12 (446 DM 10.9).
- "Bureaus and offices will ensure LEOs and AFSGs meet all applicable firearms, less-than-lethal weapons, and physical techniques training and proficiency requirements established under policy prior to deploying such weapons and techniques in a use of force." Id. at 16 (446 DM 20.8(B)).

| **Electronic Control Devices** | |
| --- | --- |
| • ███████████████████████████ | • In early 2017 Webb and Sandland completed electronic control device policy training pursuant to |



| | |
|---|---|
| <span style="visibility:hidden">redacted</span><br> Chino Decla. at at Exh. B at 14 (Handbook § 1-24-03(A)).<br><br>• <span style="visibility:hidden">redacted</span><br> Id. (Handbook § 1-24-03(B)).<br><br>• <span style="visibility:hidden">redacted</span><br> Id. at 10 (Handbook § 1-23-01(D)).<br><br>• <span style="visibility:hidden">redacted</span><br> Id. at 12 (Handbook § 1-23-06(A)). | the Handbook policy 1-24 Electronic Control Devices. Chino Decla. at ¶ 12, Exh. L and M. Officer Webb and Sandland's training supervisor, Lt. Jeff Ward, served as the Standing Rock Agency's Taser instructor from 2016 to 2018, and certified that both officers completed Taser training in 2017. Declaration of Lt. Jeff Ward, ¶ 3. In June 2016 Ward had completed the Taser X26, X2, & X26 Conducted Electrical Weapon Instructor Certification conducted by David Townsend, a Taser Master Instructor with TASER International, Inc. The training was held at the Indian Police Academy/Federal Law Enforcement Training Center in Artesia, New Mexico. Ward's certification was valid through June 28, 2018.  Id. at ¶ 2. |
| **Annual In-Service Training** | |
| • <span style="visibility:hidden">redacted</span><br> Chino Decla. at 18 (Handbook § 6-02-01(A)). | • The 2017 annual performance reviews for both Webb and Sandland certified that each officer received at least 40 hours of in-service training. Chino Decla. at ¶ 13, Exh. N at 10–11, and Exh. O at 10–11. |

### 2.    The Method and Means of BIA Law Enforcement Training Is Subject to the Discretionary Function Exception.

While training is mandated for certain <u>general</u> subject matters—such as biannual firearms training, or minimum hours of in-service training—the Handbook does not specify the specific content, means, or methods of such training, leaving these decisions to the discretion of the BIA. Accordingly, in order for Plaintiffs to proceed on their theory that Webb and Sandland were negligently (<u>i.e.</u>, not properly) trained, Plaintiffs must defeat the United States' contention that the methods and means of training is subject to the discretionary function exception. Because the United States can establish that Webb and Sandland completed the required training in the general subject matters, the United States is entitled to DFE protections under <u>Gaubert</u>.

#### a.    Part one of the DFE test is satisfied because BIA officer training necessarily involves discretion as to the means and methods of implementing mandatory minimum training requirements.

"Where there is room for policy judgment and decision there is discretion." <u>Varig Airlines</u>, 467 U.S. at 811. "Even when some provisions of a policy are mandatory, governmental action remains discretionary if all of the challenged decisions involved 'an element of judgment or choice.'" <u>Compart's Boar Store</u>, 829 F.3d at 605 (quoting <u>Hart</u>, 630 F.3d at 1086). Moreover, "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." <u>Miller v. United States</u>, 163 F.3d 591, 595 (9th Cir. 1998). The <u>Miller</u> court explained:

> [W]hile the above standards and procedures outline certain requirements for fire suppression, they do not eliminate discretion because they do not tell firefighters how to fight the fire. As the district court phrased it, they did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time.

Id.

The Eighth Circuit has held similarly, reasoning that a particular general requirement may be mandated; but, if the mandate does not direct the actor on how it must specifically fulfill the requirement, the actor retains discretion to choose the means and manner to accomplish the goal:

> Applying the Supreme Court's two-part test, we find that the defendant's decision to adopt civilian screening procedures was a protected exercise of judgment within the discretionary function exception. First, the decision was discretionary because it involved the exercise of judgment and choice. Indeed, there are no mandatory regulations or policies directing the MBPO to adopt particular blood screening procedures. To be sure, Directive 6480.5 directed the MBPO to "develop . . . policies" concerning blood "collection, procurement, processing, storage, distribution, and management." Directive 6480.5, supra, at 3. The directive, however, vested the MBPO with broad discretion to choose the type of screening procedures it deemed appropriate, leaving even the choice of how to go about making this decision to the MBPO. Plaintiffs have failed to identify any regulation or policy that "specifically prescribe [d] a course of action" for the defendant to follow in selecting screening procedures. We thus hold that the MBPO had discretion in determining what screening procedures to adopt.

C.R.S. by D.B.S. v. United States, 11 F.3d 791, 796 (8th Cir. 1993) (emphasis in original). The Eighth Circuit concluded that "[i]n short, the issue of what screening procedures to adopt is precisely the type of policy-bound decision that Congress intended to insulate from judicial scrutiny through the discretionary function exception." Id. at 797.  See also Sabow v. United States, 93 F.3d 1445, 1453 (9th Cir. 1996) ("the presence

of a few, isolated provisions cast in mandatory language does not transform an otherwise

suggestive set of guidelines into binding agency regulations."").

More specifically, the district court in Guerrero v. United States explained how

discretion is inherent in training of law enforcement:

> Further, the manner in which a law enforcement agency trains and oversees
> its officers is a function that involves a large measure of discretion. For
> each topic about which a department might train its officers—proper
> procedures for search and seizure, reading of Miranda warnings, the rights
> that a criminal suspect has before being officially charged, when and how
> to use force, when and how to use deadly force, firearms training, tactical
> or defensive driving—there is the initial layer of discretion: does the
> department train the officer on this topic? And then there is a <u>broader array
> of discretion in selecting what about each topic the officer should be taught,
> and how the instructor should teach it.</u>

No. CV-12-00370, 2012 WL 12842348, at *3 (D. Ariz. Dec. 19, 2012) (emphasis added).

Here, BIA policies require that officer training address certain broad categories of

subject matter, such as use of force and firearm certification; however, the authority does

not dictate the specifics of <u>how</u> the BIA must approach that subject matter during

training. How the training is actually conducted is left to the discretion of the BIA. The

first element of the discretionary function exception test is satisfied because it is

ultimately up to the United States, acting through the BIA, to determine the content of

that training and how it is to be conducted.

Plaintiffs will likely attempt to challenge the United States' position by citing to

this Court's decision in Gooden v. U.S. Dep't of Interior, 339 F. Supp. 2d 1072 (D.N.D.

2004). In Gooden, the United States moved for summary judgment under the

discretionary function exception on the plaintiff's negligent hiring, supervision, and

training claims in connection with an alleged injury sustained during a vehicle stop by

BIA officers. Id. at 1075–76. The plaintiff conceded the negligent hiring claim fell within

the discretionary function exception. Id. at 1077. This Court held the negligent

supervision claim was covered by the discretionary function, and dismissed it. Id. at

1079–80. As to the negligent training claim, this Court determined genuine issues of

material fact precluded summary judgment on apparent mandatory training provisions in

the Handbook. Id. at 1078–79.

Gooden is distinguishable; the facts here warrant dismissal. In Gooden, the United

States presented no arguments explaining the United States' inherent discretion in

implementing applicable mandatory training provisions. See generally id.; Gooden v.

United States, Doc. A4-03-070 14 and 22. Accordingly, that issue was not addressed by

the Court. Gooden, 339 F. Supp. 2d. at 1077–79. Further, the Court in Gooden did not

hold that DFE never applies to BIA law enforcement training. Rather, the Court simply

concluded that the evidence and argument presented by the United States at that time did

not compel a finding of DFE. Id. at 1079. Here, the applicable provisions, as well as the

discretion allowed by those provisions, have been presented for the Court; the DFE

training issue is ripe for decision. Further, the questions of fact identified by the Court in

Gooden are not present here.[11]

_____

[11] In resolving the motion for summary judgment, the Gooden court applied the summary judgment standard to whether the discretionary function exception applied, rather than the jurisdictional standard of review, which would be applied here based on the procedural posture of the case. Compare id. at 1075, with Johnson v. United States, 534 F.3d 958, 962 (8th Cir. 2008) (citation omitted) ("A district court has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate

Review of the applicable training provisions demonstrates that the manner and methods of completing even the "mandatory" BIA law enforcement training is ultimately left to the discretion of the BIA. Certain training must be done; but, there is no corresponding mandate that the training must be completed in specified ways, what the specific content must be, etc. The first element of the discretionary function analysis is satisfied.

> b.  Part two of the DFE test is satisfied because BIA officer training decisions involve policy judgments of the type Congress intended to shield from FTCA liability.

The subject matter of Plaintiffs' Negligent Training claim also satisfies the second element of the discretionary function test, which is "whether the challenged governmental decision involves the type of discretion that Congress intended to shield from liability." Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995) (citing Berkovitz, 486 U.S. at 537). In Vickers v. United States, the Court collected numerous Circuit Court of Appeals cases, which "have held that decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." 228 F.3d 944, 950 (9th Cir. 2000) (citing Gager v. United States, 149 F.3d 918, 920–22 (9th Cir. 1998); Nurse v. United States, 226 F.3d 996, 1001–02 (9th Cir. 2000); Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1216–17 (D.C. Cir. 1997); Tonelli, 60 F.3d at 496; Richman v. Straley,

---

bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.") (emphasis added).

48 F.3d 1139, 1146 (10th Cir. 1995); <u>Attallah v. United States</u>, 955 F.2d 776, 784–85 (1st Cir. 1992)) (emphasis added).

In addition, the Sixth Circuit has held that a negligent training claim against the FBI was barred by the discretionary function exception. <u>Snyder v. United States</u>, 590 Fed. Appx. 505, 510 (6th Cir. 2014) (citations omitted). In <u>Snyder</u> the court reasoned that "[b]ecause FBI hiring, supervision, <u>training</u>, and retention require policy judgments—the type that Congress intended to shield from tort liability—and because Plaintiff failed to allege the United States' nonconformance with any applicable regulations, we find that the district court lacked subject matter jurisdiction." <u>Id.</u> (emphasis added).

Relying on <u>Vickers</u> and similar precedent, the District of Montana determined the United States Forest Service's decisions regarding training of its law enforcement officers were discretionary, and found claims challenging such training were barred. <u>Bisom v. United States</u>, No. CV-13-42, 2015 WL 12591718 at *1 (D. Mont. May 11, 2015) ("the government's decisions as to how Officer Taylor should be trained and supervised . . . are of the kind shielded by the discretionary function exception to the Federal Tort Claims Act"). As explained by the district court in <u>Guerrero</u>:

> [A] law enforcement agency's training and supervision of its officers involves substantial policy considerations. Training costs money, and therefore the agency must consider what officers to train, and which topics to train these officers on, in light of available funding. In making this decision, the agency must also consider that certain training modules serve different purposes. Some enhance the safety of the public, such as firearm and vehicular training. Some increase the efficiency of prosecuting individuals charged with crimes, such as Fourth and Fifth Amendment training.

2012 WL 12842348, at *3. BIA officer training decisions are of the type Congress

intended to exempt from tort liability.

> c.      Webb and Sandland Successfully Completed All
> Mandatory Training and the United States is Entitled to
> the Discretionary Function Exception.

Even if one concludes the general training requirements are mandatory, the United

States has established that the means and methods of accomplishing those requirements

are left to BIA and therefore subject to the DFE. Accordingly, the Negligent Training

claim is subject to the discretionary function exception because the United States

established that Webb and Sandland completed the mandatory training.

The table on pages 13–19, supra, identifies the "required" training in the left

column, and shows the officers' completion of that training in the right column. At the

time of the shooting, both Webb and Sandland were current and in full compliance with

all the training provisions referenced by Plaintiffs in the Second Amended Complaint or

otherwise required by the BIA. This includes basic law enforcement training, use of force

training, firearm qualification, and general in-service training.

Under Gaubert, compliance with mandatory general requirements—to undergo

training—ends the inquiry and affords the United States the protections of the DFE.

Gaubert, 499 U.S. 324 ("[I]f a regulation mandates particular conduct, and the employee

obeys the direction, the Government will be protected because the action will be deemed

in furtherance of the policies which led to the promulgation of the regulation.") (citing

Dalehite, 346 U.S. at 36); see also Tracor/MBA, Inc. v. United States, 933 F.2d 663, 666-

67 (8th Cir.1991) (citing Gaubert for proposition that discretionary function exception

26

protects governmental conduct if regulation mandates particular conduct and government employee obeys direction); Archambault, 82 F. Supp. 3d at 966 (discussing Gaubert DFE protections if mandatory regulations are complied with).

> Where Congress has granted an agency discretion in implementing a regulatory statute, the agency's promulgation of regulations or guidelines describing how it will use that discretion is protected by the discretionary function exception. "Furthermore, if the regulation or guideline mandates particular conduct, and the agency's employee obeys the direction, the Government will be protected by the discretionary function exception because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation or guideline."

Addison v. United States, Civil No. CV211-176, 2012 WL 2863434 at *3 (S.D. Ga. April 16, 2012) (citations omitted in quotation) (quoting Cohen v. United States, 151 F.3d 1338, 1344 (11th Cir. 1998)).

As discussed above, it is well-established that training provisions implicate policy considerations at the agency level. It is also demonstrated above that Webb and Sandland complied with any applicable mandatory directives regarding their law enforcement officer training. Plaintiffs' negligent training claim must be dismissed pursuant to the DFE.

## II. Plaintiffs' Negligence and Negligent Training Claims Fail to State a Claim upon which Relief can be Granted and Must be Dismissed Under Iqbal.

### A. Legal Standard - Fed. R. Civ. P. 12(b)(6).

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must plead facts that, if true, state a claim as a matter of law. "The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." Benton v. Merrill

Lynch & Co., 524 F.3d 866, 870 (8th Cir. 2008), citing Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007).

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to "state a claim to relief that is plausible on its
> face." A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged. The plausibility standard is
> not akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully. Where a complaint pleads
> facts that are "merely consistent with" a defendant's liability, it "stops short
> of the line between possibility and plausibility of 'entitlement to relief.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (internal citations omitted). "[T]he pleading standard

Rule 8 announces does not require 'detailed factual allegations,' but it demands more

than an unadorned, the-defendant-unlawfully-harmed me accusation." Id. (quoting

Twombly, 550 U.S. at 555). "A gallimaufry of labels, conclusions, formulaic recitations,

naked assertions and the like will not pass muster." Christiansen v. West Branch Cmty.

Sch. Dist., 674 F.3d 927, 934 (8th Cir. 2012) (citing Twombly, 550 U.S. at 555-57).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint

is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678–

79 (citations omitted).

### B.   The Negligence Claim Must be Dismissed Because Plaintiffs Fail to Allege a Plausible Claim for Relief.

In Count III – Negligence, Plaintiffs purport to allege the United States negligently

caused Gipp's death. But, rather than alleging facts supporting such a claim, Plaintiffs

merely recite the elements of a negligence cause of action:[12] duty, breach, causation,

damages:

> 47. Ryan Gipp was subjected to unnecessary and unreasonable force, both when BIA agents tasered him and when they shot him while he was unarmed and posed no danger to the officers or anyone else.[13]
>
> 48. This unreasonable use of deadly force resulted in Ryan Gipp's wrongful death.
>
> …
>
> 52. BIA Officers had a duty to protect the health and safety of others, including criminal suspects.
>
> 53. BIA Officers also had a duty to not use force other than that which is reasonable, necessary, and appropriate.
>
> 54. The acts and omissions at the scene where Ryan Gipp was shot constitute a breach of that duty of care with respect to Ryan Gipp by federal employees while acting in the course and scope of their office or employment
>
> 55. This breach was a direct and proximate cause in Ryan Gipp's death.
>
> 56. The acts and omission by federal employees described herein constitute the tort of negligence under the laws of North Dakota.
>
> 57. Under the Federal Tort Claims Act, Defendant United States of America is liable for these acts and omissions.
>
> 58. As a result of Ryan Gipp's death, Plaintiffs have sustained damages allowed under North Dakota law including lost benefits of a parental

---

[12] "In actions brought against the United States under the FTCA, the Court is to apply the law of the place where the alleged negligence occurred." Poitra v. United States, No. 4:09-CV-048, 2011 WL 1311729, at *3 (D.N.D. Apr. 4, 2011). "Since the FTCA's enactment in 1948, the 'law of the place' has meant the law of the state where the negligent act or omission occurred." Mentz, 359 F. Supp. 2d at 860. Under North Dakota law, "[t]o succeed in a negligence claim, the plaintiff must prove that the defendant owed a duty to the plaintiff, the defendant breached that duty, and the plaintiff has suffered an injury that was proximately caused by the defendant's negligence." Beckler v. Bismarck Pub. Sch. Dist., 711 N.W.2d 172, 175 (N.D. 2006) (citing Fast v. State, 680 N.W.2d 265, 268 (N.D. 2004)).

[13] Plaintiffs' allegation that the officer "shot [Gipp] while he was unarmed and posed no danger to the officers or anyone else" is a statement of opinion, not fact, and does not begin to address the complexity of the situation. Plaintiffs acknowledge, as they must, that during the course of the incident Gipp had at least one firearm, which he discharged in Ft. Yates. Doc. 24 at ¶¶ 12, 14, 17.

> relationship such as emotional and financial support, the full amount
> of said damages to be proven at trial.

Doc. 24.

Plaintiffs fail to plead facts sufficient to allow the Court to determine whether there was an identifiable, established duty under North Dakota law under the facts of this case. "To establish an actionable negligence, the plaintiff must show the defendant had a duty to protect the plaintiff from injury." Azure v. Belcourt Pub. Sch. Dist., 2004 ND 128, ¶ 9, 681 N.W.2d 816, 819. "'Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." Id. at 820 (quoting 57A Am. Jur. 2d. Negligence § 89 (1989 & Supp. 2002)). The existence of a duty is a question of law to be determined by the Court. Rice v. N. Star Energy & Constr., LLC, No. 4:15-cv-167, 2019 WL 7372434, at *3 (D.N.D. Dec. 31, 2019) (citing Gullickson v. Torkelson Bros., Inc., 598 N.W.2d 503, 504 (N.D. 1999)).

Plaintiffs further fail to allege sufficient facts to support their claim that the United States breached any established duty, or how the breach proximately caused Gipp's death. "'[N]aked assertion[s]' without 'factual enhancement' are insufficient to state a plausible claim for relief." Christiansen, 674 F.3d at 936 (quoting Twombly, 550 U.S. at 557). Count III is a claim based on an assumption that because the high-risk stop culminated in Gipp's death, the BIA must have been negligent. However, "[n]egligence, must be affirmatively proved, and will not be presumed merely from the occurrence of the accident or damages." Victory Park Apartments, Inc. v. Axelson, 367 N.W.2d 155,

158 (N.D. 1985) (citation omitted). These allegations are exactly the type of "gallimaufry of labels, conclusions, formulaic recitations, naked assertions and the like [that] will not pass muster." Christiansen, 674 F.3d at 934 (citing Twombly, 550 U.S. at 555-57). The bare assertion that the BIA officers used lethal force does not automatically demonstrate negligence, and Plaintiffs provide no further factual enhancement to move Count III from naked assertions to plausible claims for relief. See id. at 936 (quoting Twombly, 550 U.S. at 557); Iqbal, 556 U.S. at 678-79. Where, as here, a plaintiff "has not 'nudged [their] claims' of [negligence] 'across the line from conceivable to plausible," such claims are not entitled to be assumed as true to pass Rule 8 muster, and must be dismissed. Iqbal, 556 U.S. at 680–83 (quoting Twombly, 550 U.S. at 570). Accordingly, Count III of Plaintiffs' Second Amended Complaint must be dismissed for failure to state a claim.[14]

---

[14] Plaintiffs have alleged two inconsistent claims: intentional assault and battery, and negligence. Doc. 24 at ¶ 45–58. Both claims are premised upon the exact same set of actions by the United States; namely, that the use of force against Gipp resulted in his death. Id. at ¶¶ 11–32, 45–57. If Plaintiffs wish to continue to assert an intentional tort here, they will have to give up on their negligence claim—they cannot recover for both. Phillips-Van Heusen Corp. v. Shark Bros., 289 N.W.2d 216, 221–22 (N.D. 1980). "[T]here is generally no claim of negligence that flows from intentionally tortious conduct." BP Chemicals Ltd. v. Jiangsu Sopo Corp., 285 F.3d 677, 685 (8th Cir. 2002) (finding as a matter of law the negligence claim invalid because it rested on the performance of intentionally tortious acts) (citing Restatement (Second) of Torts § 282 cmt. d (1965); United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 353 (2d Cir.1993) (recognizing the "mutual exclusivity of negligence and battery"); and Hockensmith v. Brown, 929 S.W.2d 840, 845 (Mo.Ct.App.1996) ("The theories of negligence and intentional tort are contradictory and mutually exclusive.")); see also State Farm Fire & Cas. Co. v. van Gorder, 235 Neb. 355, 358, 455 N.W.2d 543, 545 (1990) ("There is no such cause of action as negligent assault and battery. An assault and battery is an intentional act, whereas negligence is unintentional."). At some point, Plaintiffs will have to settle upon one theory or the other because "negligence claims related to a government employee's assault or battery are barred by § 2680(h) unless the claimed 'negligence arose out of an independent, antecedent duty unrelated to the employment relationship

**C.     The Negligent Training Claim Must be Dismissed Because Plaintiffs Failed to Allege a Plausible Claim for Relief.[15]**

In Count IV – Negligent Training, Plaintiffs allege the BIA negligently trained Webb and Sandland. Even if one accepts, <u>arguendo</u>, that the BIA mandate that officers complete certain categories of training creates a duty, Plaintiffs do not allege any facts showing how the United States breached such duty, or how that breach proximately caused Gipp's death. The Negligent Training claim consists only of legal conclusions and bare assertions that the BIA was negligent in training Webb and Sandland:

59.    The BIA had a duty to properly train the officers involved in the above-described incident in order to protect the health and safety of others.

60.    The Bureau of Indian Affairs (BIA) Law Enforcement Handbook (last revised: October 1, 1999) mandates certain pre-service and in-service training for all BIA law enforcement officers. <u>See, e.g.,</u> BIA Handbook LES-4-1-1 (mandatory pre-service training requirements), LES-4-1-3 (mandatory in-service training).

61.    The mandated training includes training in "use of force" and firearms. <u>See, e.g.,</u> BIA Handbook LES 5-1-2, LES 4-1-6.

62.    By its negligence, the BIA breached this duty.

63.    This breach was a direct and proximate cause in Ryan Gipp's death.

64.    These acts and omissions by the BIA constitute the tort of negligence under the laws of North Dakota.

65.    Under the Federal Tort Claims Act, Defendant is liable for these acts and omissions.

66.    As a result of Ryan Gipp's death, Plaintiffs have sustained damages allowed under North Dakota law including lost benefits of a parental

---

between the tortfeasor and the United States.'" <u>Iverson v. United States</u>, CV No. 18-323, 2018 WL 3637530, at *3 (D. Minn. July 31, 2018) (quoting <u>Olson v. U.S. Postal Serv.</u>, No. 14cv3213, 2015 WL 4488438, at *4 (D. Minn. July 23, 2015) (Ericksen, J., adopting R. & R. of Thorson, M.J.) (quoting <u>Billingsley v. United States</u>, 251 F.3d 696, 698 (8th Cir. 2001)). "Because the duty he alleges is not independent of the agents' status as agents, his negligence claim is barred by § 2680(h) and must be dismissed." <u>Id.</u>

[15] This argument is made in the alternative, in the event the Negligent Training claim is not dismissed for lack of subject-matter jurisdiction under the DFE.

relationship such as emotional and financial support, the full amount
of said damages to be proven at trial.

Doc. 24 at ¶¶ 59–66.

The Second Amended Complaint does not contain any allegations supporting
negligent conduct of the United States for failing to properly train its officers. Rather,
Plaintiffs make only general statements about the elements required for negligence and
legal conclusions as to the negligent conduct of the BIA. Count IV concludes only that
the BIA was negligent in training the involved officers because Gipp died during the
high-risk stop, but provides no factual allegations as to how the BIA breached any duties
it may have had. Again, these allegations are the type of "gallimaufry of labels,
conclusions, formulaic recitations, naked assertions and the like [that] will not pass
muster." Christiansen, 674 F.3d at 934 (citing Twombly, 550 U.S. at 555–57).

The bare assertion that the BIA officers used lethal force does not automatically
demonstrate negligence or negligent training and Plaintiffs provide no further factual
enhancement to move this claim from naked assertions to a plausible claim for relief. See
id. at 936 (quoting Twombly, 550 U.S. at 557); Iqbal, 556 U.S. at 678–79. Where, as
here, a plaintiff "has not 'nudged [their] claims' of [negligence] 'across the line from
conceivable to plausible,'" such claims are not entitled to be assumed as true to pass Rule
8 muster, and must be dismissed. Iqbal, 556 U.S. at 680-83 (quoting Twombly, 550 U.S.
at 570). Plaintiffs' Negligent Training claim must be dismissed.

## CONCLUSION

The real issue before this Court is whether the use of deadly force against Gipp was appropriate. This issue is squarely addressed by Plaintiffs' claim under Bivens and under the assault and battery FTCA claim. The negligence-related claims are not on point, and seem to have been included "just in case" there are problems with the intentional tort claims. However, Plaintiffs cannot muster sufficient factual allegations to establish any prima facie negligence claim. The Negligence and Negligent Training claims are thrown into the Complaint in an attempt to cover all the bases—Constitutional tort, intentional tort, negligent tort. However, Plaintiffs' Negligent Training claim is barred by the discretionary function exception to the FTCA, and the Negligence and Negligent Training arguments both fail to state a claim upon which relief can be granted. The United States requests the Court dismiss, with prejudice, Counts III and IV of the Second Amended Complaint.

Dated:  August 25, 2020

DREW H. WRIGLEY
United States Attorney

By:     /s/ Sarah E. Wall
JAMES PATRICK THOMAS
Assistant United States Attorney
ND Bar ID 06014
TARA VAVROSKY IVERSEN
Assistant United States Attorney
MN Bar ID 0387790
SARAH E. WALL
Assistant United States Attorney
ND Bar ID 07822
P.O. Box 699
Bismarck, ND  58502-0699

(701) 530-2420
james.p.thomas@usdoj.gov
tara.iversen@usdoj.gov
sarah.wall@usdoj.gov

Attorneys for
United States of America