IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| ELIAS GIPP, ET AL., | Case No. 1:19-cv-00213 |
| Plaintiffs, | |
| v. | UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

The United States submits this memorandum in support of its motion for summary judgment. Plaintiffs allege one count of assault and battery and one count of negligence against the United States arising out of the tasing and shooting death of George "Ryan" Gipp, Jr. ("Gipp"). These claims are brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671-2680 (2006). The United States is entitled to summary judgment because the undisputed evidence shows the use of force in question was justified under North Dakota law. At the time of the use of force during a high-risk traffic stop (much of which can be seen on a dashcam recording), the responding officers reasonably believed Gipp was armed.

Further, Gipp's actions during the encounter, such as ignoring officer commands, picking car keys off the ground, approaching the officers contrary to instructions, refusing to show hands or keep them above his head, repeatedly reaching into a weighed-down hoodie pocket, and other aggressive actions, heightened the perceived threat level. The use of a taser under such circumstances is justified under North Dakota law. After deployment of the taser, Gipp continued to ignore commands, ran behind a police vehicle, behaved in a manner consistent with an ambush, pulled a black shiny object out of his pocket, and started to turn towards one of the officers, who reasonably believed the object was a firearm. The use of deadly force under such

1

circumstances is justified under North Dakota law. Summary judgment in favor of the United States is warranted.

## <u>EVIDENCE GUIDE</u>

The following evidence items are cited in support of this motion and are all currently on file with the Court, as attachments to the pending United States' Motion for Leave to File Certain Documents Under Seal and Conventionally, at ECF 113-2–113-22.[1]

(1) Exhibit 1:  04/20/2022 Deposition of Raymond Webb ("Webb Dep.");

(2) Exhibit 2:  10/26/2017 FBI Interview of Raymond Webb ("Webb FBI Interview");

(3) Exhibit 3:  09/13/2022 Deposition of Becky Sandland-Gullickson ("Sandland-Gullickson Dep.");

(4) Exhibit 4:  FBI 302 and select photographs of location where Ryan Gipp's shotgun was found, along with photographs of the shotgun itself, taped-on bayonet and flashlight, and ammunition ("FBI – Shotgun photos");

(5) Exhibit 5:  10/26/2017 FBI Interview of Gary Sandland, Jr. ("Sandland FBI Interview");

(6) Exhibit 6:  04/21/2022 Deposition of Gary Sandland, Jr. ("Sandland Dep.");

(7) Exhibit 7:  10/31/2019 BIA Internal Affairs Interview of Raymond Webb, BIA Transcription ("BIA-IA Webb IA Interview – IA Tr.");

(8) Exhibit 8:  10/31/2019 BIA Internal Affairs Interview of Raymond Webb, Plaintiffs' Transcription ("Webb IA Interview – P Tr.");[2]

(9) Exhibit 9:  11/30/2022 Deposition of George Gipp, Sr. ("George Gipp Dep.");

---

[1] The motion for leave to file under seal is fully briefed. (ECF 113). Once it is decided, the United States will file sealed, unsealed, or redacted versions of the Exhibits consistent with the Court's rulings.

[2] BIA Internal Affairs and Plaintiffs' counsel each had the BIA interview with Officer Webb transcribed. For completeness, both transcripts are submitted as exhibits (Exhibits 7 and 8) because there are some slight discrepancies between them. If the Court would find it helpful, the United States can conventionally file the audio recording for this interview. The United States also has the FBI audio recordings associated with Exhibits 2, 5, 18 and 19, and the deposition videos associated with Exhibits 1, 6, 9, and 13, and can file those as well, upon request.

(10)        Exhibit 10:  Dashboard Camera #1 Video ("Dashcam Video #1");

(11)        Exhibit 11:  Dashboard Camera #3 Video ("Dashcam Video #3");

(12)        Exhibit 12:  Officer Raymond Webb's Taser Video ("Taser Video");

(13)        Exhibit 13:  11/29/2022 Deposition of Roberta Gipp ("Roberta Gipp Dep.");

(14)        Exhibit 14:  FBI 302, Photographic Log, and select photographs of evidence items recovered from the scene ("FBI Scene photos");

(15)        Exhibit 15:  Scene photograph taken by Officer Webb shortly after the shooting ("BIA-IA Scene photo");

(16)        Exhibit 16:  FBI 302 and select photographs of evidence recovered from the autopsy of Ryan Gipp ("Autopsy photos");

(17)        Exhibit 17: FBI 302 and select photographs of evidence items recovered during search of George Gipp, Sr.'s vehicle ("FBI Vehicle Search photos");

(18)        Exhibit 18:  10/24/2017 FBI Interview of George Gipp, Sr. ("George Gipp FBI Interview");

(19)        Exhibit 19:  10/24/2017 FBI Interview of Roberta Gipp ("Roberta Gipp FBI Interview");

(20)        Exhibit 20:  Office of Attorney General Crime Laboratory Toxicology Drug Screening Analytical Report dated November 30, 2017 ("Toxicology Report"); and,

(21)        Exhibit 21:  Plaintiffs' Second Supplemental Responses to Defendant United States' First Set of Discovery, dated June 14, 2022.

The foregoing exhibits were produced during discovery by the parties. The documents produced by the United States are further authenticated by declarations of federal law enforcement officials, filed herewith:  Declaration of Raymond Webb in Support of United States' Motion for Summary Judgment dated August 30, 2023 ("Webb Decl.") (Raymond Webb is a BIA Police Officer); Declaration of Gary Sandland, Jr. in Support of United States' Motion for Summary Judgment dated August 30, 2023 ("Sandland Decl.") (Gary Sandland is a BIA Police Officer); Declaration of Murray H. Spence in Support of United States' Motion for Summary Judgment dated August 30, 2023 ("Spence Decl.") (Murray Spence is a BIA

Supervisory Police Officer); Declaration of Justin Wendland in Support of United States' Motion for Summary Judgment dated August 30, 2023 ("Wendland Decl.") (Justin Wendland is a Deputy Chief at BIA Internal Affairs Division); and Declaration of Brian R. Hoff in Support of the United States' Motion for Summary Judgment dated August 24, 2023 ("Hoff Decl.") (Brian Hoff is a Special Agent with the FBI).

## FACTUAL BACKGROUND

Plaintiff Corrine Kopp is the mother and natural guardian of Gipp's minor children, S.G. 1 and S.G. 2, as well as the mother and purported legal guardian of plaintiff Elias Gipp, an adult, disabled son of Gipp. Second Amended Complaint, at ¶ 6 (ECF 24).[3]

### A.   Ryan Gipp Discharges a Shotgun at Hagel's Gas Station.

On October 23, 2017, Gipp was out with his parents, George Gipp, Sr. and Roberta Gipp, allegedly turkey hunting. *Id.,* at ¶ 11. At around 7:30 p.m., they stopped at Hagel's Gas Station in Fort Yates, North Dakota. *See id.* While there, Gipp discharged his shotgun in the parking lot. *Id.,* at ¶ 12. The Gipp family drove away from Hagel's. *See id.*, at ¶ 13. BIA Officers learned shots were fired. *Id.*, at ¶ 14.[4]

---

[3] "Allegations in a complaint are binding admissions." *L.L. Nelson Enterprises, Inc. v. Cnty. of St. Louis*, Mo., 673 F.3d 799, 806 (8th Cir. 2012).

[4] While Plaintiffs allege the discharge was accidental (Sec. Amend. Compl., at ¶ 12 (ECF 24), a worker at Hagel's heard the shooting, looked out the window, and saw Gipp standing with his feet apart in a shooting stance, holding the gun at eye level, aiming at something, with the shotgun pointing at the road to the north of Hagel's. Sandland-Gullickson Dep., at 29:15-30:10, 79:23-83:1 (Ex. 3). After Gipp fired the gun, he took two or three steps forward with the gun still raised. *Id.* The witness looked in the direction where Gipp had fired the weapon and saw the taillights of a vehicle driving away. *Id.* at 80-83. Gipp cycled the pump-shotgun, as evidenced by the expended round later found at Hagel's, and the live round in the chamber when the FBI later found the shotgun. *See* Sec. Amend. Compl., at ¶ 30 (ECF 24) (a spent shotgun shell was found at Hagel's); FBI – Shotgun Photographs, FBI-000156 (Ex. 4) (showing a round in the chamber when FBI later recovered the Gipp shotgun); Hoff Decl., at ¶ 5a (identifying photographs as true and correct copies of photographs of recovered shotgun).

BIA Officer Raymond Webb ("Officer Webb") was on duty that evening and driving from South Dakota up to Fort Yates at the time of the incident. Webb Dep., at 128:18-23, 136:22-137:5 (Ex. 1); Webb FBI Interview, at 5:19-6:11 (Ex. 2); Webb Decl., at ¶ 3 (affirming that his cited FBI interview statements are truthful and accurate statements of his recall of events). Officer Webb heard over dispatch, "shots fired." Webb Dep., at 148:10-20 (Ex. 1). Based on the dispatch channel the call came over, Officer Webb determined the shots were fired in Fort Yates. Webb Dep., at 152:23-153:23 (Ex. 1). He also heard BIA Officer Gary Sandland, Jr. ("Officer Sandland"), say over dispatch something to the effect of "we need to find the victim of who might have been shot." Webb Dep., at 168:1-7, 258:1-15 (Ex. 1) (stating that based on Officer Sandland's statement over dispatch, Officer Webb believed someone in the Gipp Vehicle had done something to a victim); Webb FBI Interview, at 6:21-7:1 (stating that he heard Officer Sandland state over radio something to the effect of "we need to find the victim who is shooting at") (Ex. 2); Sandland FBI Interview, at 7:13-18 (stating that he called over dispatch to make sure if anybody was shot or if Gipp was shooting at a vehicle) (Ex. 5); Sandland Decl., at ¶ 3 (affirming that his cited FBI interview statements are truthful and accurate statements of his recall of events). Officer Sandland also provided a description of the vehicle, which was, in fact, Officer Sandland's old 1996 Crown Victoria that he had sold to the Gipp family. Sandland FBI Interview, at 6:8-12; 7:20-8:10 (Ex. 5); *see also* Webb Dep., at 161:9-162:2 (Ex. 1); Webb FBI Interview, at 7:9-18 (Ex. 2). The Crown Victoria had LED license plates and tinted windows. *Id.*

### B.     Officer Webb Conducts a Felony Stop on the Gipp Vehicle.

Shortly after, while heading east towards Fort Yates on Highway 24, Officer Webb came across the Gipp vehicle, travelling west, out in the country several miles outside of Fort Yates. Sandland Dep., at 122-123 (Ex. 6); Webb FBI Interview, at 7:19-8:14, 8:22-9:5 (Ex. 2). The Gipp vehicle had yielded to Officer Webb's emergency lights. Webb Dep., at 164-167 (Ex. 1);

BIA-IA Webb IA Interview - IA Tr., at 6 (Ex. 7); Webb IA Interview - P Tr., at11:8-14, 11:23-12:2 (Ex. 8); Wendland Decl., at ¶ 4 (affirming Exhibit 7 is a true and correct copy the BIA-IA transcript of Officer Webb's recorded interview); Webb Decl., at ¶ 4 (affirming that his cited BIA-IA interview statements are truthful and accurate statements of his recall of events).

Unbeknownst to Officer Webb at the time, when the occupants of the Crown Victoria saw Officer Webb's flashing lightbar, Gipp threw his shotgun out of the Crown Victoria's window, into the ditch, at the suggestion of Roberta Gipp. George Gipp Dep. at 135:2-7; 148:9-15; 174:10-184:7 (Ex. 9). Officer Webb did a three-point turn to pursue the Gipp vehicle, which took off and accelerated. BIA-IA Webb IA Interview - IA Tr., at 6 (Ex. 7); Webb IA Interview - P Tr., 11:16-23 (Ex. 8); *see also* Webb FBI Interview, at 8:6-9:10 (stating that after he did a three-point turn, he saw the Gipp vehicle take off, hit the brake lights a couple of times, and accelerate) (Ex. 2); Sec. Amend. Compl., at ¶ 15 (ECF 24) ("On the way home, the Gipps were pursued by BIA agents, including Defendants Webb and Sandland.").

After a mile or so, the vehicle eventually stopped, near Mile Marker 5. Webb FBI Interview, at 9:6-10 (Ex. 2); Webb Dep., at 170:4-21 (Ex. 1); Dashcam Video #1, at 11:30-11:45 (Ex. 10) (dispatch indicating the officers are on Highway 24, near Mile Marker 5); Spence Decl., at ¶ 3 (identifying Dashcam Video #1 and Dashcam Video #3 as true and accurate copies). Because of the reports of shots having been fired in town, Officer Webb performed a high-risk felony stop, which generally involves asking each occupant to exit the vehicle with their hands up and slowly walk backwards to the sound of the officer's voice. Webb Dep., at 169:2-4 (Ex. 1); BIA-IA Webb IA Interview - IA Tr., at 6 (Ex. 7); Webb IA Interview - P Tr., at 12:5-20 (Ex. 8); Sandland Dep., at 123:24-124:9 (Ex. 6). Officer Webb instructed the driver, Roberta Gipp, to roll down the window and throw the keys out. Webb FBI Interview, at 9:22-10:4 (Ex. 2). She

complied. *Id.* Officer Webb then ordered her to exit the vehicle with her hands in the air and walk backwards to the sound of his voice. *Id.* at 10:5-15. She complied. *Id.* Officer Webb searched her and placed her in the back of his vehicle. *Id.* at 10:15-17.

At about this point, Officer Sandland arrived on the scene. Webb Dep., at 235:2-5 (Ex. 1); Webb FBI Interview, at 11:10-11 (Ex. 2). Officer Sandland's BIA dashboard video camera was recording. *See* Dashcam Video #1 and Dashcam Video #3 (Exs. 10 and 11).[5] Officer Webb directed George Gipp using the same commands he used with Roberta Gipp, but ordered George Gipp to walk backwards to Officer Sandland instead of to Officer Webb. Webb FBI Interview, at 11:10-19 (Ex. 2). George Gipp complied. *Id.* at 11:15; Dashcam Video #1, at 5:35-6:30 (Ex. 10) (showing George Gipp exiting the vehicle with his hands up and walking backwards to Officer Sandland). Officer Sandland handcuffed George Gipp and placed him in the back of Officer Sandland's vehicle. Webb FBI Interview, at 11:17-19 (Ex. 2); Sandland Dep., at 130:24-131:3 (Ex. 6); Dashcam Video #1, at 6:30-8:10 (Ex. 10) (showing Officer Sandland handcuff George Gipp and place him in Officer Sandland's police vehicle).

### C.     Ryan Gipp Repeatedly Fails to Comply With Officers' Commands, Increasing Threat Level.

Officer Webb repeatedly ordered Gipp to jump into the front seat of the Crown Victoria. Gipp eventually did so. Webb FBI Interview, at 12:1-9 (Ex. 2). Next, Officer Webb ordered Gipp to place his hands out of the window and Gipp did. *Id.*; Dashcam Video #1, at 7:47-8:05 (Ex. 10) (showing Gipp place his hands out of the front driver-side window). Officer Webb can be heard instructing Gipp in a calm voice to open the door. *Id.* at 8:04 (Ex. 10). Gipp opened the car door.

---

[5] Officer Sandland's Dashcam had two angles, one facing forward (Dashcam Video Camera #1) (Ex. 10), capturing the events in front of the vehicle, and one facing backward (Dashcam Video Camera #3) (Ex. 11), capturing the interior backseat where George Gipp was placed.

*Id.* at 8:07 (Ex. 10). Officer Webb then directed Gipp with the same commands Officer Webb

gave Roberta Gipp and George Gipp: to step out of the vehicle with hands in the air and facing

away from the officers. Webb FBI Interview, at 12:9-17 (Ex. 2). Gipp did not step out of the

vehicle; he instead sat there for approximately 30 seconds. Dashcam Video #1, 8:08-8:38 (Ex.

10); *see also* Webb FBI Interview, at 12:14-17 (Ex. 2); Sandland Dep., at 158:13-18 (stating that

Officer Webb was telling Gipp to place his hands out the window and exit the vehicle, but Gipp

refused) (Ex. 6). Gipp then partially closed the door, sat in the vehicle for 37 seconds, reopened

the door, and then sat in the vehicle for another 37 seconds. Dashcam Video #1, at 8:38-9:52

(Ex. 10).

After repeated commands, Gipp eventually exited the vehicle, but he did not put his

hands up in the air or turn around and walk backwards toward the officers, as instructed. Webb

FBI Interview, at 13:2-12 (Ex. 2). Instead, Gipp bent over, picked up the vehicle keys off the

ground with his left hand, closed the car door, faced the officers, and immediately placed his

hands in his hoodie pockets, rather than over his head. *Id.* at 13:14-16; Dashcam Video #1, at

9:52-9:55 (Ex. 10); *see also* BIA-IA Webb IA Interview - IA Tr., at 8 (Ex. 7) (stating Officer

Webb gave Gipp the same commands as far as lifting his shirt up, turning around, facing away,

and walking backwards to the sound of Officer Webb's voice, but Gipp was refusing to obey all

commands); Webb IA Interview - P Tr., at16:12-16 (Ex. 8); Sandland Dep., at 167:4-6 (stating

Gipp was commanded to keep his hands out of his hoodie pocket, keep his hands raised, turn

around and walk backwards) (Ex. 6).

Gipp fiddled with his hands, putting one or both hands into his hoodie pocket, and then

walked forward a bit with his left hand in his hoodie pocket. Dashcam Video #1, at 9:55-10:18

(Ex. 10). Gipp's left hand appeared to reach behind his back near his waistband. Dashcam Video

#1, at 10:09-10:20 (Ex. 10). After some time, Gipp walked back to the Gipp vehicle. Webb FBI Interview, at 14:2-9 (Ex. 2); Dashcam Video #1, at 10:20-10:24 (Ex. 10). Gipp placed his left hand on the driver's door handle and opened it part way, and in the Dashcam Video it appears a shiny object can be seen in Gipp's right hand. Dashcam Video #1, at 10:23-11:06 (Ex. 10).

Throughout this encounter, Gipp kept putting his hands in his pockets despite repeated commands to keep his hands out of his pockets. Webb Dep., at 283:16-18, 286:7-9 (Ex. 1); Webb FBI Interview, at 14:14-17 (Ex. 2); BIA-IA Webb IA Interview - IA Tr., at 8 (stating Gipp kept on trying to reach into this right side pocket) (Ex. 7); Webb IA Interview - P Tr. at 17:8-9 (Ex. 8); Sandland Dep., at 168:3-6 (stating Gipp was advised to keep his hands out of his hoodie pocket, to keep his hands up where the officers could see them, and to turn around, but Gipp was not following commands) (Ex. 6); Dashcam Video #1, at 9:55-10:03, 10:09-10:17, 10:19-10:20 (Ex. 10) (showing Gipp repeatedly place one or both hands in his pockets).

After some time, Gipp walked rapidly towards the officers, swinging out slightly to his left – away from the officers and towards the ditch – to behind the Crown Victoria. *Id.*, at 10:49-10:55 (Ex. 10). Actively resisting, Gipp then veered directly towards the officers with his hands near his pockets, contrary to repeated commands to walk towards the officers backwards with his hands in the air. Webb FBI Interview, at 14:13, 15:5-7 (Ex. 2); Webb Dep., at 289:21-25 (stating Officer Webb was not instructing Gipp to come towards the pickup at this time) (Ex. 1); Dashcam Video #1, at 10:55-11:02 (Ex. 10). Officers Webb and Sandland observed something heavy weighing down Gipp's front hoodie pocket. Webb FBI Interview, at 16:3-6 (Ex. 2); Sandland Dep., at 227:18-228:20 (Ex. 6). Officer Webb assumed it was a gun. Webb FBI Interview, at 16:6-9 (Ex. 2).

Based on everything he had observed and the totality of the circumstances, Officer Webb considered Gipp a high-risk threat. Webb Dep., at 293:20-294:5 (Ex. 1) (explaining that Gipp was not obeying any commands, at one point Gipp tried to get back into the vehicle, that Officer Webb had warned Gipp that they had machine guns pointed at him, and that the whole time there was something heavy weighing down Gipp's sweatshirt). As Gipp walked towards the officers, Officer Webb kept telling Gipp to turn around and by the time Gipp approached Officer Webb's vehicle, Officer Webb had told Gipp to get on the ground. *Id*. at 122:10-123:13, 292:23-293-4, 300:12-15 (Ex. 1); *see also* Webb FBI Interview, at 14:10-16 (stating he kept telling Gipp to turn around as Gipp advanced toward Officer Webb's vehicle); BIA-IA Webb IA Interview - IA Tr., at 13 (stating that Gipp was ordered to walk backwards and kneel in front of Officer Webb's vehicle, but Gipp did not want to get on the ground, as instructed) (Ex. 7); Webb IA Interview - P Tr., at 32:3-7 (Ex. 8).

After Gipp aggressively walked directly in front of Officer Webb's vehicle and within a few feet of Officer Sandland, Officer Sandland slung his rifle over his shoulder, asked Officer Webb to cover him, and took a step toward Gipp so Officer Sandland could approach Gipp, take him into custody, and handcuff him. Sandland Dep., at 182:2-14, 185:3-14 (Ex. 6); Sandland FBI Interview, at 12:3-17 (Ex. 5); Webb Dep., at 299:2-20 (Ex. 1). As Officer Sandland took a step toward Gipp, Gipp took a step back and balled up his right hand into a fist. Webb Dep., at 299:25-300:5 (Ex. 1); Sandland Dep., at 173:16-174:2 (stating that when Gipp came walking toward him, out of view of the camera, Gipp had his fist balled up like he was going to strike Officer Sandland) (Ex. 6). Gipp then took a step toward Officer Sandland, who was standing just a few feet away. Sandland Dep., at 173:5-8) (Ex. 6). The Dashcam Video confirms Gipp took a

step back (and into the view of the Dashcam), and then took a step forward toward Officer

Sandland (and out of the view of the Dashcam). Dashcam Video #1, at 11:02, 11:04 (Ex. 10).

At the moment Gipp took a step toward Officer Sandland, Officer Webb lost sight of

Gipp's hands, placing Officer Webb at a disadvantage because he was supposed to be covering

Officer Sandland, who had previously slung his rifle over his back and was not holding a

weapon. Webb Dep., at 301:16-19, 303:15-21 (Ex. 1); Webb FBI Interview, at 15:15-16:2, 33:2-

35:4 (Ex. 2); *see also* BIA-IA Webb IA Interview - IA Tr., at 9 (stating Officer Webb

remembered Gipp sort of jerk and then he could not see Gipp's arms anymore) (Ex. 7); Webb IA

Interview - P Tr. at 20:1-9 (Ex. 8). The Taser Video confirms that just prior to the tasing, Gipp's

hands were no longer visible to Officer Webb because they were blocked by the hood of Officer

Webb's vehicle. Taser Video (Ex. 12); Wendland Decl., at ¶ 6 (identifying Taser Video as a true

and accurate copy). However, the Taser Video confirms that based on Gipp's arm placement, his

hands just prior to the tasing were near his hoodie pocket, where Officer Webb believed Gipp

might be concealing a firearm. Taser Video (Ex. 12). In response, Officer Webb deployed his

taser twice at Gipp. Webb Dep., at 308:13-16 (Ex. 1); Webb FBI Interview, at 16:10-19 (Ex. 2);

Dashcam Video #1, at 11:04 (Ex. 10). When he discharged his taser, Officer Webb believed,

based on his own observations, that Gipp had committed the crimes of hindering law

enforcement, resisting arrest, and disorderly conduct. Webb Dep., at 347:1-348:18, 350:2-13 (Ex.

1).[6]

---

[6] Because the tasing occurred in front of Officer Webb's vehicle, it is not entirely visible on
Officer Sandland's Dashcam Video, because Officer Webb's vehicle partially obstructed the
view. The "pop" of the taser can be heard at 11:04. Dashcam Video #1. (Ex. 10). And because
the shooting occurred behind Officer Sandland's vehicle, it too is not visible on Officer
Sandland's Dashcam Video, although some of the commands and the gunfire can be heard.
There is no video recording available from Officer Webb's dashcam because the camera's data

**D.    Ryan Gipp Continues to Ignore Commands, Flees Behind Officer Sandland's Vehicle, and Pulls Black Object Out of his Hoodie Pocket.**

From the Dashcam Video, it does not appear Gipp was affected by the taser, and it is apparent it did not achieve its intended purpose of incapacitating him. Dashcam Video #1, at 11:05-11:06 (Ex. 10) (showing Gipp flee from the officers). Instead, continuing his active resistance, Gipp swept his hands across the front of his chest, apparently to remove the taser probes, and took off running along the passenger side of Officer Webb's and Officer Sandland's vehicles. Webb FBI Interview, at 16:20-17:17 (Ex. 2); Taser Video (Ex. 12); Dashcam Video #1, at 11:06-11:12 (Ex. 10) (showing Gipp run behind Officer Sandland's vehicle). Gipp tried to open the passenger door to Officer Sandland's vehicle. Sandland FBI Interview, at 12:18-13:1, 26:18-19 (Ex. 5); *see also* Dashcam Video #1, at 11:10-11:11 (Ex. 10).

Gipp failed to open the locked passenger door of Officer Sandland's vehicle and continued running towards the rear of Officer Sandland's vehicle. Dashcam Video #3, at 11:12 (Ex. 10) (a glimpse of Gipp running behind Officer Sandland's vehicle can be seen through the back window, in the upper lefthand corner of the Dashcam Video). Gipp moved to his right and crouched behind the tailgate of Officer Sandland's vehicle. BIA-IA Webb IA Interview - IA Tr., at 9-10 (Ex. 7); Webb BIA Interview – P Tr., at 21:10-23:3 (Ex. 8); Sandland Dep., at 192:9-18 (stating that Gipp was behind his tailgate) (Ex. 6).

In pursuit, Officer Sandland proceeded along the road, on the driver's side of the police vehicles, towards the rear of Officer Sandland's vehicle, bringing his service rifle up to a low ready position as he went. Dashcam Video #1 at 11:07-11:13 (Ex. 10). Officer Webb, re-raising his service rifle to the ready position as he pursued Gipp, passed along the driver's side of

---

storage device was already full and therefore unable to store new footage. *See* Webb Dep., at 195:1-197:2 (Ex. 1).

Officer Webb's vehicle to between the rear of his vehicle and the front of Officer Sandland's vehicle, and then continued on into the ditch at the passenger side of Officer Sandland's vehicle. *Id.* at 11:07-11:13 (Ex. 10); BIA-IA Webb IA Interview - IA Tr., at 9-10 (Ex. 7); Webb BIA Interview – P Tr., at 21:10-23:3 (Ex. 8).

Behind the tailgate, Gipp was crouched and oriented so the front of his body was facing the tailgate, with his back towards the road. Webb FBI Interview, at 17:13-19:5 (Ex. 2). Officer Webb observed Gipp manipulating something in his front hoodie pocket like he was chambering a round and charging a handgun, and doing "quick peeks" over the tailgate at Officer Sandland. Webb FBI Interview, at 17:18-21:20 (Ex. 2); BIA-IA Webb IA Interview - IA Tr., at 9 (stating it looked like Gipp was chambering a round, and then Officer Webb saw Gipp turn and do these quick peeks) (Ex. 7); Webb BIA Interview - P Tr., at 21:25-22:6 (Ex. 8); Sandland Dep., at 202:9-203:4 (stating Officer Sandland observed Gipp do two quick peeks over the tailgate at him) (Ex. 6); Sandland FBI Interview, at 14:19-21 (Ex. 5). Officer Webb thought Gipp was going to ambush Officer Sandland. Webb FBI Interview, at 18:1-3; 20:22-21:11, 42:10-19 (Ex. 2); *see also id.* at 35:3-11 (stating Officer Webb thought Gipp was going to ambush Officer Sandland and kill him, and that whatever Gipp had in his pocket, his intent was to use it to kill Officer Sandland) (Ex. 2). It was dark and the only light was the taillights, license plate lights, and lightbar from Officer Sandland's police vehicle. Webb FBI Interview, at 36:3-20 (Ex. 2); Sandland Dep., at 193:9-194:3 (Ex. 6). Officer Sandland lost sight of both Officer Webb and Gipp at this time. Sandland Dep., at 199:7-200:4 (Ex. 6).

At this point Gipp, Officer Sandland, and Officer Webb are all off camera. The Officers can be heard on the Dashcam Video yelling, "Give me your hands" and "Give me your fucking hands!" Dashcam Video #1, at 11:12-11:15 (Ex. 10); *see also* Webb Dep., at 313:14-23 (Ex. 1);

Sandland Dep., at 203:12-16 (Ex. 6). Officer Webb observed Gipp focus on Officer Sandland, then take some steps back from the tailgate, which Officer Webb perceived to be Gipp obtaining separation to clear the way for a shot at Officer Sandland. BIA-IA Webb IA Interview - IA Tr., at 15-16 (Ex. 7); Webb BIA Interview – P Tr., at 36:1-25 (Ex. 8); Webb FBI Interview, at 18:1-9 (Ex. 2). Officer Webb called out to Gipp, who then turned to look at Officer Webb. BIA-IA Webb IA Interview - IA Tr., at 16 (Ex. 7); Webb BIA Interview – P Tr., at 36:22-38: 7 (Ex. 8); Webb FBI Interview, at 18:9-19:5 (Ex. 2). While that was happening, Gipp pulled a black, shiny object out of his front hoodie pocket. Webb FBI Interview, at 18:9-19:5 (Ex. 2); BIA-IA Webb IA Interview - IA Tr., at 10 (Ex. 7); Webb IA Interview - P Tr., at 23:2-3 (Ex. 8). Officer Webb feared the object was a gun. Webb FBI Interview, at 19:4-5, 21:16-17 (Ex. 2). Officer Webb had no cover to hide behind. *Id.* at 39:6-13. Officer Sandland was in the road off the driver's side of his vehicle, having advanced as far as the driver's door. *Id.* at 18:13-15, 21:6-9 (Ex. 2); Dashcam Video #1 at 11:07-11:13 (Ex. 10); Sandland Dep., at 192:16-25, 198:9-21 (Ex. 6). Officer Sandland was exposed, in the open. BIA-IA Webb IA Interview – IA Tr. at 10, 13, 15 (Ex. 7), Webb IA Interview - P Tr., at 22:8-11, 30:23-31:5, 36:9-13 (Ex. 8).

In response to Gipp's actions, Officer Webb discharged his service rifle. Webb FBI Interview, at 21:19-20, 42:18-43:10 (Ex. 2); *see also id.* 35:12-20 (stating that Officer Webb had to see the gun and when Gipp pulled out what he thought was a black gun, he fired); Webb Dep., at 317:12-320:11; 326:22-327:12 (stating Officer Webb did not shoot until Gipp pulled out what he believed was a gun) (Ex. 1). Officer Webb continued to shoot until the threat posed by Gipp stopped. BIA-IA Webb IA Interview - IA Tr., at 25 (Ex. 7); Webb IA Interview - P Tr., at 57:16-18 (Ex. 8); Webb Dep., at 328:12-18, 370:8-372:14 (Ex. 1) (stating he continued to shoot until

Gipp was no longer a threat).[7] A total of 17 shots were fired, all of which occurred in the span of 4.01 seconds. Dashcam Video #1, at 11:15-11:20 (Ex. 10). Officer Sandland immediately called for medical assistance. Sandland Dep., at 210:16-19 (Ex. 6).

     **E.**    **Additional Evidence Relating to Ryan Gipp and the Shooting.**

Roberta Gipp, sitting in Officer Webb's backseat, did not observe the shooting. Roberta Gipp Dep., at 36:21-37:8 (Ex. 13) (agreeing she told Corrine Kopp that after the tasing, Gipp ran out of sight and all Roberta Gipp heard was shots); *id.* at 122:5-14 (stating that everything behind the second door of the vehicle she was placed in she could not see); *id.* at 125:25-126:3 (stating that after Gipp got past her door, she could not see and then she heard gunshots); *id.* at 126:9-17 (stating that after Gipp ran around the pickup she could not seem him at that point). George Gipp, sitting in Officer Sandland's backseat, did not observe the shooting. George Gipp Dep., at 45:23-46:23 (Ex. 9) (stating he could not see when Gipp was shot because it was behind the vehicles); *id.* at 48:21-49:6 (indicating he did not see where Officers Webb and Sandland went before the shooting); *Id.* at 49:17-19 (stating he did not see the shooting that night).

After the shooting, Gipp continued to reach inside his hoodie pocket and punch and kick Officer Sandland who was trying to handcuff him. Sandland Dep., at 207:16-210:8 (Ex. 6); *see*

---

[7] Officer Webb described shooting at Gipp and not appearing to hit him. Officer Webb then adjusted his aim downward, continued firing, and saw two wounds ("leg" and "ankle") occur from bullet impacts on Gipp. After those two impacts, Gipp fell to the ground, then did a sit-up and reached back into his hoodie pocket. Officer Webb continued to fire his weapon until Gipp reclined and laid back, arms out, not reaching for anything. At that point, Officers Sandland and Webb approached Gipp while Officer Webb continued to cover him. Webb FBI Interview, at 22:2-16 (Ex. 2); BIA-IA Webb IA Interview - IA Tr., at 10 (Ex. 7); Webb IA Interview – P Tr., at 22:14-24:7 (Ex. 8). Through the back window of Officer Sandland's vehicle, Officer Webb can be seen moving from left to right, advancing with his rifle raised towards Gipp. Dashcam Video #3, at 11:32-11:33 (Ex. 11).

*also* Dashcam Video #1, at 11:26-11:45 (Ex. 10) (Officers Webb and Sandland can be heard

yelling "give me your hands" and "stop fucking messing around").

After Gipp was handcuffed, Officer Sandland pulled a number of items out of Gipp's

front hoodie pocket, including:

- A black metal bar – later identified as Gipp's AR-15 stock wrench, a multi-purpose tool used for the installation and removal of parts on semi-automatic rifles.[8]

- A black-lined, camouflage stocking cap with Mexican flag bandana stuffed inside;

- A set of keys (with attached black plastic keychain, a swivel "church key" bottle opener, a red plastic item emblazoned "Tablet Traveler," a silver Ford logo keychain, a silver carabiner, and silver and brass keys, including at least one with a black-plastic head); and

- A teal-colored cigarette lighter.

Sandland Dep., at 211:24-214:1 (Ex. 6); Sandland FBI Interview, at 22:1-10 (Ex. 5); *see also*

FBI Scene photos, FBI-000634, FBI-000635 (Ex. 14) (camouflage stocking cap and bandana);

FBI-000618 and FBI-000633 (*Id.*) (keys and lighter); FBI-000655 and FBI-000656 (*Id.*) (AR-15

stock wrench); Hoff Decl., at ¶ 5b (identifying photographs as true and correct copies of

photographs of items seized on the scene); Wendland Decl., at ¶ 7 (Ex. 15) (identifying

photograph BIA-IA 000159 as a true and correct copy of a scene photograph taken by Officer

Webb shortly after the shooting); Webb Decl., at ¶ 5 (identifying Ex. 15 photograph as true and

accurate record of what he observed on the evening of October 23, 2017). A silver folding knife

was also pulled out of a different Gipp pocket. *See* Webb FBI Interview, at 23:6-9, 25:7-9 (Ex.

2); BIA-IA Webb IA Interview - IA Tr., at 10 (Ex. 7); Webb IA Interview – P Tr., at 24:20-25:6

---

[8] According to Roberta and George Gipp, Gipp owned an AR-15 stock wrench and had it with him on the night of the shooting. Roberta Gipp Dep., at 124:16-125:8, 136:4-5 (Ex. 13); George Gipp Dep., at 212:6-213:12 (Ex. 9).

(Ex. 8); *see also* FBI Scene photos, FBI-000634 and FBI-000635 (Ex. 14) (silver knife); Hoff

Decl., at ¶ 5b. The photograph at Ex. 15 shows, on the ground near Gipp, the items taken from

Gipp's pockets:  AR wrench, silver knife, camouflage stocking cap, Mexican flag bandana, keys,

and teal-colored lighter.

Located on the ground behind Officer Sandland's vehicle, below the tailgate where Gipp

was positioned just before he was shot, was:

- A live PDX1 Defender 12-gauge shotgun round with black matte-painted brass and black-plastic shell;[9] and

- A blue cigarette lighter.

BIA-IA Webb IA Interview - IA Tr., at 16 (Ex. 7); Webb IA Interview – P Tr., at 38:15-20 (Ex.

8); *see also* FBI Scene photos, FBI-000627, FBI-000629, FBI-000631 (black shotgun shell and

lighter) (Ex. 14);[10] Hoff Decl., at ¶ 5b.

Items found on Gipp's person during his autopsy include, but are not limited to:

- A second live PDX1 Defender 12-gauge shotgun round (like the one found on the scene);

- A set of gold-colored brass knuckles;

- A silver-colored necklace with handcuff key, and

- A black-matte metal field-point arrowhead.

---

[9] "The 12-gauge PDX1 Defender ammunition features a distinctive black hull, black oxide high-base head and 3 pellets of Grex buffered 00 plated buckshot nested on top of a 1 oz rifled slug. The result is the ideal, tight patterning personal defense load. The slug/buckshot combination provides optimum performance at short and long ranges while compensating for aim error." https://winchester.com/Products/Ammunition/Shotshell/Defender/S12PDX1 (last accessed 08/12/2023).

[10] The black shotgun shell is also visible in a scene photograph taken by Officer Webb, located in the upper left corner as a small black mark bracketed by the legs of the last letter "R" in the watermarked word "ORDER" on the photograph. *See* BIA-IA Scene photo (Ex. 15).

Autopsy photos, (Ex. 16), FBI-000501 (displaying various items), GIPP_DISC_0156 (shotgun shell); GIPP_DISC_0158 (arrowhead); GIPP_DISC_0164 (necklace with handcuff key); and GIPP_DISC_0168 (gold-colored brass knuckles); Hoff Decl., at ¶ 5c (identifying photographs as true and correct copies of photographs of items seized at autopsy). Accordingly, Gipp was not unarmed at the time he was shot; he had weapons on his person, including a knife and brass knuckles.

A search of the Gipp vehicle discovered large quantities of a variety of rifle and shotgun ammunition and numerous firearm accessories and other weapons, including but not limited to:

- A DPMS AR buttstock component;

- A GPS Grip Pod System;

- Two 30-round AR magazines taped together, containing an unknown number of rounds;

- A silver-colored set of brass knuckles;

- Two sets of nunchakus; and

- Multiple knives and bladed tools.[11]

After the shooting, the FBI interviewed George and Roberta Gipp. *See* George Gipp FBI Interview (Ex. 18); Roberta Gipp FBI Interview (Ex. 19). George Gipp disclosed to the FBI where Gipp had tossed the shotgun. George Gipp FBI Interview, at 38:22-39:3; 41:8-22 (Ex. 18). Along Highway 24, not far from the location of the shooting, the FBI located Gipp's Mossberg 500 12-gauge shotgun with a taped-on Alabama Slammer 440 stainless steel "bayonet" and

---

[11] *See* FBI Vehicle Search photos (Ex. 17), FBI-000380, FBI-000413, FBI-000425-428, FBI-000439 (ammunition); FBI-000394-396 (AR buttstock and Grip Pod System); FBI-000400, FBI-405 (Ruger magazines); FBI-000408 (brass knuckles); FBI-000415, FBI-000433-435 (knives); FBI-000416, FBI-000418, FBI-000420 (multi-tools); FBI-000431 (nunchakus); Hoff Decl., at ¶ 5d (identifying photographs as true and correct copies of photographs of items seized from the Gipp vehicle).

flashlight, loaded with six rounds of Federal 12-gauge 2¾ inch/70mm rifled slug rounds. *See* Photographs (Ex. 4), FBI-000150, FBI-000153-156, FBI-000162, FBI-000164-165; Hoff Decl., at ¶ 5a. A spent shotgun shell casing was also found at Hagel's Gas Station. Sec. Amend. Compl., at ¶ 30 (ECF 24).[12]

A blood and urine drug screen detected a number of controlled substances in Gipp's system on the night of October 23, 2017. *See* Toxicology Report (Ex. 20).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "genuineness" inquiry focuses on the sufficiency of the evidence. A genuine dispute of material fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In applying this standard, the court reviews all evidence in the light most favorable to the nonmoving party. *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1769 (2015). A fact is material if it may "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

A defendant carries its burden on summary judgment by offering evidence to negate an essential element of the plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 331 (1986). Once the defendant does so, the burden shifts to the plaintiff to produce evidence showing the existence of a genuine issue of material fact. *Id.* at 324. A plaintiff must carry its burden by offering "significant probative evidence tending to support the complaint." *Anderson*, 477 U.S. at 249. This requires more than "some metaphysical doubt as to the material facts."

---

[12] The Federal 70mm rifled slug rounds the FBI recovered from Gipp's shotgun had similar loads as Gipp's black PDX1 personal defense rounds (*i.e.*, rifled slugs) found on the scene and on his person – the PDX1 having three additional pellets of 00 buckshot.

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

Under the FTCA, "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Further, "the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission, . . . if a private person would be liable to the claimant in accordance with the law of the place." 28 U.S.C. § 1346(b)(1). The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State – the source of substantive liability under the FTCA." *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (citations omitted). Here, because the events occurred in North Dakota, that state's laws apply. *See Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) ("The FTCA serves as a limited waiver of sovereign immunity, opening the door to *state-law liability* claims against the federal government for harm caused by government employees.") (emphasis added).

Plaintiffs plead two claims for assault and battery, and negligence. "Under North Dakota law, an assault is 'any willful and unlawful attempt or offer with force or violence, to do a corporal hurt to another,' and a battery is 'any willful and unlawful use of force or violence upon 'the person of another.'" *Clark v. Carlson*, No. 1:18-CV-00026, 2020 WL 10731267, at *5 (D.N.D. Oct. 14, 2020) (quoting *Wall v. Zeeb*, 153 N.W.2d 779, 786 (N.D. 1967). In either case, the act must be unjustifiable to constitute battery or assault. *Binstock v. Fort Yates Pub. Sch.*

*Dist. No. 4,* 463 N.W.2d 837, 840 (N.D. 1990). Under North Dakota law, "[a]n actionable negligence consists of a duty on the part of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge that duty, and a resulting injury proximately caused by the breach of the duty." *Forsman v. Blues, Brews and Bar-B-Ques, Inc.*, 820 N.W.2d 748, 753 (N.D. 2012) (citations omitted).

North Dakota law provides that "[c]onduct engaged in by a public servant in the course of the person's official duties is justified when it is required or authorized by law." N.D.C.C. § 12.1-05-02. "A person is justified in using force upon another person to defend himself against danger of imminent unlawful bodily injury." N.D.C.C. § 12.1-05-03. Force is also justified if "[t]he person defended would be justified in defending himself [so long as t]he person coming to the defense has not, by provocation or otherwise, forfeited the right of self-defense." N.D.C.C. § 12.1-05-04. A person cannot use "more force than is necessary and appropriate under the circumstances." N.D.C.C. § 12.1-05-07(1). However, deadly force is authorized "when it is expressly authorized by law." N.D.C.C. § 12.1-05-07(2)(a). The duty to retreat or avoid force does not apply where "[a] public servant [is] justified in using force in the performance of the public servant's duties." N.D.C.C. § 12.1-05-07(2)(b)(1). "An individual who uses force as permitted under this chapter is immune from civil liability for the use of the force to the individual against whom force was used" unless the force was used against a law enforcement officer. N.D.C.C. § 12.1-05-07.2. Finally, "[a] person's conduct is excused if he believes that the facts are such that his conduct is necessary and appropriate for any of the purposes which would establish a justification or excuse under this chapter, even though his belief is mistaken . . . [unless] his belief is negligently or recklessly held." N.D.C.C. § 12.1-05-08.

It has been long established in North Dakota that "a peace officer lawfully attempting to take a violator of law into custody is under no obligation to retreat or retire to avoid the necessity of using force, . . . the presumption is always in favor of the correct performance of his duty, and . . . every intendment will be made to support such presumption. The conduct of an officer must be weighed in light of the circumstances under which he acted and not by the incidental results thereof." *Wall*, 153 N.W.2d at 786; *see also* N.D.C.C. § 29-06-13 ("If, after notice of intention to arrest the defendant, the defendant either flees or forcibly resists, the officer may use all necessary means to effect the arrest."). An officer is presumed to have acted in good faith and that presumption continues until it is overcome by definite evidence to the contrary. *State v. Larson*, 554 N.W.2d 655, 657 (N.D. 1996). The plaintiff bears the burden of showing that a use of force was unreasonable. *Clark*, 2020 WL 10731267 at *5.

This Court has held that where a use of force is deemed reasonable under the Fourth Amendment, the use of force is also justified as a matter of North Dakota law. *See Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1067 (D.N.D. 2021) (citing *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) (finding the use of force was justified under the Fourth Amendment and relying on the same reasoning to find the use of force justified under the State common law assault and battery claims). Accordingly, the United States will primarily analyze Officer Webb's use of force under the Fourth Amendment.[13]

---

[13] Apart from the fact that a shooting deemed justified under North Dakota law renders one immune from *all civil liability*, including negligence, *see* N.D.C.C. § 12.1-05-07.2, the negligence claim alleged here is independently meritless. Plaintiffs define their negligence claim as follows: "Plaintiffs have brought a negligence claim asserting that Officers Sandland and Webb negligently used more force than was reasonably[sic], necessary, or appropriate." Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Partial Dismissal of Second Amended Complaint ("Ps' Opp. to Dismissal"), at 9 (ECF 39); *see also* Sec. Amend. Compl. at ¶ 53 (ECF 24). The duty to not use more force than is reasonably necessary or appropriate, according to Plaintiffs, arises under *Tennessee v. Garner*, 471 U.S. 1 (1985) and

**A.     The United States is entitled to summary judgment on the state tort claims.**

Whether an officer used excessive force is analyzed under the Fourth Amendment's "objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). That standard asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "[I]ts proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This list of factors is non-exhaustive. *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Finally, reasonableness must be "based upon the information the officers had *when the conduct occurred*." *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428  (2017) (quoting *Saucier v. Katz*, 533 U. S. 194, 207 (2001)) (emphasis added).

---

*Graham v. Connor*, 490 U.S. 386, 396 (1989). *Id.* at 13-16. But Officer Webb's use of force *was* justified under and consistent with *Graham* and *Garner*. *See infra*. Under Plaintiffs' own theory of liability, any negligence claim necessarily fails as long as Officer Webb's conduct complied with *Graham* and *Garner*. Because Officer Webb's conduct did comply, the negligence claim must be dismissed.

Here, looking to the *Graham* factors, the evidence shows that Officer Webb reasonably believed that Gipp unlawfully discharged a firearm.[14] Indeed, under Standing Rock Sioux Tribal law, it is unlawful to discharge a firearm within 100 yards of an occupied building (and unlawful to carry a loaded firearm in a motor vehicle). *See* Standing Rock Sioux Tribal Code of Justice, Criminal Offenses §§ 4-703, 4-706. It was also reported that Gipp may have been shooting at a victim. Based on these serious allegations, it was objectively reasonable for Officer Webb to treat Gipp as a potential suspect who posed a serious threat to officer safety. For example, in *Kohorst v. Smith*, 968 F.3d 871, 877 (8th Cir. 2020), the officer had learned that a suspect might have been involved in an altercation at a local theater. Based on that fact alone, the Eighth Circuit held that "it was reasonable for [the officer] to approach [the individual] as a potential suspect in an assault investigation who posed a threat to officer safety." *Id.* Here, the threat was even more serious because Gipp was suspected of unlawfully firing a gun. The law did not require that Officer Webb presume Gipp's discharge of the gun was innocent.[15] In addition,

---

[14] While Officer Webb himself did not know which Gipp discharged the firearm, he could reasonably treat each occupant of the vehicle as a suspect until proven otherwise, especially given the threat a firearm discharge poses to officer safety. And here, Ryan Gipp was the only one ignoring commands and he also had something weighing down his hoodie pocket. Once Officer Webb secured George and Roberta Gipp, both of whom complied with commands, he could reasonably treat Ryan Gipp as the one who potentially discharged the firearm. After all, as its name suggests, probable cause is based on probabilities, not certainties. *Illinois v. Gates*, 462 U. S. 213, 243 n.13 (1983) (probable cause "requires only *a probability or substantial chance* of criminal activity, not an actual showing of such activity") (emphasis added).

[15] While Plaintiffs allege Gipp discharged his shotgun accidentally, *see* Sec. Amend. Compl., at ¶ 12 (ECF 24), there is no evidence (or even allegation) Officer Webb was aware the discharge was allegedly accidental. In any event, officers are not required to rely on so-called innocent explanations when evaluating probable cause. *See D.C. v. Wesby*, 583 U.S. 48, 138 S. Ct. 577, 592 (2018) (stating that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts" and further noting that several courts of appeals have held that "innocent explanations – even uncontradicted ones – do not have any automatic, probable-cause-vitiating effect"); *see also Borgman v. Kedley*, 646 F.3d 518, 524 (8th Cir. 2011) (officers "need not rely on an explanation given by the suspect"). Nor is an officer required to rely on so-called innocent explanations in the field during escalating circumstances where officer safety is at issue.

Officer Webb observed Gipp commit the crimes of hindering law enforcement, resisting arrest, and disorderly conduct, all the while believing that Gipp was potentially armed with a gun. Based on these facts, the first *Graham* factor weighs in Officer Webb's favor. And because Gipp was actively resisting and evading arrest, or, at the very least, Officer Webb could reasonably construe Gipp's conduct as active resistance, and then fleeing, *see id.* at 876, the third *Graham* factor weighs in Officer Webb's favor.

This leaves the second *Graham* factor; whether at the time the force was used, Gipp posed an immediate threat to officer safety. The answer is unequivocally yes. At the time of the tasing, Gipp (1) repeatedly ignored commands, (2) had something heavy weighing down his hoodie pocket that Officer Webb reasonably believed might be a gun, (3) walked front-facing within a few feet of Officer Sandland, (4) took a step back when Officer Sandland tried to approach him, and (5) then took a step toward Officer Sandland with Gipp's right hand balled into a fist. That conduct alone most certainly posed an immediate threat to officer safety justifying the use of non-lethal force such as a taser, especially when Officer Webb lost sight of Gipp's hands, which were still near his hoodie pocket. Moreover, Officer Webb reasonably believed Gipp could still be carrying a firearm in his hoodie pocket. At the time of the shooting, Gipp – who continued to ignore commands – escalated the situation by running behind Officer Sandland's vehicle, making hand motions that Officer Webb interpreted as charging a handgun, appearing to wait in ambush, pulling a black shiny object out of his pocket that Officer Webb reasonably feared was a gun, and turning towards Officer Webb, conduct that most definitely presented an immediate threat to officer safety justifying the use of deadly force. All three *Graham* factors weigh in Officer Webb's favor. The Supreme Court has been clear, "[i]f there is

no excessive force claim under *Graham*, there is no excessive force claim at all." *Mendez*, 581 U.S. at 429.

While the *Graham* factors are certainly useful, and in this case, dispositive, "[courts] cannot apply them mechanically." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013). They "must still slosh [their] way through the fact-bound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383; *see also Boudoin v. Harsson*, 962 F.3d 1034, 104[1] (8th Cir. 2020) (stating that to evaluate whether officers used excessive force, "we consider the totality of the circumstances, guided by the Supreme Court's instruction in *Graham*"). The United States will address the totality of the circumstances facing Officer Webb in more detail, starting first with the tasing.

### 1. Officer Webb's use of a taser was reasonable and justified.

The deployment of a taser is considered more than *de minimis* force, but less than deadly force. *Boudoin*, 962 F.3d at 1040. When analyzing the deployment of a taser, the Eighth Circuit has stated, "[t]he use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public." *Kohorst*, 968 F.3d at 876 (citation omitted).[16] However, "[w]hen a suspect is passively resistant, somewhat more force may reasonably be required." *Id.* (citation omitted). "The failure to follow police instruction may constitute passive resistance." *Id.* (citations omitted). Even "partial compliance" may constitute "passive resistance" sufficient to "favor[] the . . . use of force." *Hosea v. City of St. Paul*, 867 F.3d 949, 958-59 (8th Cir. 2017). "Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force." *Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018);

---

[16] The evidence here, however, shows Gipp was engaged in far more than mere passive resistance. For example, Gipp's aggressive actions such as picking up the car keys and opening the door to the Crown Victoria, approaching the officers in defiance of commands, stepping back to avoid apprehension, balling his fist and advancing towards Officer Sandland, and fleeing after the taser was ineffective, are all actions that constitute active resistance.

*see also Pollreis v. Marzolf*, 66 F.4th 726, 731 (8th Cir. 2023) ("[T]hreat[s] to an officer's safety can justify the use of force, even if someone is not actively resisting arrest.") (internal quotations and citation omitted). "Whether a suspect's resistance is intentional does not impact how an officer would reasonably interpret the suspect's behavior." *Kohorst*, 968 F.3d at 876 (citation omitted). Instead, "[a]n officer is entitled to use the force necessary to effect an arrest where a suspect at least appears to be resisting." *Id.* (internal quotations and citation omitted). Based on these principles, the Eighth Circuit has held that where a suspect is non-compliant and resists arrest or ignores commands from law enforcement, the use of a taser does not violate the Fourth Amendment. *Id.* (citing *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019)). The Eighth Circuit does not require a warning prior to deploying a taser. *Boudoin*, 962 F.3d at 1043.

Here, no affirmative evidence exists showing that Gipp suffered anything more than a *de minimis* injury as a result of the tasing. Indeed, from the video, Gipp appeared completely unaffected by the taser and instead ran behind Officer Sandland's vehicle. Certainly, the taser was ineffective insofar as it did not have the intended effect of incapacitating Gipp. While *de minimis* injuries do not necessarily preclude a finding that an officer used excessive force, "the infliction of only *de minimis* injuries supports the conclusion that the officer did not use excessive force." *Brossart v. Janke*, 859 F.3d 616, 626 (8th Cir. 2017) (quoting *Davis v. White*, 794 F.3d 1008, 1012 (8th Cir. 2015)); *see also Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir.2006) (concluding *de minimis* injuries did not support a finding of excessive force); *Crumley v. City of St. Paul,* 324 F.3d 1003, 1007 (8th Cir.2003) (explaining "a de minimus use of force or injury is insufficient to support a finding of a constitutional violation").

With that backdrop, the undisputed facts demonstrate that prior to the tasing Officer Webb reasonably believed Gipp had previously been involved in the unlawful discharge of a

firearm in the city of Fort Yates and that Gipp might still be armed because something weighed down his hoodie pocket. Also, Gipp kept reaching into his pocket and ignoring commands. Finally, instead of walking backwards towards the officers with his hands up and getting on the ground as instructed, Gipp actively resisted and walked directly towards the officers, front-facing with his hands near his side. As these events rapidly unfolded – captured on the incontrovertible Dashboard Camera – Officer Webb had mere seconds to evaluate the evolving, dynamic situation and determine whether Gipp posed an immediate risk of danger to Officers Sandland and Webb. Even if Gipp could not hear or understand the commands – and there is no affirmative evidence to support that conclusion – "an arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (use of force reasonable even where arrestee maintains he did not hear instructions because officer could reasonably interpret his refusal to obey commands as resistance).

The situation here then became especially dangerous. When Officer Sandland tried to approach Gipp in an attempt to detain and handcuff him, Gipp actively resisted again, took a step backward, balled up his hand into a fist, and took a step forward toward Officer Sandland, who was left exposed with his rifle slung over his shoulder. At that point, Officer Webb, who was supposed to be covering an exposed Officer Sandland, lost sight of Gipp's hands, placing Officer Webb at a significant disadvantage, further escalating the threat. The Dashcam Video confirms that Gipp took a step backward as Officer Sandland tried to approach him and then Gipp took a step forward toward Officer Sandland. The Taser Video confirms that Gipp's hands were out of Officer Webb's sight just prior to the tasing, but Gipp's hands were near the hoodie pocket. At any moment, Gipp could have easily accessed the heavy object weighing down his hoodie pocket

(that Officer Webb reasonably believed was a gun) and shot Officer Sandland standing only a few feet away.[17] *See Sheehan*, 575 U.S. at 612 ("[D]elay could make the situation more dangerous. . . . and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others.") (internal quotations and citation omitted); *Quinones v. City of Edina*, No. 22-2818, __ F.4th at __, 2023 WL 5256215, at *2 (8th Cir. Aug. 16, 2023) (use of deadly force reasonable where suspect armed with a knife acted aggressively, disobeyed commands, and was within a few feet of officers).

Under these facts, Officer Webb's use of a taser did not violate the Fourth Amendment. Indeed, the Fourth Amendment simply does not require an officer to withhold using less than deadly force when a potentially armed suspect ignores commands, walks within a few feet of law enforcement, steps away when approached, balls his hand into a fist, and then takes a step toward an officer, especially when the other officer providing cover then loses sight of the suspect's hands. The case law is in accord. For example, the Eighth Circuit has upheld the use of a taser where the suspect exited his vehicle and took *a single step* in the direction of the officers. *Cook v. City of Bella Villa*, 582 F.3d 840, 850-51 (8th Cir. 2009); *see also McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020) ("Under our precedent, it is reasonable for an officer to tase an uncuffed suspect who appears to be resisting arrest.") (citing *Ehlers*, 846 F.3d at 1011); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012)). In fact, the Eighth Circuit has held that even the use of *deadly force* was objectively reasonable where a suspect, "walking aggressively," disobeys commands and approaches an officer. *See Wenzel v. City of Bourbon*, 899 F.3d 598,

---

[17] It would not have even been necessary for Gipp to draw a gun out of the hoodie pocket - he could have fired a weapon through the hoodie pocket fabric.

600-02 (8th Cir. 2018); *see also Sheehan*, 575 U.S. at 612-13 (use of deadly force reasonable where suspect kept coming at officers and was only a few feet from cornered officer).

Because Officer Webb's use of a taser did not violate the Fourth Amendment, it was also justified under North Dakota law and the United States is immune from civil suit. *Dundon*, 577 F. Supp. 3d at 1067; *see also* N.D.C.C. § 12.1-05-07.2.

### 2.    Officer's Webb use of deadly force was reasonable and justified.

The Supreme Court has held that the use of deadly force is reasonable where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). However, "[a]n officer is not constitutionally required to wait until he sets eyes upon [a] weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001); *see also Liggins v. Cohen*, 971 F.3d 798, 801 (8th Cir. 2020) (officer need not wait until the suspect is actually pointing his weapon to use deadly force). "Even if a suspect is ultimately 'found to be unarmed, a police officer can still employ deadly force if objectively reasonable.'" *Loch [v. City of Litchfield*, 689 F.3d 961] at 966 [(8th Cir. 2012)] (quoting *Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th Cir. 2002); *Capps v. Olson*, 780 F.3d 879, 885 (8th Cir. 2015) ("[E]ven if a suspect is ultimately found to be unarmed, a police officer who reasonably believes a suspect is armed and dangerous may still employ deadly force."); *accord Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993). Finally, the use of deadly force does not violate the Fourth Amendment simply because one or more shots might have struck the suspect from behind so long as the use of force was objectively reasonable. *See, e.g.*, *Church v. Anderson*, 898 F.3d 830, 833-34 (8th Cir. 2018) (use of deadly force held reasonable where suspect assaulted officer even though some shots struck the suspect in the back as he turned to withdraw).

Here, after continuing to ignore commands, Gipp ran behind Officer Sandland's vehicle, did two "quick peeks" at Officer Sandland over the vehicle, made a gesture like he was charging a gun, took a few steps back, turned toward Officer Webb, and pulled a black object out of his hoodie pocket that Officer Webb reasonably believed was a gun. That conduct posed an imminent threat of serious physical harm to Officer Webb, who had no cover to hide behind. There is no question an officer may discharge his weapon in response to a suspect who draws what an officer reasonably believes is a gun. Indeed, in *Loch*, an officer similarly confronted a suspect who the officer believed was armed. 689 F.3d at 964. The suspect had previously discarded a firearm outside the view of the officer and several bystanders in fact later yelled that the suspect was no longer armed. *Id.* The suspect ignored commands and approached the officer, moving his hand towards his side. *Id.* The officer discharged his weapon, believing the suspect was reaching for a holstered firearm. *Id.* It turned out the holstered object was a cell phone holder. *Id.* In finding the use of deadly force was reasonable, the Eighth Circuit reasoned that the officer knew the suspect was previously armed, did not witness the suspect discard the firearm, could reasonably interpret the suspect's conduct as resistance, and even if the officer mistakenly believed the suspect was reaching for a firearm, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Id.* at 965-66.[18]

The same analysis applies here. Officer Webb had reason to believe that Gipp had previously and unlawfully discharged a firearm (possibly at a victim) and that Gipp might still be armed. Further, under Eighth Circuit precedent, Gipp's conduct that evening of repeatedly

---

[18] Even if Officer Webb had known Gipp had previously thrown a shotgun out of the window of his vehicle, that did not foreclose the possibility that Gipp also had a handgun concealed and weighing down his hoodie pocket.

ignoring commands, refusing to get on the ground, advancing on the officers, stepping back

when approached, and stepping toward the officers with his hand balled up in a fist could

reasonably be interpreted as active resistance. So too could Gipp's conduct of fleeing then taking

cover behind Officer Sandland's vehicle, making hand motions like he was charging a gun while

doing "quick peeks" at an exposed Officer Sandland, and then turning toward Officer Webb

while pulling out an object that Officer Webb reasonably believed was a gun. These are actions

any reasonable officer on the scene would interpret as an imminent threat to his own life and that

of his fellow officer. In these rapidly escalating circumstances, Officer Webb did not violate the

Fourth Amendment by using deadly force in response to protect his own life and the life of

Officer Sandland. *See Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001) ("[N]o

constitutional or statutory right exists that would prohibit a police officer from using deadly force

when faced with an apparently loaded weapon."); *Aipperspach v. McInerney,* 766 F.3d 803, 807

(8th Cir. 2014) (same); *Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010) ("[T]here can be

no doubt that officers are permitted to use force when their safety is threatened.").[19]

Because Officer Webb was justified in firing his weapon to end a severe threat, the law

did not require him to stop shooting until the threat posed by Gipp ended. *Plumhoff v. Rickard,*

572 U.S. 765, 777 (2014) ("It stands to reason that, if police officers are justified in firing at a

suspect in order to end a severe threat to public safety, the officers need not stop shooting until

---

[19] While an officer should give a warning prior to discharging his weapon, *where feasible*, (*Loch*, 689 F.3d at 967) both Officers Webb and Sandland had their guns drawn throughout this encounter. "This would have given [the suspect] adequate notice that any action the officers perceived as escalation could result in the use of deadly force." *Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018). And here, Officer Webb announced to Gipp that they had "machine guns" pointed at him. "The lack of a more specific warning does not render [an officer's] use of force unreasonable." *Id.* (quoting *Loch*, 689 F.3d at 967).

the threat has ended."). This is true, even if that meant firing multiple rounds in a single four-

second span. *Id.* (finding discharge of fifteen rounds reasonable under Fourth Amendment

because they all happened in a single volley and during a ten-second span); *see also Sheehan*,

575 U.S. at 613 ("Nothing in the Fourth Amendment barred [officers] from protecting

themselves, even though it meant firing multiple rounds."); *Quinones*, __ F.4th at __, 2023 WL

5256215, at *1-2 (finding use of force reasonable notwithstanding that officers fired 18 shots in

about four seconds); *Ching as Tr. for Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir.

2023) (shooting deemed reasonable where all shots were fired in two seconds, without a pause,

even where some shots occurred after decedent fell to the ground); *Church*, 898 F.3d at 833 (shot

to decedent's back not unreasonable when fired in close temporal proximity to reasonable shot to

decedent's front).[20]

      In addition to *Loch*, other Eighth Circuit case law establishes that an officer may use

deadly force when a suspect pulls out an object the officer reasonably believes is a gun. *See N.S.

v. Kansas City Bd. of Police Commissioners*, 35 F.4th 1111, 1114-15 (8th Cir. 2022) (use of

deadly force objectively reasonable where officer shot fleeing suspect, who had just accessed an

---

[20] To the extent Plaintiffs claim that Officer Webb had other options at his disposal such as
waiting for more backup, giving more specific warnings, using less than lethal force, or
retreating or running for cover, the Eighth Circuit "has declined to second-guess whether
alternative actions by police officers might conceivably have been available." *Est. of Morgan v.
Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (internal quotations and citation omitted). The Fourth
Amendment only requires that a seizure be objectively reasonable, "not that the officer pursue
the most prudent course of conduct as judged by 20/20 hindsight vision." *Id.* (citation omitted);
*see also Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996) ("It may appear, in the calm
aftermath, that an officer could have taken a different course, but we do not hold the police to
such a demanding standard."). Nonetheless, the record shows that the Officers repeatedly made
attempts to get control of the situation by using no force or lesser force: both officers repeatedly
tried to verbally persuade Gipp to cooperate, Officer Sandland attempted to approach Gipp to
handcuff him, and Officer Webb deployed his taser. All attempts were unsuccessful; Gipp
continued to actively resist, then flee.

unknown vehicle before turning and raising his hands to waist level); *Billingsley*, 277 F.3d at 992 (use of deadly force objectively reasonable where officer could not see suspect's right hand and suspect turned towards officer, even though suspect was ultimately unarmed); *Thompson*, 257 F.3d at 899 (use of deadly force objectively reasonable where suspect in close proximity turns towards officer and moves as if reaching for a weapon, even though suspect was ultimately unarmed and shot in the back); *Kruger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993) (use of deadly force objectively reasonable where officer believed suspect was reaching for a knife, even if suspect was ultimately unarmed at the time of the shooting).

This Court has already held that where a use of force is deemed reasonable under the Fourth Amendment, it is also justified under North Dakota law. *Dundon*, 577 F. Supp. 3d at 1067. Moreover, North Dakota law is clear that law enforcement is entitled to use force required or authorized by law and that a person is justified in using force to defend himself or another from imminent unlawful bodily injury. N.D.C.C. § 12.1-05-03; N.D.C.C. § 12.1-05-04; N.D.C.C. § 12.1-05-07(2)(a). As detailed above, those are the precise circumstances Officer Webb faced here. And where the use of force is justified under the law, the officer is immune from civil liability. N.D.C.C. § 12.1-05-07.2. Further, an officer is presumed to have performed his duty correctly unless the plaintiff provides definitive evidence to the contrary. *Larson*, 554 N.W.2d at 657. No such definitive evidence exists here. Accordingly, the United States is entitled to summary judgment on all state law tort claims.

**B.    Plaintiff cannot proceed on both intentional and negligent tort claims.**

Plaintiffs have alleged contradictory claims: intentional assault and battery and negligence. Both are premised upon the same set of actions by the United States; namely, that the use of force against Gipp resulted in his death. Sec. Amend. Compl., at ¶¶ 11-32, 45-58 (ECF

24). However, these claims are mutually exclusive because an intentional tort cannot, by law, also be a negligent tort. Not only are these claims inapposite, Plaintiffs have failed to identify any facts supporting a negligent act by the United States. Relying on the same set of facts as the intentional tort claim, and as demonstrated above, Officer Webb's actions were reasonable, defeating the negligence claim on the merits. Accordingly, Plaintiffs' negligence claim against the United States must be dismissed.

A tortious action can be either intentional or negligent, but it cannot be both:

Negligence has been held to be wholly, legally incompatible with the theory of assault and battery—and any consideration of negligence, by way of pleading, evidence, or otherwise, is immaterial and irrelevant. Therefore, a jury cannot find both negligence on the part of the defendant and liability for the intentional torts of assault and battery based on the same acts. Once intentional offensive conduct has been established, the actor is liable for assault and not negligence. There is no such thing as negligent battery or negligent assault.

8 Am. Law of Torts § 26:1 (Mar. 2023). Further, "[a]n act or conduct moves beyond the realm of negligence when the injury or damage itself is intentional." 3 Am. Law of Torts § 10:17.

Courts have widely adopted this distinction, including the Eighth Circuit. "[T]here is generally no claim of negligence that flows from intentionally tortious conduct." *BP Chemicals Ltd. v. Jiangsu Sopo Corp.,* 285 F.3d 677, 685 (8th Cir. 2002) (finding as a matter of law the negligence claim invalid because it rested on the performance of intentionally tortious acts) (citing Restatement (Second) of Torts § 282 cmt. d (1965)); *United Nat'l Ins. Co. v. Tunnel, Inc.,* 988 F.2d 351, 353 (2d Cir.1993) (recognizing the "mutual exclusivity of negligence and battery"); *Hockensmith v. Brown,* 929 S.W.2d 840, 845 (Mo. Ct. App. 1996) ("The theories of negligence and intentional tort are contradictory and mutually exclusive.")); *see also State Farm Fire & Cas. Co. v. van Gorder*, 235 Neb. 355, 358, 455 N.W.2d 543, 545 (1990) ("There is no such cause of action as negligent assault and battery. An assault and battery is an intentional act,

whereas negligence is unintentional."). When a plaintiff has failed to "distinguish between negligent and intentional acts, does not identify any specific act that was allegedly negligent, and fails to make out a claim of negligen[ce] . . . ," summary judgment has been affirmed on appeal. *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 916 (D.C. Cir. 2015).

The Court in this case previously opined at the motion to dismiss stage that "[t]he officers could not have intentionally and negligently shot Gipp at the same time. Depending on how the facts come out, the Plaintiffs will almost certainly have to settle upon one theory or the other." *See* Order Granting, in Part, and Denying, in Part, Partial Motion to Dismiss, at ¶23 (ECF 43). Here, Plaintiffs' Second Amended Complaint contains one set of facts, at ¶¶ 11-32. (ECF 24). This set of facts is used to support Plaintiffs' assault and battery claim. *Id.,* at ¶¶ 45-51. The same set of facts is used to support Plaintiffs' negligence claim. *Id.,* at ¶¶ 52-58. When Plaintiffs were asked in an interrogatory to identify the facts supporting their negligence claim, Plaintiffs provided only the following response:

> **INTERROGATORY NO. 16:** Identify the facts supporting each of the elements of Count III, Negligence, asserted against the United States by you in the Second Amended Complaint and Demand for Jury Trial.
>
> **ANSWER:**
> 1. Video and audio from Sandland squad.
> 2. All dispatch records and communications to or from the responding officers.
> 3. Photos taken of the scene the night of the incident by Webb and other scene photos taken during the investigation of the incident.
> 4. The Ryan Gipp autopsy report and photos.
> 5. Interviews of Webb, Sandland, and others produced by defendants.
> 6. Plaintiffs note that discovery is ongoing and that they continue to work to collect, identify, and assess additional information as it comes to their attention and will supplement as needed.

Plaintiffs' Second Supplemental Responses to Defendant United States' First Set of Discovery, dated June 14, 2022, at 8 (Ex. 21). Plaintiffs did not supplement this response. *Id.* This is the exact same response, word for word, Plaintiffs provided in response to an interrogatory asking

them to identify the facts supporting their intentional tort claim. *See* Interrogatory No. 15, *id*. at 7-8. Indeed, Plaintiffs did not identify any actual facts; Plaintiffs instead simply pointed to various documents and other records that had been produced in discovery rather than identify the specific facts allegedly supporting their claim.

Plaintiffs have not identified any set of facts to support negligence distinct from those alleged to support their intentional tort claim against the United States. Fact discovery closed on January 17, 2023. Order (ECF 74) (amending discovery deadlines). "Unless a plaintiff includes allegations in her complaint or informs the defendant before the close of discovery of her intent to rely on previously undisclosed allegations, she may not assert them for the first time in opposing summary judgment." *McKinney v. Am. Airlines, Inc.*, 641 F. Supp. 2d 962, 982 (C.D. Cal. 2009) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291-94 (9th Cir. 2000)); *see also N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.").

While in April 2021 the Court found the time was not right to choose between the intentional and negligent tort claims, now is the time to dismiss one or the other as inconsistent remedies. "At the summary judgment or later stage of a case, courts have dismissed either the negligence or the intentional tort claims because eventually 'the same facts cannot give rise to causes of action both for intentional tort and negligence.'" *P.C.B. v. Cha*, No. CIV.03-6368MJDJGL, 2005 WL 1421465, at *3 (D. Minn. June 17, 2005) (quoting *Byers v. Spaulding*, 725 S.W.2d 893, 895 (Mo. App. 1987)) (citing *Pravda v. City of Albany, New York*, 956 F. Supp. 174, 183 n. 9 (N.D.N.Y.1997) (noting, on summary judgment motion, "Plaintiff's assault &

battery and his negligence claims arise out of the same underlying factual allegations. It is well settled that negligence and assault and battery claims are mutually exclusive. . . . Therefore, the court finds that all of Plaintiff's negligence claims must be dismissed")); *see also Phillips-Van Heusen Corp. v. Shark Bros.*, 289 N.W.2d 216, 222 (N.D. 1980) ("Inconsistent alternative pleading is permitted in certain instances to allow the party to select in the alternative an ultimate solution at a crucial point and obtain one or the other relief, but is not designed to permit the party to obtain relief of both at the same time."). Accordingly, either Plaintiffs' negligence claim or intentional tort claims are now ripe for dismissal; one set of claims must be dismissed.

## **CONCLUSION**

"[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257 (emphasis added). But no affirmative evidence here will change the incontrovertible video recording demonstrating Gipp's threatening behavior that justified the tasing. And no affirmative evidence exists to contradict Officer Webb's testimony that just prior to the shooting, Gipp pulled out an object that Officer Webb reasonably believed was a firearm. The three other fact witnesses on the scene, Officer Sandland, Roberta Gipp, and George Gipp, all testified they lost sight of Gipp just before the shooting and thus cannot create a genuine issue of material fact as to whether or not prior to being shot Gipp drew something from his pocket. In light of the foregoing, Plaintiffs cannot carry their burden of proving Officer Webb committed an actionable tort. *Thompson*, 257 F.3d at 899 (quoting *Gardner*, 82 F.3d at 252) ("We conclude that summary judgment was appropriate in this case because [the officer's] use of force, as he described it, was within the bounds of the Fourth Amendment, and all of the evidence presented to the district court is consistent with that account. The plaintiffs may not stave off summary judgment 'armed with only the hope that the jury

might disbelieve witnesses' testimony.") (cleaned up).

It can take seconds for an armed suspect to turn an encounter with law enforcement into a deadly one. That is why the calculus of reasonableness of an officer's use of force is not judged with "20/20 hindsight," but instead must "allow[] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. Where an officer's use of force is objectively reasonable in light of the circumstances the officer faced, as was the case here, there can be no tort liability under North Dakota law. There is no material question of fact preventing judgment in favor of the United States as a matter of law. The Court should grant the motion for summary judgment, enter judgment in favor of the United States, and end this case now.

Dated September 1, 2023.

MAC SCHNEIDER
United States Attorney

JAMES PATRICK THOMAS
Assistant United States Attorney
ND Bar ID 06014
SARAH E. WALL
Assistant United States Attorney
ND Bar ID 07822
P.O. Box 699
Bismarck, ND  58502-0699
(701) 530-2420
james.p.thomas@usdoj.gov
sarah.wall@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General, Civil Division

C. SALVATORE D'ALESSIO, JR.
Director, Torts Branch
Civil Division

RICHARD MONTAGUE
Senior Trial Counsel, Torts Branch
Civil Division

By:    */s/ Siegmund F. Fuchs*
SIEGMUND F. FUCHS
Senior Trial Attorney, Torts Branch
JOSEPH A. GONZALEZ
Trial Attorney, Torts Branch
Civil Division
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
P.O. Box 7146
Washington, D.C. 20044-7146
(202) 598-3888 (phone)
(202) 616-4314 (fax)
siegmund.f.fuchs@usdoj.gov
joseph.a.gonzalez@usdoj.gov

Attorneys for United States of America