IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| ELIAS GIPP, ET AL., | Case No. 1:19-cv-00213 |
| Plaintiffs, | |
| | **UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CHALLENGING CONSTITUTIONALITY OF N.D.C.C. § 29-06-13** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

The United States of America ("United States") responds to Plaintiffs' Motion for Partial

Summary Judgment (Challenging Constitutionality of N.D.C.C. § 29-06-13) (ECF 119)

("Plaintiffs' Motion").

## INTRODUCTION

Contrary to Plaintiffs' assertion, the United States does not intend to defend this case by

arguing that under N.D.C.C. § 29-06-13 Officer Webb "could use *any* force whatsoever to effect

the arrest of George 'Ryan' Gipp[,]" without regard to the reasonableness of the force. *See*

Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment. (ECF 120,

at 1) ("Plaintiffs' Memo") (emphasis in original).[1] Rather, the United States premised its

summary judgment arguments on the fact that Officer Webb's application of force was

objectively reasonable under the totality of the circumstances, consistent with North Dakota law,

*Graham v. Connor*, 490 U.S. 386, 388 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

---

[1] N.D.C.C. § 29-06-13, "When defendant resists, force necessary may be used to make arrest," states: "If, after notice of intention to arrest the defendant, the defendant either flees or forcibly resists, the officer may use all necessary means to effect the arrest."

United States' Memorandum in Support of its Motion for Summary Judgment (ECF 118, at 22-23, n.13).[2]

Plaintiffs have manufactured this straw-man issue, seeking an advisory opinion on the constitutionality of a North Dakota state law and whether it permits an officer to use any force whatsoever to effect an arrest without taking into account the reasonableness and necessity for the use of force. Plaintiffs' "as applied" argument, however, is not ripe for adjudication. Plaintiffs gloss over the controlling fact that the Court has not applied the statute.

If, however, the Court reaches the constitutionality question, Plaintiffs' Motion must fail on the merits. Plaintiffs' argument is illusory because North Dakota law already statutorily includes a necessity and reasonableness standard on the use of force when effecting an arrest.[3] N.D.C.C. § 29-06-10, "Restraint in an arrest is limited," states:  "A person who is arrested may

---

[2] Notably, N.D.C.C. § 29-06-13 is referenced one time in the United States' summary judgment memo, as a "*see also*" cite in a discussion of the State law regarding arrest. (ECF 118, at 22). As will be discussed, *infra*, it is a constitutionally valid affirmative defense; but, for purposes of the United States' motion for summary judgment, it is by no means the cornerstone of the summary judgment argument and affirmative defenses. *See also* Answer of United States of America to Plaintiffs' Second Amended Complaint and Demand for Jury Trial (Doc. 47 at 14-19) (identifying 40 affirmative defenses). North Dakota's statutory and common law consistently recognize a person's right to use reasonable force in self-defense, as a response to a reasonably perceived threat. Force used under such circumstances bars a finding of liability for the torts of assault and battery.

[3] Not only is Plaintiffs' Motion illusory, but it seems designed primarily to serve as a pretextual mechanism to attempt to muddy the waters with respect to the United States' pending motion for summary judgment (ECF 117). Plaintiffs include an extensive "Uncontested Material Facts" section and attach wholly superfluous expert reports that merely repeat information already in the Record (*see e.g.,* "Ryan died from the rounds fired by Webb. (*See Bennett Rep.* (Ex. D); *Autopsy Rep.*, (Ex. E)." ECF 120 at 7.); however, Plaintiffs never use any of that information to argue they have established their Rule 56 right to judgment as a matter of law on the "unconstitutional as applied" question. None of the "facts" or reports cited by Plaintiffs shed any light on the "as applied" question at hand. The Court, of course, has not made (and presumably will not make) a finding that Officer Webb's use of force was permitted exclusively on the basis of the language of § 29-06-13, without taking into consideration North Dakota law as a whole and without consideration as to whether the use of force was reasonable under the circumstances.

not be subjected to unnecessary or unreasonable force, nor to any greater restraint than is necessary for the person's detention." And North Dakota courts applying North Dakota law have long employed a reasonableness standard when assessing the use of force by an arresting officer. The United States has not argued Officer Webb was permitted to use unlimited force to effect the arrest of Ryan Gipp; the United States' position is consistent with established North Dakota law and the Fourth Amendment.

## UNCONTESTED MATERIAL FACTS

None of the facts cited by Plaintiffs is material to the question raised in their motion for partial summary judgment:  whether N.D.C.C. § 29-06-13 is constitutional. Nonetheless, the United States responds to Plaintiffs "uncontested" facts because several misstate the record or omit contrary evidence.

While the United States does not necessarily dispute that Gipp might have taken his Mossberg 500 12-gauge shotgun to his parents' house to go "turkey hunting" to make "turkey sausage," the United States notes the shotgun had been loaded with seven rifled slug rounds typically used for large game animal hunting or personal defense, and taped to the shotgun was a 13-inch stainless steel Alabama Slammer "bayonet" and a flashlight. FBI Shotgun photos (Def. Ex. 4 (ECF 113-5)).[4] When asked if the shotgun "was the only weapon you guys used that day," Roberta Gipp answered, "for turkeys," and volunteered, "only birdshot." Roberta Gipp Dep. at 130:8-12 (Def. Ex.13 (ECF 113-14 at 37)). The shotgun Ryan Gipp threw out of the vehicle

---

[4] According to Standing Rock Sioux Tribal law, "[n]o person shall at any time transport a firearm with a round in the chamber, or revolvers with cartridges in the cylinder, or a shot gun with more than two (2) shells in the magazine." Standing Rock Sioux Tribal Code of Justice, Title IX, Game, Fish and Wildlife Conservation, § 9-1001(3)(a).

window when he spotted Officer Webb's police lights was *not* loaded with birdshot. FBI

Shotgun photos (Def. Ex. 4 (ECF 113-5)).

The United States has no evidence to dispute that the Gipp family visited Roberta Gipp's

sister and then headed to Hagel's gas station. The United States disputes that Gipp decided to

unload his shotgun at Hagel's parking lot and that it accidentally discharged. When first asked by

the FBI what happened at Hagel's, Roberta and George Gipp stated they did not want to

"incriminate" their son. George Gipp FBI Interview, at 20:6-9 (Def. Ex. 18 (ECF 113-19 at 6));

Roberta Gipp FBI Interview, at 15:14-18 (Def. Ex. 19 (ECF 113-20 at 5)). While Roberta Gipp

later speculated at her deposition that it "looked like he was trying to unload it," she testified that

Gipp was "pointing it up north" and she could not remember how he held the shotgun. *See*

Roberta Gipp Dep., at 146:25-147:2, 147:19-21 (Def. Ex. 13 (ECF 113-14 at 41-42)). A worker

at Hagel's heard the shot, looked out the window, and saw Gipp standing with his feet apart in a

shooting stance, holding the gun at eye level, aiming at something, with the shotgun pointing at

the road to the north of Hagel's. Sandland-Gullickson Dep., at 29:15-30:10, 79:23-83:1 (Def. Ex.

3 (ECF 113-4 at 11, 23-24)). After Gipp fired the gun, he took two or three steps forward with

the gun still raised. *Id.* Roberta Gipp testified "[n]obody was around," but the worker at Hagel's

looked in the direction where Gipp fired the weapon and saw the taillights of a vehicle driving

away. *Compare*, Roberta Gipp Dep., at 148:5-6 (Def. Ex. 13 (ECF 113-14 at 42)) *with* Sandland-

Gullickson Dep., at 80-83 (Def. Ex. 3 (ECF 113-4 at 23-24)). Roberta Gipp testified Gipp looked

scared and immediately jumped back into the vehicle, but it is undisputed Gipp fully cycled the

pump-shotgun, as evidenced by the expended round found at Hagel's and the live round found

still in the chamber. *Compare* Roberta Gipp Dep., at 146:5-13 (Def. Ex. 13 (ECF 113-14 at 42))

*with* Sec. Am. Compl. (ECF 24 ¶ 30) (spent shotgun shell found at Hagel's) and FBI Shotgun

photos (Def. Ex. 4 (ECF 113-5)) at FBI-000156 (showing live round in chamber when FBI recovered the Gipp shotgun from the ditch).

The United States disputes that Gipp said he thought the two employees working in Hagel's would call the police. The cited evidence indicates that *Roberta Gipp* said that. Roberta Gipp Dep., at 148:15-22 (Def. Ex. 13 (ECF 113-14 at 42). The United States further disputes the suggestion that because no police officers "came right away," the Gipps "eventually pulled out from Hagel's." (ECF 120, at 3). Roberta Gipp admitted they did not wait to see if the police would come:

> Q. Is there a reason why you just didn't stay and wait to see if they came?
>
> A. I should have. I never -- I didn't think so, and I thought they would just come to the house to talk to us and that was it, you know. And here I didn't know they were going to do all that.

Roberta Gipp Dep., at 150:6-11 (Def. Ex. 13 (ECF 113-14 at 42)). Moreover, a Hagel's employee described the actions of George Gipp and Ryan Gipp immediately after the shot: "then they both just scurried into the car as quick as they could." Sandland-Gullickson Dep. at 29:10-30:5 (Def. Ex. 3 (ECF 113-4 at 11)). George Gipp was "trying to hustle in" to the vehicle and after they both got in, the Gipps drove away. *Id.* at 32:7-8, 16-21. The United States disputes that after Gipp discharged his shotgun at Hagel's, the Gipp family headed to Ryan Gipp's house. George Gipp testified that the family was headed out of town and not going anywhere in particular. George Gipp, at 130:18-24 (Def. Ex. 9 (ECF 113-10 at 37)).

The United States clarifies that Officer Sandland's sister, Becky Sandland-Gullickson, gave her cellphone to Hagel's co-worker, Duanna Silk, to call Officer Sandland's to report the incident. Sandland-Gullickson Dep. at 22:4-21 (Def. Ex. 3 (ECF 113-4 at 9)); Sandland FBI Interview, at 7:3-12 (Def. Ex. 5 (ECF 113-6 at 7)). While Ms. Silk was talking to Officer Sandland, Becky Sandland-Gullickson called the Standing Rock police station on Hagel's

landline. *See* Sandland-Gullickson Dep. at 44:24-45:10 (Def. Ex. 3 (ECF 113-4 at 14-15)). The United States disputes Officer Webb "supposedly" learned there was a "gun call." Officer Webb in fact heard over dispatch, "shots fired," Webb Dep., at 148:10-20 (Def. Ex. 1 (ECF 113-2 at 38)); and then Officer Sandland called Officer Webb over the radio and said, "we got a gun call and I need you up here." Webb FBI Interview, at 6:13-20 (Def. Ex. 2 (ECF 113-3 at 6)); Sandland FBI Interview, at 8:1-3 (Def. Ex. 5 (ECF 113-6 at 8)) ("I told him to watch out for this car because, you know, it's been called in somebody's shooting a gun off[.]"). Officer Webb also heard Officer Sandland say over dispatch something to the effect of "we need to find the victim of who might have been shot." Webb Dep., at 168:1-7, 258:1-15 (Def. Ex. 1 (ECF 113-2 at 43, 66)); Webb FBI Interview, at 6:21-7:1 (Def. Ex. 2 (ECF 113-3 at 6-7)); Sandland FBI Interview, at 7:13-18 (stating he called over dispatch to make sure if anybody was shot or if Gipp was shooting at a vehicle) (Def. Ex. 5 (ECF 113-6 at 7)).

The United States does not dispute that during this high-risk felony stop, Officer Webb ordered Roberta Gipp out of the vehicle and placed her in the back of his vehicle. The United States also does not dispute that Officer Webb ordered George Gipp out of the vehicle and that Officer Sandland placed George Gipp in the back of Officer Sandland's vehicle.

The United States disputes the assertion by Plaintiffs that there are "*many* statements by Webb and Sandland that are contradicted by the video footage." (ECF 120, at 4, n.5) (emphasis in original). In support, Plaintiffs cite to their own expert, Seth Stoughton, who selectively cites record evidence.[5] Indeed, Mr. Stoughton's main point of contention is that Officers Webb and Sandland told the FBI that Officer Webb discharged his Taser *while* Gipp was taking off where

---

[5] By their very nature, expert reports are opinions not facts. This Court is in no way bound by an expert's characterization of the facts. Plaintiffs' gratuitous citation to their experts' reports to allow them to insert their opinions into the record is transparent.

the Dashcam Video shows Gipp did not run until *after* Webb discharged his Taser. Stoughton Report, at 10-11 (Pl. Ex. B (ECF 120-3)). But during his FBI interview, Officer Sandland clarified that it was "*after* [Officer Webb] had shot [Gipp] with the Taser . . . that's when [Gipp] started running towards the passenger side of the, in the ditch area." Sandland FBI Interview, at 28:2-7 (Def. Ex. 5 (ECF 113-6 at 28)) (emphasis added). In the cited passage where Officer Webb tells the FBI that Gipp "comes around and takes off," Officer Webb also states that he saw Gipp "*leaning* towards of taking off, so I deployed my Taser at him." Webb FBI Interview, at 15:15-16:2 (Def. Ex. 2 (ECF 113-3 at 15-16)) (emphasis added). Both officers agreed at their depositions that Ryan Gipp did not run until after Officer Webb deployed his Taser. Webb Dep., at 108:16-23 (Def. Ex. 1 (ECF 113-2 at 28)); Sandland Dep., at 188:4-11 (Def. Ex. 6 (ECF 113-7 at 48)). In short, while Plaintiffs would like this Court to believe there is some major discrepancy for this Court to resolve, all witnesses agree Gipp did not begin to run until *after* Officer Webb discharged his Taser.[6]

The United States disputes Roberta Gipp's speculation that Gipp was "afraid" that night. His behavior instead appears to be self-assured and belligerent, as evidenced by Gipp's aggressive, front-facing walk toward the officers (who had their weapons drawn), all in violation of specific commands to turn around and walk backward with his hands in the air. Dashcam Video #1, at 10:49-11:02 (Def. Ex. 10 (ECF 113-11)); Webb FBI Interview, at 14:13, 15:5-7 (Def. Ex. 2 (ECF 113-3 at 14, 15)); Webb Dep., at 289:21-25 (Def. Ex. 1 (ECF 113-2 at 73)). The United States also disputes that Officer Sandland asked Roberta Gipp to yell at Gipp to exit

---

[6] Mr. Stoughton also notes that Officer Webb recalls pausing during the shooting, but no pause is heard on the Dashcam Video. Stoughton Report, at 19-20 (Pl. Ex. B ECF 120-3). Officer Webb recognizes no pause can be heard on the Dashcam Video, but that is still his recollection from that night. Webb Dep., at 324:3-326:21 (Def. Ex. 1 ECF 113-2 at 82-83).

the vehicle and that she told Officer Sandland that Gipp had already thrown the shotgun out of

the Gipp vehicle. Officer Sandland testified that he does not remember asking Roberta Gipp

anything or her saying anything to him. Sandland Dep., at 157:10-25 (Def. Ex. 6 (ECF 113-7 at

40)). Officer Webb stated that Roberta Gipp said she could get Gipp out of the car, and so

Officer Webb rolled down the window and she called out Ryan Gipp's name a couple of times.

Webb FBI Interview, at 13:2-8 (Def. Ex. 2 (ECF 113-3 at 13)). However, when Officer Webb

asked Roberta Gipp whether there was a gun, she responded, "it was fireworks." Webb Dep., at

226:22-227:6 (Def. Ex. 1 (ECF 113-2 at 58)).

While Plaintiffs are correct that Gipp eventually exited the vehicle, they omit that it took

him over two minutes to do so, despite repeated commands to exit the vehicle. Dashcam Video

#1, at 7:47-9:50 (Def. Ex. 10 (ECF 113-11)); Webb FBI Interview, at 12:9-17 (Def. Ex. 2 (ECF

113-3 at 12)); Sandland Dep., at 158:13-18 (Def. Ex. 6 (ECF 113-7 at 41)). Plaintiffs also omit

that upon exiting the vehicle, Gipp picked up the keys off the ground, immediately placed his

hands in his pockets, retreated back to the Gipp vehicle, partially opened the front driver's side

door, and kept placing his hands in or near his hoodie pocket. Dashcam Video #1, at 9:52-10:48

(Def. Ex. 10 (ECF 113-11)). Gipp did this despite being told repeatedly to keep his hands out of

his pockets, to turn around, and to walk backward toward the officers with his hands in the air.

Webb FBI Interview, at 13:2-16 (Def. Ex. 2 (ECF 113-3 at 13)); BIA-IA Webb IA Interview - IA

Tr., at 8 (Def. Ex. 7 (ECF 113-8 at 9)); Webb IA Interview - P Tr., at 16:12-16 (Def. Ex. 8 (ECF

113-9 at 16)); Sandland Dep., at 167:4-168:6 (Def. Ex. 6 (ECF 113-7 at 43)). Plaintiffs are

correct that Gipp approached Officer Webb's vehicle, however, Gipp was walking forward with

his hands at his side, contrary to repeated commands to walk backward toward the officer with

his hands in the air. Plaintiffs also omit that Officer Webb ordered Gipp to get on the ground, and

Gipp did not comply. Webb Dep., at 293:3-4, 300:12-15 (Def. Ex. 1 (ECF 113-2 at 74, 76));

BIA-IA Webb IA Interview - IA Tr., at 13 (Def. Ex. 7 (ECF 113-8 at 14)); Webb IA Interview -

P Tr., at 32:3-6 (Def. Ex. 8 (ECF 113-9 at 32)); Dashcam Video #1, at 10:49-10:58 (Def. Ex. 10

(ECF 113-11)).

      Plaintiffs further neglect to mention that just prior to the tasing Gipp took a step back

when Officer Sandland tried to approach him, balled up his hand into a fist like he was going to

strike Officer Sandland, then took a step forward toward Officer Sandland. Webb Dep., at

299:25-300:1-5 (Def. Ex. 1 (ECF 113-2 at 76)); Sandland Dep., at 173:5-174:2 (Def. Ex. 6 (ECF

113-7 at 44-45)). The Dashcam Video confirms Gipp took a step back into a "bladed" stance,

and then moved forward toward Officer Sandland. Dashcam Video #1, at 11:02, 11:04 (Def. Ex.

10 (ECF 113-11)). At that point, Officer Webb lost sight of Gipp's hands, which placed him at a

disadvantage because Officer Webb was trying to cover an exposed Officer Sandland. Webb

Dep., at 301:16-19, 303:15-21 (Def. Ex. 1 (ECF 113-2, 76, 77)); Webb FBI Interview, at 15:15-

16:2, 33:2-35:4 (Def. Ex. 2 (ECF 113-3 at 15-16, 33-35)); BIA-IA Webb IA Interview - IA Tr.,

at 9 (Def. Ex. 7 (ECF 113-8 at 10)); Webb IA Interview - P Tr. at 20:1-9 (Def. Ex. 8 (ECF 113-9

at 20)). The Taser Video confirms that just prior to the tasing, Gipp's hands were no longer

visible to Officer Webb but near Gipp's hoodie pocket where Officer Webb believed Gipp had a

gun. Taser Video (Def. Ex. 12 (ECF 113-13)). The United States disputes that just prior to the

second Taser discharge, which took place a split-second after the first one, that Gipp's hands

were empty. A still photograph from the Taser video shows that Gipp had a set of keys in his

right hand. Stoughton Report, at 16 (Pl. Ex. B (ECF 120-3)). Before, and as, Gipp flees, the

Dashcam Video shows a shiny object (presumably the keys) in Gipp's right hand, repeatedly

flashing with reflected light. Dashcam Video #1, at 10:23-11:07 (Def. Ex. 10 (ECF 113-11)).

The United States does not dispute that Gipp fled along the passenger side of Officer Sandland's vehicle, tried to open the door, and then fled behind Officer Sandland's vehicle. Plaintiffs then state, "[f]rom this point on, there are very few details that are uncontested (and many that require credibility determinations by this Court—as factfinder)." (ECF 120, at 6). It is unclear what these contested facts might be as Plaintiffs do not assert any facts. Nor is it clear what the basis would be for contesting any facts from this point because every other live witness on the scene–Officer Sandland, Roberta Gipp, and George Gipp–each stated they did not observe the shooting. Sandland Dep., at 199:7-200:4 (Def. Ex. 6 (ECF 113-7 at 51)); Roberta Gipp Dep., at 36:21-37:8, 122:5-126:17 (Def. Ex. 13 (ECF 113-14 at 14, 35-36)); George Gipp Dep., at 45:23-46:23, 48:21-49:19 (Def. Ex. 9 (ECF 113-10 at 16, 17)).[7]

The United States does not dispute that Gipp did not have a firearm on his person at the time of the shooting, but there is no evidence Officer Webb was aware of that fact. The United States disputes that after the shooting, Gipp had nothing in his hands when Officer Sandland handcuffed him. Officer Sandland testified that Gipp's one hand was empty and was swinging as Gipp continued to fight, but the other hand was in Gipp's hoodie pocket. By the time, Officer Sandland pulled Gipp's other hand out of his hoodie pocket, that hand was empty. Sandland Dep., at 208:15-210:12 (Def. Ex. 6 (ECF 113-7 at 53, 54)). Of course, none of this refutes Officer Webb's testimony that Gipp had something in his hand *prior* to the shooting. Webb Dep.,

---

[7] The reality is that after Gipp moved behind Officer Sandland's vehicle the facts presented by *the United States* are factually uncontested. Plaintiffs' argument that summary judgment turns on an assessment of credibility is incorrect. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) (quoting *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996) ("We conclude that summary judgment was appropriate in this case because [the officer's] use of force, as he describes it, was within the bounds of the Fourth Amendment, and all of the evidence presented to the district court is consistent with that account. The plaintiffs may not stave off summary judgment 'armed with only the hope that the jury might disbelieve witnesses' testimony.'") (cleaned up).

343:13-25 (Def. Ex. 1 ECF 113-2 at 87)); Webb FBI Interview, at 18:9-19:5 (Def. Ex. 2 ECF

113-3 at 18-19)); BIA-IA Webb IA Interview - IA Tr., at 10 (Def. Ex. 7 (ECF 113-8 at 11));

Webb IA Interview - P Tr., at 23:2-3 (Def. Ex. 8 (ECF 113-9 at 23)).

 Indeed, there were several dark and/or shiny objects found on or near Gipp's person at

the time, including a black live PDX1 Defender 12-gauge shotgun round and blue lighter (found

on the ground behind Officer Sandland's tailgate where Gipp was hiding), a black AR-15 wrench

and set of keys with black attachments (both found in Gipp's hoodie pocket, along with a teal

lighter, a black-lined camouflage stocking cap, and a Mexican flag bandana), and a silver folding

knife (found in a different Gipp pocket). FBI Scene photos, FBI-000618 and FBI-000633 (keys

and teal lighter); FBI-000655 and FBI-000656 (AR-15 stock wrench); FBI-000627, FBI-000629,

FBI-000631 (black shotgun shell and blue lighter), FBI-000636 (silver folding knife). (Def. Ex.

14 (ECF 113-15)); *see also* Doc. 118 at 16-17 (discussing location of items on scene). Additional

items were found on Gipp's person at the autopsy, including but not limited to a second black

live PDX1 Defender 12-gauge shotgun round, set of gold-colored brass knuckles, a silver-

colored necklace with handcuff key, and black-matte metal field-point arrowhead. Autopsy

photos (Def. Ex. 16 (ECF 113-17)).

 The United States disputes that Gipp did not present a threat of bodily harm on the night

of the shooting. As discussed above, he fired a gun in town, was armed with several weapons,

and was acting in an unpredictable and aggressive manner while ignoring police commands.

While Plaintiffs' highlight that Officer Sandland stated at one point in his deposition that Gipp

did not threaten him or Officer Webb with bodily harm–which Officer Sandland could have

interpreted to mean a "verbal" threat–Officer Sandland also testified that just prior to the tasing,

Gipp threatened him by balling his hand into a fist like he was going to strike Officer Sandland.[8] Sandland Dep., at 173:23-25, 179:1-11 (Def. Ex. 6 (ECF 113-7 at 44, 46)). Officer Sandland also considered Gipp, the last person remaining in the Gipp vehicle, as a present threat. *Id.* at 133:22-134:3. Also, because Officer Sandland lost sight of Gipp prior to the shooting, he is unable to testify either way if Gipp posed a threat by pulling out a black shiny object prior to the shooting. *Id.* at 199:7-200:4. The fact that Officer Sandland cannot testify to the heightened threat level experienced by Officer Webb at that moment in no way contradicts the underlying basis for Officer Webb's objectively reasonable belief that Gipp was drawing a gun, placing the officers in imminent danger of death or serious bodily injury.

The United States disputes that Plaintiffs accurately summarize Officer Webb's description of the possible crimes Ryan Gipp committed prior to the tasing the night of the shooting. Officer Webb also described "carrying the gun" which could also have been charged as

---

[8] Anticipating this exact scenario, Defendants' counsel repeatedly objected to Plaintiffs' counsel's tactic of asking unclear questions–including the very one cited by Plaintiffs–regarding whether Gipp "threatened" the officers. Sandland Dep. at 137:13-18 (Def. Ex. 6 ECF 113-7 at 35)). There is a difference between Gipp *posing* a threat to the officers versus Gipp verbally or physically making an explicit threat to the officers. During one exchange when this was specifically noted in an objection, Plaintiffs' counsel pointedly declined to clarify or cure the defect, surely hoping to capitalize on the answers to his misleading questions:

Q. Okay. At any time when you're within that few feet of him does he threaten you in any way?
MR. THOMAS: Object. "Threaten" is an undefined term.
MR. GONZALEZ: You mean verbally, physically?
Q. Go ahead. Did he threaten you in any way?
MR. THOMAS: Same objection.
MR. GONZALEZ: Join.
A. Yes.
Q. What did he do or say that you viewed as threatening?
A. When he came walking towards me, out of view of the camera, he had balled up his fists like he was going to -- going to strike me.

*Id.* at 173:9-25; *see also* Webb Dep. at 220:1-18, 293:12-15 (Def. Ex 1 (ECF 113-2 at 56, 74)).

a violation under the tribal code, *supra* at n.4. Webb Dep. at 348:20-349:5 (Def. Ex. 1ECF 113-2 at )). As to Plaintiffs' legal conclusions about the charges, the United States notes the charging decisions, and whether Gipp's conduct at any time during the incident would have sufficed to support other charges, would typically be made by a prosecutor examining the evidence, rather than Officer Webb, and the determination of guilt would have been by the finder of fact. *Id*. (noting deposition objections to form, legal conclusions, and incomplete hypotheticals).

The United States does not dispute that Gipp died from his injuries.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In applying the standard, the court reviews all evidence in the light most favorable to the nonmoving party. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 603 (2015).

There is, of course, a second element to Rule 56(a):  that the movant be "entitled to judgment as a matter of law." Even if, *arguendo*, there are no material issues of fact, the movant must still identify a legal theory entitling the movant to judgment as a matter of law. *See Johnson v. Am. Leather Specialties Corp.*, 578 F. Supp. 2d 1154, 1162 (N.D. Iowa 2008).

> Rule 56(a) requires the moving party to demonstrate "that there is no genuine dispute as to any material fact *and* [that] the movant is entitled to judgment as a matter of law" (emphasis added). Therefore, in order to prevail on this motion, Hood must demonstrate not only that there is no genuine factual dispute, but that "the controlling law *must* require a decision in [its] favor." 11 *Moore's Federal Practice,* § 56.21 (3d ed. 2012) (emphasis added); *Wrobel v. County of Erie,* 692 F.3d 22, 692 F.3d 22, 2012 WL 3104529, *3 (2d Cir. 2012) ("Summary judgment is only appropriate when the evidence is so one-sided that one party must prevail

as a matter of law"). Even where the facts are undisputed, summary judgment must be denied "if the controlling law does not . . . dictate the outcome of the claim or defense". *Moore's*, § 56.21.

*Steuben Foods, Inc. v. HP Hood, LLC*, No. 12-CV-00211 A M, 2012 WL 7829014, at *1

(W.D.N.Y. Oct. 3, 2012) (emphasis in original), *report and recommendation adopted*, No. 12-

CV-211A, 2013 WL 1337318 (W.D.N.Y. Mar. 29, 2013).

## LEGAL STANDARD FOR FINDING OF UNCONSTITUTIONALITY

Under North Dakota law:

All regularly enacted statutes carry a strong presumption of constitutionality, which is conclusive unless the party challenging the statute clearly demonstrates that it contravenes the state or federal constitution. *Teigen [v. State, 2008 ND 88* at ¶ 7, 749 N.W.2d 505]; *Grand Forks Prof'l Baseball, Inc. v. North Dakota Workers Comp. Bureau,* 2002 ND 204, ¶ 17, 654 N.W.2d 426. Any doubt about a statute's constitutionality must, when possible, be resolved in favor of its validity. *State v. M.B.,* 2010 ND 57, ¶ 4, 780 N.W.2d 663; *Hoffner v. Johnson,* 2003 ND 79, ¶ 8, 660 N.W.2d 909. The power to declare a legislative act unconstitutional is one of the highest functions of the courts, and that power must be exercised with great restraint. *Teigen,* at ¶ 7; *MCI Telecomm. Corp. v. Heitkamp,* 523 N.W.2d 548, 552 (N.D.1994). The presumption of constitutionality is so strong that a statute will not be declared unconstitutional unless its invalidity is, in the court's judgment, beyond a reasonable doubt. *In re Craig,* 545 N.W.2d 764, 766 (N.D.1996); *MCI,* at 552. The party challenging the constitutionality of a statute has the burden of proving its constitutional infirmity. *State v. Brown,* 2009 ND 150, ¶ 30, 771 N.W.2d 267; *City of Fargo v. Salsman,* 2009 ND 15, ¶ 23, 760 N.W.2d 123.

*Simons v. State, Dep't of Hum. Servs.*, 2011 ND 190, ¶ 23, 803 N.W.2d 587, 594-95. Moreover,

North Dakota has statutorily enacted Rules of Interpretation, including the following

presumptions:

In enacting a statute, it is presumed that:
  1. Compliance with the constitutions of the state and of the United States is intended.
  2. The entire statute is intended to be effective.
  3. A just and reasonable result is intended.
  4. A result feasible of execution is intended.
  5. Public interest is favored over any private interest.

N.D.C.C. § 1-02-38, "Intentions in the enactment of statutes."

14

**ARGUMENT**

Plaintiffs have already dismissed their *Bivens* claims in this case. (ECF 69, 108). The remaining claims are North Dakota state tort claims for assault and battery and negligence brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671-2680 (2006). The FTCA requires courts to apply the "law of the place where the act or omission occurred" (28 U.S.C. § 1346(b)(1)) to the disposition of claims, thus making the tort law of the state in which the alleged tortious conduct occurred determinative of substantive liability under the FTCA. *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). Here, North Dakota law applies because the events at issue occurred here. *See Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019).

## I.     PLAINTIFFS' MOTION IS NEITHER RIPE FOR ADJUDICATION NOR NECESSARY TO RESOLVE THE CASE.

The Court should deny Plaintiffs' Motion because it is not yet ripe for adjudication and no constitutionality determination is necessary to resolve the case at this juncture. The constitutionality of a statute may be challenged on its face or as applied. In a facial challenge, the plaintiff "must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Hall*, 44 F.4th 799, 805 (8th Cir. 2022). "An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Id*. at n.5 (citation omitted); s*ee also State v. Anderson*, 2022 ND 144, ¶ 7, 977 N.W.2d 736, 738-39 (discussing facial vs. as applied challenges). Plaintiffs concede a facial challenge here would have no merit because the United States Supreme Court, in *Garner*, previously held the language at issue is not unconstitutional on its face. (ECF 120, at 8, n.7). "It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect

poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11.

For the statute to be found to be unconstitutional "as applied" it follows that a condition precedent is that the Court has already applied it. In *Garner*, the Supreme Court found the statute at issue to be facially valid, but unconstitutional as applied, because the trial court below had actually applied it in an unconstitutional manner. After a 3-day bench trial, the trial court entered judgment for the officer who had shot and killed a suspect, even though the officer had no articulable basis to think Garner was armed. *Garner*, 471 U.S. at 1, 20-21. Nonetheless, the trial court concluded the officer's use of force was authorized by the Tennessee statute, which in turn was constitutional. *Id*. at 5-6. The trial court "concluded that [the officer] was justified in shooting Garner because state law allows, and the Federal Constitution does not forbid, the use of deadly force to prevent the escape of a fleeing felony suspect if no alternative means of apprehension is available. . . . This conclusion made a determination of Garner's apparent dangerousness unnecessary." *Id.* at 20.

The Sixth Circuit reversed and remanded, finding the Tennessee statute failed as applied to the facts of the case by the trial court because "the facts, as found, did not justify the use of deadly force under the Fourth Amendment." *Id*. at 6 (citing *Garner v. Memphis Police Dep't*, 710 F.2d 240, 246 (6th Cir. 1983)). The Supreme Court affirmed, finding the trial court should have examined the totality of the circumstances to determine whether the use of force–the seizure–was justified under the Fourth Amendment, *i.e.* was "reasonable," when applying the Tennessee statute. *Garner*, 471 U.S. at 6-9. The Supreme Court held, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be

used if necessary to prevent escape, and if, where feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster." *Garner*, 471 U.S. at 11-12.

Here, this Court has not applied N.D.C.C. § 29-06-13, so there can be no "as applied" analysis of constitutionality. Plaintiffs know this; the relief they request confirms they seek an advisory opinion to prospectively adjudicate potential application of the law by the Court: "Plaintiffs seek partial summary judgment on the United States' section 29-06-13 defense *to the extent it would foreclose consideration of the reasonableness of the deadly use of force Webb employed*." (ECF 120, at 1) (emphasis added). Such relief is not available under the law and facts as they exist now; rather, it is wholly dependent upon contingencies that may never come to pass.

Given the multiple legal bases for judgment in favor of Officer Webb, it is possible the Court may decide in favor of Officer Webb *without* reliance on § 29-06-13, meaning the constitutional question may never achieve ripeness.

> It is a cardinal rule of decision making to avoid constitutional confrontations where there are appropriate alternative grounds to resolve the case before us. *Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 2451, 73 L.Ed.2d 16 (1982); *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960); *State v. King*, 355 N.W.2d 807, 809 (N.D.1984); *State ex rel. Stutsman v. Light*, 68 N.D. 513, 281 N.W. 777, 780 (1938) (a constitutional question will be decided only when it is properly before the court and the question *must* be decided in order to resolve the controversy).

*In Int. of Goodwin*, 366 N.W.2d 809, 814 (N.D. 1985) (emphasis in original); *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 345-47 (1936) ("It is a foundational principle in our legal system, enunciated by Justice Brandeis in a familiar concurrence, that courts must make every effort to avoid deciding novel constitutional questions.")). Here there is no need, or even the capability, to determine at this time whether the statute will be applied unconstitutionally by this Court at some

future date.

Alternatively, the Court might rely on § 29-06-13 but simultaneously make a determination as to whether Officer Webb's use of force was reasonable, satisfying *Garner*'s direction that application of the statute be assessed in relation to the reasonableness of the use of force under the totality of the circumstances. At this stage in the litigation Plaintiffs are merely worried that the Court might not assess the reasonableness of the use of force.

> "Merely potential impairment of constitutional rights under a statute does not of itself create a justiciable controversy in which the nature and extent of those rights may be litigated." *In re C.W.*, 453 N.W.2d 806, 810 (N.D. 1990) (quoting *Communist Party v. Control Bd.*, 367 U.S. 1, 71, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961)). The adjudication of the constitutionality of a statute when there is only merely a potential for impairment of constitutional rights would result in an advisory opinion. *C.W.*, at 810. It is well settled that courts should not give advisory opinions where no actual controversy needs to be decided. *Id.* We have explained:
>
> > This court may not render advisory opinions. We may adjudicate only an actual controversy, which requires an issue that is ripe for review. An issue is not ripe for review if it depends on future contingencies which, although they might occur, necessarily may not, thus making addressing the question premature.
>
> *Sprunk v. N.D. Workers Comp. Bureau*, 1998 ND 93, ¶ 15, 576 N.W.2d 861 (citations and quotations omitted). "As a general rule a court will inquire into the constitutionality of a statute only to the extent required by the case before it and will not anticipate a question of constitutional law in advance of the necessity of deciding it, and will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *State v. King*, 355 N.W.2d 807, 809 (N.D. 1984) (quoting *Tooz v. State*, 76 N.D. 599, 38 N.W.2d 285, 287 (1949)).
>
> We agree with the district court that Anderson's argument that the statute was not constitutional as applied to him was not ripe for review. The issue raised in his motion depended on future contingencies that were not certain to occur. We conclude the question was raised prematurely and we will not consider his arguments at this time.

*State v. Anderson*, 2022 ND 144, ¶¶ 11-12, 977 N.W.2d 736, 739-40.

Article III of the United States Constitution prohibits federal courts from issuing advisory opinions in the absence of a definite and concrete controversy. *Vorbeck v. Schnicker*, 660 F.2d 1260, 1266 (8th Cir. 1981). The requirement that a matter be ripe for adjudication is designed to prevent federal courts from entangling themselves in abstract disagreements through premature adjudication. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 806 (2003). Constitutional questions are to be avoided, unless absolutely necessary. "No rule of practice of this Court is better settled than 'never to anticipate a question of constitutional law in advance of the necessity of deciding it.'" *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 71-72 (1961) (quoting *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885)).

Here, Plaintiffs' as-applied challenge only becomes ripe *if* the Court holds that Officer Webb's conduct was not objectively reasonable under the Fourth Amendment but was nonetheless justified because N.D.C.C. § 29-06-13 permits an officer to use any force whatsoever to effect an arrest. No party has asked the Court to do that. There is no present conflict and Plaintiffs' motion is simply not ripe for adjudication.

## II.   NORTH DAKOTA LAW PROHIBITS UNNECESSARY OR EXCESSIVE FORCE IN AN ARREST.

In the event the Court permits the "as applied" constitutional challenge to go forward at this time, it must nonetheless fail on the merits. Not only are Plaintiffs not entitled to judgment in their favor as a matter of law pursuant to Rule 56(a), Plaintiffs must lose their challenge because application of § 29-06-13 is statutorily tempered by N.D.C.C. § 29-06-10, "Restraint in an arrest is limited," which states: "A person who is arrested may not be subjected to unnecessary or unreasonable force, nor to any greater restraint than is necessary for the person's detention." The two provisions must be read in conjunction with one another. "Statutes must be construed as a

whole and harmonized to give meaning to related provisions, and are interpreted in context to give meaning and effect to every word, phrase, and sentence." *Herring v. Lisbon Partners Credit Fund, Ltd. P'ship*, 2012 ND 226, ¶ 15, 823 N.W.2d 493, 498. "When statutes relate to the same subject matter, this Court makes every effort to harmonize and give meaningful effect to each statute." *State v. Murphy*, 2014 ND 202, ¶ 25, 855 N.W.2d 647, 654.

"Under North Dakota law, an assault is 'any willful and unlawful attempt or offer with force or violence, to do a corporal hurt to another,' and a battery is 'any willful and unlawful use of force or violence upon the person of another.'" *Clark v. Carlson*, No. 1:18-CV-00026, 2020 WL 10731267, at *5 (D.N.D. Oct. 14, 2020) (quoting *Wall v. Zeeb*, 153 N.W.2d 779, 786 (N.D. 1967). *See generally* North Dakota Jury Instructions - Civil C-12.00 Assault 1999 (2019 ed.) ("A person commits assault if that person willfully causes bodily restraint or harm to another or places another in immediate apprehension of bodily restraint or harm.") and C-12.10. Battery 2014 (2019 ed.) ("A person commits battery if that person:  1) intentionally causes a harmful or offensive contact with another or places another in immediate apprehension of such contact; and 2) directly or indirectly results in harmful or offensive contact with the other person.").

In either case, the act must be unjustifiable to constitute battery or assault. *Binstock v. Fort Yates Pub. Sch. Dist. No. 4,* 463 N.W.2d 837, 840 (N.D. 1990). North Dakota law explicitly excuses the use of force by a defendant in an assault and battery claim when the defendant reasonably believed the plaintiff intended to do the defendant harm.

> In a civil action for assault, the defendant's belief that the plaintiff intended to do him bodily harm cannot support a plea of self-defense unless it was such a belief as a reasonable person of average prudence would have entertained under similar circumstances. It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken. In forming such reasonable belief a person may act upon appearances.

*Jahner v. Jacob*, 233 N.W.2d 791, 797 (N.D. 1975) (quoting 6 Am. Jur. 2d Assault and Battery § 161). The degree of force exerted is likewise limited by reasonableness:

> It is thus seen that the right of self-defense is not limited by actualities, but by reasonableness of belief, and that a person may be justified by self-defense where he used such force as reasonably appeared to him necessary to repel the attack, although the force used by him was greater than in retrospect appears to have been actually necessary. One who uses excessive force in repelling an attack may not be precluded from asserting self-defense, but may become civilly liable as an aggressor for so much of the force used as is excessive.

*Id.* (quoting 6 Am. Jur. 2d Assault and Battery § 162).

The *Jahner* court noted the rule of law in a civil case:  "Factors to consider in determining whether a person acted in self-defense and is thereby exempt from liability for injury caused to another are the reasonableness of his belief (of being) in danger and the reasonableness of his belief of the need of the amount or degree of force used." *Id.* (quoting *Julson v. Loyal Order of Moose Number 822*, 140 N.W.2d 39, 40 (N.D. 1966)). The common law of North Dakota has long authorized the reasonable use of force in self-defense. Conveniently, the standard has been distilled into a North Dakota Jury Instruction relating to civil assault:

> An individual may use any force necessary to protect his or her person. However, the force used must be no more than the individual reasonably believed necessary at that time to provide the necessary protection.
>
> If the Plaintiff committed the initial assault, the burden is on the individual assaulted to prove that no more force than was reasonably necessary was used to prevent or contain the assault. In meeting that burden, the Defendant must have some reasonable basis for believing he or she was in danger. In addition, the Defendant must have some reasonableness in the belief of the amount or degree of force used under the circumstances. . . .

North Dakota Jury Instructions - Civil C-12.05 Justifiable Response to Assault 2013 (2019 ed.).

Turning to the challenged statute, N.D.C.C. § 29-06-13, the United States notes it is only one of several North Dakota statutes related to the use of force, but it is the only one Plaintiffs constitutionally challenge. Indeed, Plaintiffs distinguish the challenged statute from N.D.C.C. Ch. 12.1-05, "Justification—Excuse—Affirmative Defenses." (ECF 120 at 8, n.8).[9] Plaintiffs acknowledge the constitutionality of the provisions of N.D.C.C. Ch. 12.1-05 because it contains limiting language at N.D.C.C. § 12.1-05-07(1), providing that "[a]n individual is not justified in using more force than is necessary and appropriate under the circumstances[.]" For the same reason, the limiting language of § 29-06-10 takes the potential unconstitutionality of § 29-06-13 off the table.

And, as Plaintiffs themselves highlight, North Dakota state and federal courts have routinely applied a standard of reasonableness to an officer's use of force when interpreting North Dakota state law. (ECF 120, at 10) (citing *Schell v. Collis*, 83 N.W.2d 422, (N.D. 1957); *Wall v. Zeeb*, 153 N.W.2d 779, 789 (N.D. 1967), *Clark v. Carlson*, 2020 WL 10731267, at *5; *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1067 (D.N.D. 2021)). The United States agrees.

For the last 66 years–well before the *Garner* case–the North Dakota Supreme Court recognized that the language now found in § 29-06-13 (then included in § 29-0613) provides protection only to an officer that uses reasonable force under the circumstances:

> *The law protects an officer who is trying to do his duty as long as he does not use more force than is necessary*. In making an arrest he is under no obligation to retreat but has both the legal right and the official duty to press forward and accomplish his object by overcoming any resistance offered. . . . If after notice of intention to arrest, the defendant either flees or forcibly resists, the officer may use all necessary means to effect his arrest, Sec. 29-0613, NDRC 1943.

---

[9] Incidentally, the United States' motion for summary judgment extensively discusses N.D.C.C. Ch. 12.1-05 as grounds for judgment in its favor. (Doc. 118 at 21-22, 30, 34).

*Schell*, 83 N.W.2d at 425 (emphasis added). In *Schell*, the North Dakota Supreme Court, after having cited § 29-06-13, extensively reviewed the facts and circumstances leading up to the use of force and held that the officer "was justified in using force to overcome that resistance; that he did not use any more force than was reasonable and necessary." *Id.* at 428.

The *Schell* court did not mechanically apply § 29-0613 to justify the use of any degree of force to effect an arrest, unlike the trial court in *Garner*. Rather, the court undertook an in-depth analysis of the events leading up to and during the use of force in order to assess the reasonableness of the officer's use of force. There, the Sheriff of Sioux County was attempting to persuade an intoxicated, disorderly bar patron (the plaintiff) to leave a bar and go home, or face arrest. The plaintiff kicked the officer in the crotch, then in the shoulder as the officer doubled over in pain, and then the officer partially straightened up and punched the plaintiff in the face. The plaintiff was wearing glasses, which broke when he was punched, causing him to lose his left eye. *Schell*, 83 N.W.2d at 425-26.

The plaintiff claimed the officer "used more force than was necessary." *Id*. The court noted, "[T]he presumption is that an officer performs his duty correctly and acts with ordinary caution and in good faith. That presumption prevails unless overcome by definite evidence to the contrary. 'It is always to be presumed that a public officer has acted with ordinary caution and in good faith. . . . This presumption is one of law and necessarily continues until it is overcome by truth to the contrary.'" *Id.* (citations omitted). In assessing the reasonableness of the force, the court noted, "The circumstances of the assault rather than the result must control." *Id*.

> An officer in making an arrest is presumed to act in good faith as to the extent of the force employed by him. He must not employ force carelessly or unnecessarily. If he does so and injures the accused, he will be penalized. This is a jury question but the officer is primarily the judge of the extent of the force to be employed by him under the circumstances, he will not be deemed to have exercised excessive force unless it appears that he has abused his power and authority his conduct

must be weighed in the light of the circumstances under which he acted and not
measured by subsequently developed facts.

*Id.* at 427 (cleaned up) (quoting *Village of Barboursville ex rel. Bates v. Taylor*, 174 S.E. 485,

488 (W. Va. 1934) (overruled on other grounds by *State v Choat*, 363 S.E.2d 493 (W. Va.

1987)).

Similarly, in *Wall v. Zeeb* the Supreme Court cited § 29-06-13, then in the very next

sentence went on to state:

> The trial court properly instructed that the law protects an officer who is trying to
> do his duty as long as he does not use more force than necessary and, in making
> an arrest, he is under no obligation to retreat but has both a legal right and official
> duty to press forward and accomplish his object by overcoming any resistance
> offered. The person arrested shall not be subjected to unnecessary or unreasonable
> force or to any greater restraint than is necessary for his detention.

*Wall*, 153 N.W.2d at 789 (citing *Schell*, *supra*). The court noted the finder of fact would, in the

course of assessing the arrest, have to determine "whether the officer subjected the plaintiff to

unnecessary or unreasonable force to effect the arrest after giving the officer the benefit of the

presumption of correct performance of his duty. The conduct of the officer must be weighed in

the light of the circumstances under which he acted and not by the incidental results thereof." *Id*.

Similarly, this Court in *Brossart v. Janke* noted North Dakota law on the use of force is similar to

that surrounding the Fourth Amendment:

> In determining whether the use of force was objectively reasonable [under the
> Fourth Amendment] the court looks to "the totality of the circumstances,
> including the severity of the crime, the danger the suspect poses to the officer or
> others, and whether the suspect is actively resisting arrest or attempting to flee."
> North Dakota law is similar. Under North Dakota law, '[i]f, after notice of
> intention to arrest the defendant, the defendant either flees or forcibly resists, the
> officer may use all necessary means to effect the arrest.' … North Dakota law:
> protects an officer who is trying to do his duty as long as he does not use more
> force than is necessary.

*Brossart v. Janke*, No. 3:14-CV-62, 2016 WL 9459263, at *9 (D.N.D. Jan. 12, 2016), *aff'd*, 859

F.3d 616 (8th Cir. 2017) (citations omitted).

In the *Clark* case, this Court reached the same conclusion, citing to § 29-06-13 right after

noting, "To prevail on a claim for battery against police officers attempting to make a lawful

arrest, the plaintiff bears the burden of proving that the officers used unreasonable force." 2020

WL 10731267, at 5 (citing *Wall*, *supra*). And in *Dundon*, this Court addressed the state-law

battery claim against law enforcement officers who employed less-than lethal force, and applied

a reasonableness test in conjunction with application of N.D.C.C. Ch. 12.1-05. 577 F. Supp. 3d at

1066-67.

## CONCLUSION

Plaintiffs' "as applied" constitutionality challenge is not ripe. Plaintiffs seek an advisory

opinion premised on speculative future impairments to constitutional rights. The unfettered

application of § 29-06-13 that Plaintiffs fear simply has not happened. No facts are presented to

the Court which would allow it to test them against the strong presumption of the statute's

constitutionality, which is conclusive unless Plaintiffs clearly demonstrate—beyond a reasonable

doubt—that the statute contravenes the state or federal constitution. The Court should reject

Plaintiffs' challenge.

North Dakota law, including the very statute challenged here, already has both statutory

and common law standards in place with respect to evaluating reasonableness and necessity in

connection with use of force. Moreover, the United States has not advanced an argument in this

case that Officer Webb was entitled to use unlimited force to effect Gipp's arrest, and the Court

has not so held. Instead, the United States filed a motion for summary judgment advancing the

argument that *because* Officer Webb's use of force was objectively reasonable under the Fourth

Amendment, it was also justified under North Dakota law. Both parties are advocating for the evaluation of Officer Webb's conduct consistent with the Fourth Amendment's reasonableness standard, comparable to the standard that North Dakota courts have reliably been applying for at least the last 66 years.

If the United States prevails on its summary judgment motion on grounds that Officer Webb's conduct was objectively reasonable under North Dakota state law and the Fourth Amendment, then there is no conflict between federal and state law, and Plaintiffs' as-applied challenge must fail.

The Court should deny Plaintiffs' motion for partial summary judgment.

Dated this 19th day of September 2023.

> MAC SCHNEIDER
> United States Attorney
>
> By:    /s/ James Patrick Thomas
> JAMES PATRICK THOMAS
> Assistant United States Attorney
> ND Bar ID 06014
> SARAH E. WALL
> Assistant United States Attorney
> ND Bar ID 07822
> P.O. Box 699
> Bismarck, ND  58502-0699
> (701) 530-2420
> james.p.thomas@usdoj.gov
> sarah.wall@usdoj.gov
>
> BRIAN M. BOYNTON
> Principal Deputy Assistant Attorney
> General, Civil Division
>
> C. SALVATORE D'ALESSIO, JR.
> Director, Torts Branch
> Civil Division

RICHARD MONTAGUE
Senior Trial Counsel, Torts Branch
Civil Division

SIEGMUND F. FUCHS
Senior Trial Attorney, Torts Branch
District of Columbia Bar No. 986828
JOSEPH A. GONZALEZ
Trial Attorney, Torts Branch
District of Columbia Bar No. 995057
Civil Division
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
P.O. Box 7146
Washington, D.C. 20044-7146
(202) 598-3888 (phone)
(202) 616-4314 (fax)
siegmund.f.fuchs@usdoj.gov
joseph.a.gonzalez@usdoj.gov

Attorneys for United States of America