IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Elias Gipp, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case No. 1:19-cv-213 |
| | ) |
| v. | ) **UNITED STATES' REPLY IN SUPPORT** |
| | ) **OF ITS MOTION FOR SUMMARY** |
| United States of America, | ) **JUDGMENT** |
| | ) |
| Defendant. | ) |

Plaintiffs fail to offer affirmative evidence of material disputed facts foreclosing judgment in favor of the United States as a matter of law. Disbelief, speculation, and a few perceived immaterial inconsistencies do not suffice under Rule 56. The undisputed evidence is not going to change between now and a bench trial. Everything material leading up to the tasing was recorded. Everything material leading up to the shooting was either recorded or recounted by the officers present. Plaintiffs don't believe the witnesses; disbelief, however, is not evidence.

## **ARGUMENT**

Two undisputed facts highlight the serious threat Gipp posed from the start of this high-risk felony stop. First, Officer Webb reasonably believed Gipp had a gun. Gipp previously discharged a gun at Hagel's and Officer Webb did not see Gipp discard it. Plaintiffs find Officer Webb's belief unreasonable; they are mistaken. *See Loch v. City of Litchfield*, 689 F.3d 961, 966-67 (8th Cir. 2012) (officer's belief suspect was armed reasonable where officer was told suspect had a gun and did not see suspect discard it). Plaintiffs note George Gipp told Officer Sandland there was no gun, but officers are not required to credit representations that a suspect is unarmed. *Id.*; *see also Borgman v. Kedley*, 646 F.3d 518, 524 (8th Cir. 2011).[1] Second, Plaintiffs do not

---

[1] Plaintiffs' expert agrees. Depo. of Seth Stoughton, 08/31/2023, (Stoughton Dep.), at 150:15-18 (Officer Webb's belief Gipp potentially had a gun "makes sense") (Exhibit 22), filed herewith.

1

dispute Officer Webb heard over dispatch "we need to find the victim of who might have been shot." ECF 118, at 5. Thus, Officer Webb reasonably believed Gipp had a gun *and* reasonably feared Gipp shot at a victim. *Lankford v. City of Plumerville*, 42 F.4th 918, 922 n.3 (8th Cir. 2022) (officers may rely on information heard over dispatch reporting a crime).

### A. There is no genuine dispute of material fact the tasing was justified.

Plaintiffs do not dispute the events at the start of the high-risk felony stop, but they omit several key facts: it took Gipp over two minutes to exit the vehicle after directed; upon exiting he picked up the car keys, returned to the vehicle, and opened the door; Gipp repeatedly placed his hands in his pockets; and, Gipp defied instructions to walk backward toward the officers with hands up. Plaintiffs claim "events become largely disputed" just before the tasing. ECF 128, at 7. It is hard to imagine why. Those events were recorded. As Plaintiffs concede: "The video speaks for itself." *Id.* Plaintiffs nevertheless suggest three disputes; none forecloses summary judgment.

First, Plaintiffs believe there is a dispute because they *characterize* Gipp's approach toward the officers as non-aggressive. *Id.* at 7-8. "Characterizations are not evidence." *Thomas M. Cooley Law Sch. v. ABA*, No. 17-13708, 2018 WL 8806179, at *4 (E.D. Mich. Aug. 6, 2018). The Court may view the Dashcam Video and decide for itself whether Gipp's front-facing approach toward officers who had guns drawn could reasonably be perceived as aggressive and non-compliant, given (1) Officer Webb believed Gipp had a gun; (2) Gipp's hoodie pocket was weighed down;[2] (3) Gipp's approach was contrary to commands; (4) Gipp kept reaching into his

---

[2] Plaintiffs' experts initially speculated Gipp's hoodie pocket was not weighed down. Both experts walked that back at deposition. Desmoulin Dep. (ECF 126-1), at 224:3-4 (conceding Gipp had several things in his pocket and "[i]t all adds up"); Stoughton Dep. at 309:2-313:8 (conceding Gipp's pocket could have looked weighed down: "Sure. It might have. It might not have;" and that he does not know what all Gipp had in his hoodie pocket) (Ex. 22); *see also* ECF 118, at 16-17 (identifying items in Gipp's hoodie pocket).

pockets; and, (5) Plaintiffs do not dispute that as Gipp approached, Officer Webb ordered him to get on the ground but Gipp refused. ECF 118 at 10.[3]

Second, Plaintiffs dispute Gipp balled his hand into a fist. ECF 128 at 8-9. Plaintiffs do not offer any contrary evidence, just disbelief—noting the officers did not mention a fist during the initial after-incident interviews. *Id.* Skepticism is not evidence. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Also, it is expected officers provide more details in a seven-hour deposition in response to detailed, moment-by-moment questions, rather than a short debriefing interview consisting of open-ended, broad questions. *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 (10th Cir. 2008). Plaintiffs concede Officer Webb stated during the internal affairs interview Gipp did a "certain jerk" like he was ready to "fight Sandland." ECF 128 at 8; *see also* BIA-IA Webb IA Interview - IA Tr. (ECF 113-8 at 10); Webb BIA Interview – P Tr. (ECF 113-9 at 20:1-14). Plaintiffs counter Officer Webb never mentioned Gipp's fist, but that is not true. ECF 113-8 at 14-15; ECF 113-9 at 32:19-23 (stating that prior to losing sight of Gipp's hands, Gipp looked like he "tried to throw a punch"). The Dashcam Video confirms at the point when Officer Sandland said Gipp made a fist, Gipp was in a bladed stance—right foot behind left foot—a position he would take to strike with his right hand. Dashcam Video #1 (ECF 113-11), at 11:01. A Taser Video screen shot shows Gipp with his right hand balled up, clutching the keys. Stoughton Report (ECF 120-3), at 16. It stands to reason Gipp had his right hand balled up, clutching the keys just before the tasing, too. The officers say it happened, the video lends

---

[3] Plaintiffs speculate Gipp approached the officers because Officer Sandland called his name. Opp., at 8. Guesses about Gipp's motives are not evidence. *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 811 n.3 (8th Cir. 2008). Also, Plaintiffs are just making this up. Officer Sandland testified he called Gipp's name at about 10:57 on the Dashcam Video. Sandland Dep. (ECF 113-7), at 183:21-24. At that point, Gipp had *already* approached the officers and was *already* standing in front of Officer Webb's vehicle. Dashcam Video #1 (ECF 113-11), at 10:57.

support, and Plaintiffs offer nothing contrary. Those are not hallmarks of a "genuinely disputed" fact.[4]

Third, Plaintiffs disingenuously dispute whether Officer Webb discharged his taser because Gipp "took off" or because Officer Webb "could not see [Gipp's] hands." ECF 128 at 9. This is another red herring. Everyone—including Officer Webb—agrees Gipp did not flee until *after* the taser discharge. ECF 125 at 6-7. There can be no genuine dispute where everyone agrees. Plaintiffs try to discredit Officer Webb's testimony, claiming he told the "took off" story to the FBI and the "hands" story at his deposition. Even if true, discredited testimony does not create a genuine dispute. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). And, Plaintiffs' dispute is artificial, not genuine. During the FBI interview, Officer Webb stated: "I had the Taser out, and *now I can't see his hands*, and Gary's yelling at him, was aggressive towards him, and I see him *leaning* towards of taking off, so I deployed my Taser at him." ECF 113-3 at 15:21-16:2 (emphasis added). Officer Webb stopped to make a point about Gipp's

---

[4] Plaintiffs misleadingly cite testimony from Officer Sandland that Gipp did not threaten him with bodily harm. ECF 128 at 8-9. The United States already addressed this issue. ECF 125 at 12 n.8. When asked if Gipp threatened him, Officer Sandland said, "yes. . . . When he came walking towards me, out of view of the camera, he had balled up his fists like he was going to – going to strike me." *Id.* Also, when Officer Sandland approached Gipp just before the tasing, he asked Officer Webb to cover him with his rifle, further evidence of the perceived threat. Sandland FBI Interview (ECF 113-6) at 123-17. Plaintiffs belabor the fact Officer Sandland did not fire his gun, but reasonableness is evaluated from the perspective of the officer who used force. The Supreme Court has not hesitated to find no clear Fourth Amendment violation where one officer shot and others did not. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018). Also, Officer Sandland lost sight of Gipp just prior to the shooting, so he did not see when Gipp drew something from his pocket, ECF 118 at 13, but Officer Sandland did testify he was not surprised Officer Webb fired his gun. Sandland Dep. (ECF 113-7), at 205:1-13. Plaintiffs note Officer Webb never told Officer Sandland he thought Gipp drew a gun, but after the shooting, Officer Webb pointed to the black shotgun shell and said, "Is that what he had in his hand?" Webb FBI Interview (ECF 113-3), at 22:16-19; ECF 113-6 at 22:12-17. Thereafter, the officers did not discuss these events because FBI instructed them not to—a common instruction during an officer-involved shooting investigation. ECF 113-7 at 8:3-10:3; Webb Dep. (ECF 113-2), at 60:1-16.

4

weighed-down hoodie pocket, and came back to the story: "So assuming that he has the gun in his pocket, when he comes around and takes off, I, I Taser him." *Id.* at 16:10-12. That one reference to "takes off" as Officer Webb transitions back to the account is Plaintiffs' *entire* argument. Plaintiffs fail to mention Officer Webb later clarifies: "I shot [the taser] again. He's taking off." *Id.* at 16:19-20. They also don't mention Officer Webb states *four additional times* during the FBI interview he discharged his taser because he lost sight of Gipp's hands. *Id.* at 33:2-35:4. Officer Webb reiterates the same in his internal affairs interview and his deposition. ECF 118 at 11. No matter how much Plaintiffs insist otherwise, Officer Webb's one passing reference to "takes off" right after he said Gipp was "*leaning*" towards taking off does not create a genuine dispute of material fact, particularly where the testimony is otherwise consistent, and confirmed by the Taser Video itself. *Id.*

Plaintiffs fault Officer Webb for not giving a taser warning. The law does not require one. *Boudoin v. Harsson*, 962 F.3d 1034, 1041-42 (8th Cir. 2020). The officers had their guns drawn throughout this encounter. In the Eighth Circuit, that put Gipp on adequate notice any escalation of the matter could result in deadly force, let alone less-than-deadly force. ECF 118 at 32 n.19. Plaintiffs argue if Gipp did create a fist, a use of force is evaluated at the moment force is used. ECF 128 at 19 n.18. The reasonableness of a use of force must also account for "the totality of the circumstances," *Boudoin*, 962 F.3d at 1041, including Gipp's repeated non-compliance and active resistance. Plaintiffs argue the fist is irrelevant; this is nonsensical given it occurred a mere *two seconds* before the tasing. Dashcam Video #1 (ECF 113-11), at 11:02-11:04.[5] Plaintiffs cite *Jackson v. Stair*, 944 F.3d 704 (8th Cir. 2019), to argue Officer Webb's

---

[5] Plaintiffs dispute Gipp received *de minimis* injuries from the taser. ECF 128 at 26. The autopsy report identifies a *single* "superficial" cut about ¼ of an inch in size associated with the taser probe. Autopsy Report (ECF 120-6), at 5.

second taser discharge was unreasonable. In *Jackson*, the Eighth Circuit identified a genuine fact dispute whether the second tasing was unreasonable because after the first tasing the suspect "was on his back, writhing on the ground." *Id.* at 711-12. Here, Officer Webb observed the exact opposite: Gipp was unaffected by the first discharge and *did not* fall to the ground, so Officer Webb deployed a second time. ECF 113-3 at 16:10-19.[6]

Plaintiffs next turn to their expert, who opined the taser discharge violated police practices. ECF 128 at 19-20. "An expert's after-the-fact opinion that danger was not 'imminent' in no way establishes that there was no danger, or that a conclusion by the officers that it *was* imminent would have been wholly unreasonable." *Whitley v. Albers*, 475 U.S. 312, 323 (1986).[7] Stoughton is also wrong. He opines a taser cannot be used in response to passive resistance. ECF 120-3 at 32. This is not the law. *Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018). Stoughton also refuses to accept Gipp engaged in *active*, not just passive, resistance. Stoughton Dep. at 47:2-48:3 (generally agreeing passive resistance is noncompliance with no movement and active resistance involves some engagement of the "skeletomuscular system") (Ex. 22). A reasonable officer could have readily interpreted Gipp's actions of (1) advancing as Officer Webb told him to get on the ground (ten seconds before the tasing); (2) taking a step back when Officer Sandland tried to approach him (four seconds before the tasing); and (3) balling his hand into a fist (two seconds before the tasing) as active resistance justifying the use of a taser.[8]

---

[6] Plaintiffs' expert agrees if Officer Webb was justified in discharging the taser and it was ineffective, it would be appropriate to discharge again. Stoughton Dep. at 110:3-12 (Ex. 22).

[7] At least one other court in this Circuit rejected Stoughton's police practices reasoning as incompatible "with the standards that govern the *legal* question whether conduct is constitutionally unreasonable—which, it bears recalling, is a question of law." *See Taylor v. Holtmeyer*, 183 F. Supp. 3d 962, 973-74 (D. Neb. 2016). The same observation applies here.

[8] *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion that does not account for all of the relevant facts is inadmissible speculation).

**B. There is no genuine dispute of material fact the shooting was justified.[9]**

As with the tasing, Plaintiffs maintain everything happening behind Officer Sandland's vehicle is "highly disputed." ECF 128 at 10. And like the tasing, Plaintiffs offer nothing more than skepticism. They raise two points. First, without authority, Plaintiffs contend everything Officer Webb said had happened was impossible in the allotted 5-second timeframe. They even create a detailed 7-point list (with commentary) to illustrate the point—although they fail to account for the reality that many of the events occurred simultaneously. It is quite possible for a suspect to make a charging motion, do two "quick peeks," take steps back, and start to turn all in the course of five seconds. Plaintiffs have no evidentiary basis to say otherwise.

Second, Plaintiffs question whether Gipp drew a black object from his pocket, but offer no contrary evidence. Their own expert was unable to render an opinion either way with respect to the AR wrench and the knife (and never even considered the black shotgun shell or lighter on the ground behind the tailgate or the other items in Gipp's pockets). ECF 128 at 28; ECF 126-1 at 208:11-211:11. Gipp certainly had several black objects on his person, including a second shotgun shell, keys, arrowhead, and the AR wrench. ECF 118 at 16-18. Officer Webb has been entirely forthright, he does not know exactly what Gipp drew from his pocket. Was it the black shotgun shell Gipp apparently dropped during the shooting? Was it the keys Gipp had in his hand as he ran behind Officer Sandland's vehicle? Was it the AR wrench, and after Officer Webb

---

[9] Plaintiffs cannot maintain both negligence and intentional tort claims. Plaintiffs rely on two cases. The issue in *Wall v. Zeeb*, 153 N.W. 2d 779 (N.D. 1967), was whether the officer accidentally shot tear gas. Plaintiffs advance no argument that Officer Webb accidentally discharged his weapon. The issue in *Beltran-Serrano v. Tacoma*, 442 P.3d 608 (Wash. 2019), was whether the officer's tactical approach was negligent, not whether the use of force was. Plaintiffs advance no such theory here. Even if Officer Webb misperceived Gipp's threat, that analysis is accounted for in the intentional tort use-of-force analysis. *See Wall*, 153 N.W.2d at 790 (misperception during a sudden emergency is not negligence under North Dakota law). A negligence theory is not viable.

started shooting, Gipp placed it back in his hoodie pocket? In the end, it does not matter. Through the dark, Officer Webb saw a black object he thought was a gun. Tellingly, Plaintiffs do not dispute that if Gipp did rapidly draw something from his hoodie pocket, then the shooting was objectively reasonable—their own police practices expert did not opine otherwise. ECF 120-3 at 38 (opining the shooting was unreasonable only "*if Mr. Gipp did not draw anything from his pocket or have anything in his hand at the time*") (emphasis added).[10]

Plaintiffs contend it would be odd for Gipp to draw something from his pocket, and then reach back into his pocket during the shooting. The United States rejects that premise and again notes, speculation and characterizations are not evidence.[11] Gipp's hands indisputably went in and out of his pockets throughout the entire incident as recorded on the dashcam. Gipp received gunshot wounds to his right wrist and left forearm, ECF 128 at 30 n.28, so he had hands out of his pockets at some point during the shooting. Officer Webb stated that when Gipp was on the ground, Gipp went back into his pocket again, causing Officer Webb to continue to shoot. ECF 118 at 15 n. 7. Officer Sandland confirms that when he approached Gipp just after the shooting,

---

[10] Plaintiffs claim Officer Webb has vacillated over what he saw, but the record says otherwise. Officer Webb told FBI he did not know which object Gipp drew from his pocket. ECF 113-3 at 38:21-22 ("[D]id he have that shotgun shell or did he have the tool? I don't know."). While he speculated during his internal affairs interview that Gipp could have drawn the AR wrench and that the AR wrench could look like the butt of a gun, when asked, "So what ultimately was in his hoody pocket, do you recall?" Officer Webb responded, "I don't remember," and said all he did remember was that after Gipp went down, Officer Webb saw the AR wrench. *See* ECF 113-8 at 12; ECF 113-9 at 27:23-28:2. Plaintiffs concede that to this day, Officer Webb does not know exactly what Gipp drew. ECF 128 at 14. Officer Webb just knows that in the dark, in the split second he had to respond, he thought Gipp drew a gun. 113-2 at 319:25-320:2, 343:13-25, 113-3 at 19:2-5, 21:13-17, 35:16-36:16; 113-9 at 38:5-7.

[11] Gipp indisputably engaged in a variety of odd and irrational behaviors that night, including firing a shotgun down the street at Hagel's, throwing the shotgun out the car window, picking up keys and returning to the vehicle, ignoring commands, repeatedly placing his hands in his pockets after being ordered not to, walking directly towards officers with rifles pointed at him despite orders to get on the ground, fleeing after an attempted arrest, and hiding behind a truck and doing quick peeks at Officer Sandland.

Gipp had one of his hands *back in his hoodie pocket*. ECF 113-7 at 235:22-236-12; *see also* Dashcam Video #1, ECF 113-11 at 11:26-11:45 (Officers Webb and Sandland can be heard telling Gipp to "give me your hands" and "stop fucking messing around").[12]

Unable to conjure a material dispute through some fact witness, Plaintiffs resort to an expert. They cite Desmoulin's opinion that "it is unlikely that [Gipp] was facing Officer Webb *at any point during the shooting portion of the incident*." ECF 128 at 30 (emphasis added). That says nothing about whether Gipp was facing Officer Webb *just prior to the shooting*, and ignores Officer Webb's testimony that Gipp turning to face him was part of the reason Officer Webb began firing in the first place. Moreover, given that Desmoulin's methodology depends on matching wounds with evidence, he is incapable of determining Gipp's positioning before a wound occurs. In fact, Desmoulin reversed himself and conceded it is possible Gipp was facing Officer Webb and started to turn away by the time Gipp was first struck. ECF 126-1 at 127:8-16.

Plaintiffs cite *Capps v. Olson*, 780 F.3d 879 (8th Cir. 2014), to argue a fact finder must determine whether Officer Webb reasonably believed Gipp held a gun. ECF 128 at 27. But in *Capps*, the court found a genuine dispute because the officer, who claimed he mistook driftwood for a knife in broad daylight, *Capps v. Olson*, No. 12-5025, 2014 WL 10920355, at *5-6 (D.S.D. Mar. 18, 2014), reported after the shooting it was unknown whether the suspect had a weapon. The driftwood was also covered by overgrown grass and likely had been there the whole time, never disturbed. *Capps*, 780 F.3d at 883. Here, Officer Webb has always maintained Gipp drew a black object Officer Webb believed was a gun. Immediately after the shooting, he mentioned to

---

[12] Plaintiffs pick and choose the parts of Officer Webb's account they believe and call that evidence, while discounting the rest. For example, Plaintiffs believe Gipp did quick peeks at Officer Sandland (ECF 128 at 10, n. 9), but arbitrarily reject testimony that the quick peeks appeared like an ambush or that just prior to the shooting, Gipp was facing Officer Webb and drew a black object out of his hoodie pocket. *Id*. at 28-29.

Officer Sandland that Gipp had something in his hand (maybe a black shotgun shell) and there is no question Gipp had several black objects on his person. Unlike the situation in *Capps*, it is also far more reasonable to mistake a black shotgun shell or black metal bar for a gun in the dark.

This case is far more akin to *Loch*, where the officer believed the suspect had a gun, did not see the suspect discard it, and discharged his weapon after the suspect reached for his pocket. 689 F.3d at 964. There was no gun, the suspect had only a cellphone, and the officer never mentioned seeing a black object until several hours later. *Id.* The court held the shooting was reasonable. *Id.* at 966. Plaintiffs attempt to distinguish *Loch* because (1) Gipp did not have a gun (neither did the suspect in *Loch*); (2) Officer Webb did not actually witness Gipp with a gun (neither did the officer in *Loch*); (3) Gipp was not walking toward Officer Webb (but Gipp was turning toward him); (4) Gipp did not use a threatening word (but he used threatening conduct); and, (5) there was no dispute in *Loch* that the suspect moved his hands to his side (but like here, the *only* evidence to support that conclusion came from the officer himself).[13]

## CONCLUSION

Disbelieving an officer's description of events, without affirmative evidence to contradict it, does not defeat summary judgment. *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007). Nor does raising "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is all Plaintiffs have here, and without more, they cannot stave off summary judgment. *Thompson*, 257 F.3d at 899.

---

[13] Plaintiffs assert Officer Webb disliked Gipp, pointing to the officer's use of strong language. ECF 128 at 32-33. Officer Webb did not even know Gipp prior to the incident. ECF 113-8 at 28; ECF 113-9 at 62:5-8. Regardless, if Plaintiffs' grasping claim that Officer Webb "harbored anger and resentment" toward Gipp was true, animosity does not turn a justified assault into an unlawful one. *Schell v. Collis*, 83 N.W.2d 422, 426-27 (N.D. 1957).

Dated:  October 5, 2023

MAC SCHNEIDER
United States Attorney

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General, Civil Division

C. SALVATORE D'ALESSIO, JR.
Director, Torts Branch
Civil Division

RICHARD MONTAGUE
Senior Trial Counsel, Torts Branch
Civil Division

 /s/  Siegmund F. Fuchs
SIEGMUND F. FUCHS
Senior Trial Attorney, Torts Branch
District of Columbia Bar No. 986828
JOSEPH A. GONZALEZ
Trial Attorney, Torts Branch
District of Columbia Bar No. 995057
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
P.O. Box 7146
Washington, D.C.  20044-7146
(202) 616-4322 (phone)
(202) 616-4314 (fax)
siegmund.f.fuchs@usdoj.gov
joseph.a.gonzalez@usdoj.gov

JAMES PATRICK THOMAS
ND Bar ID 06014
SARAH E. WALL
ND Bar ID 07822
Assistant United States Attorneys
P.O. Box 699
Bismarck, ND  58502-0699
(701) 530-2420
james.p.thomas@usdoj.gov
sarah.wall@usdoj.gov

Attorneys for United States of America