**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Gipp, et al, | | |
| | Plaintiffs, | |
| vs. | | |
| Raymond Webb, and United States of America, | | Case No.: 1:19-cv-00213 |
| | Defendants. | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND FINDING AS MOOT MOTION FOR HEARING ON THE PARTIES SUMMARY JUDGMENT MOTIONS**

[¶1]    THIS MATTER comes before the Court on a Motion for Summary Judgment filed by the United States on September 1, 2023. Doc. No. 117. The Plaintiffs filed a Response on September 22, 2023. Doc. No. 128. The United States filed a Reply on October 5, 2023. Doc. No. 133. Plaintiffs then filed a Motion for Partial Summary Judgment on September 6, 2023. Doc. No. 119. The United States filed a Response on September 19, 2023. Doc. No. 125. Plaintiffs filed a Reply on October 3, 2023. Doc. No. 131. On September 22, 2023, Plaintiffs filed a Motion for Hearing regarding the Summary Judgment Motions. Doc. No. 127.

[¶2]    Additionally, there are three motions filed by the United States that are pending before the Court. The first is a Motion to Strike filed on September 22, 2023. Doc. No. 126. The Plaintiffs filed a Response on October 5, 2023. Doc. No. 132. The United States filed a Reply on October 12, 2023. Doc. No. 135. The second motion is a Motion to Bifurcate Trial filed on December 7,

2023. Doc. No. 140. The Plaintiffs filed a Response on December 20, 2023. Doc. No. 144. The

third motion is a Motion to Dismiss Skyler Gipp's Claims filed on December 20, 2023. Doc. No.

142. For the reasons explained below, the United States' Motion for Summary Judgment is

**GRANTED**; the Plaintiffs Motion for Partial Summary Judgment is **DENIED**; and the Plaintiff's

Motion for Hearing regarding Summary Judgment is **MOOT**. Because the United States has been

granted Summary Judgment, the three pending nondispositive motions it filed are hereby **MOOT**.

## BACKGROUND

[¶3]      On October 23, 2017, George "Ryan" Gipp Jr. was out turkey hunting with his parents,

Roberta Gipp and George Gipp, Sr.[1] Doc. Nos.  136-8, pp. 194-98; 136-12, pp. 127-28. Around

7:30 p.m., the Gipp family stopped at Hagel's Gas Station in Fort Yates, North Dakota. Doc. No.

136-12, p. 144:4-7. While at the gas station, Ryan discharged a shotgun in the parking lot.[2]

Employees at Hagel's gas station called in the shooting. Doc. No. 136-2, pp. 22:4-24:2. The Gipps

drove away from the gas station shortly thereafter. Doc. Nos. 136-2, p. 32:16-21; 136-12, p. 149:5-

10. During the drive, the Gipps disposed of the shotgun by throwing it out of the vehicle into the

ditch.[3] Doc. No. 136-12, pp. 151:12-152:3.

[¶4]      Bureau of Indian Affairs ("BIA") Officers Raymond Webb ("Officer Webb") and Gary

Sandland, Jr. ("Officer Sandland") learned a gun had been fired and pursued the Gipps. Id. at pp.

---

[1] To avoid confusion, Roberta and George Gipp, Sr. will be referred to by their first names, while George Gipp Jr. will be referred to as Ryan.

[2] There is a dispute regarding the discharge of the shotgun. The Plaintiffs hold it was accidental, and Ryan was pointing the gun "north up" and "no one was around." Doc. Nos. 136-8, p. 199:22; 136-12, pp. 139-40; 148:8-9. The United States has a witness who says it appeared Ryan was in a shooting stance, cycled the gun, and took several steps towards the road. Doc. No. 136-2, pp. 22-24; 29-30. Regardless, it is undisputed Ryan was responsible for discharging the shotgun.

[3] The shotgun was later found and contained 7 slug rounds of ammunition typically used for large game or self-defense, and the shotgun itself had a 13-inch knife taped to it like a bayonet. Doc. No. 136-5.

152-54; Doc. No. 136-1, pp. 7-9. Officer Sandland announced over the radio that "[w]e need to find the victim who is shooting at." Doc. No. 136-1, pp. 6:21-7:2. Officer Webb found the Gipps' vehicle and initiated a high-risk felony stop. Doc. Nos. 136, p. 207:9-11; 136-7, p. 12:7-9.  With his service rifle drawn, Officer Webb began ordering the driver, Roberta, to roll down the window and throw out the keys. Doc. No. 136-1, pp. 9:22-10:4. Roberta complied with these commands. Id. Officer Webb then instructed Roberta out of the vehicle with her hands up and to walk backward towards him. Id. at p. 10:5-11. Roberta again complied and was subsequently handcuffed by Officer Webb and placed in his patrol car. Id. at p. 10:11-17. During this time, Officer Sandland arrived on scene to provide backup. Id. at p. 10:18-19. With Officer Webb and Sandland both having their service rifles drawn, Officer Webb commanded the front passenger, George, to exit the vehicle in a similar fashion. Id. at p. 11:10-14. George complied, was handcuffed by Officer Sandland, and then placed in his patrol car. Id. at p. 15:15-19. Officer Sandland asked George if there were any guns in the vehicle. Doc. No. 136-4, p. 9:13-15. George paused multiple times for a few seconds and then answered no. This left Ryan as the sole occupant of the vehicle. Doc. No. 136-1, p. 15:15-19.

[¶5]     Officer Webb ordered Ryan from the back seat of the vehicle to the front seat. Id. at p. 12:3-8.  Ryan eventually complied with this order. Id. at p. 12:9-13. The Officers then commanded Ryan to place his hands outside of the vehicle, and Ryan initially complied with this command. Id. at p. 12:13-14; Doc. No. 136-9, 7:45-8:04. After this point, Ryan began to disregard the Officers' commands. Officer Webb instructed Ryan to exit the vehicle with his hands up and facing away from the Officers. Doc. No. 136-1, p. 12:13-17. Ryan ignored this command and stayed seated in the vehicle for approximately two more minutes. Doc. No. 136-9, 8:04-9:53. Ryan eventually exited the vehicle, but he did not obey Officer Webb's commands to have his hands up

and face away from the Officers. Doc. No. 136-1, p. 13:8-12. Instead, Ryan picked up the car keys off the ground, closed the car door, stood facing the Officers, placed his hands out of sight in his hoodie pocket, and took several steps toward the Officers. Id. at pp. 13-14; Doc. No. 136-9, 9:50-9:54. Ryan proceeded back towards the Gipp vehicle in opposition to Officer Webbs' commands. Doc. Nos. 136-1, p. 14:3-11; 136-9, 9:55-10:10. Ryan then walked towards the Officers with one hand in his hoodie pocket. Doc No. 136-1, p. 14:14-17; 136-9, 10:10-17. Ryan proceeded back to the vehicle in opposition of Officer Webbs' orders and opened the car door slightly. Id. at 10:17-10:42.

[¶6]     Ryan continued to ignore repeated commands to keep his hands visible to Officers and placed them in his hoodie pockets. Doc. No. 136-1, p. 14:14-15. Officer Webb also saw an object weighing down Ryan's hoodie pocket, which is visible on the recording of the incident. Id. at p. 16:4-6; Doc. Nos. 136-5, p. 228:19-20; 136-9, 10:16-10:20, 11:16-11:20. Officer Webb informed Officer Sandland that he saw something heavy in Ryan's pocket. Doc. No. 136-1, p. 16:8-9. Officer Webb believed it could be a gun. Id. at p. 16:3-7. Officer Webb ordered Ryan to get on the ground, which he ignored. Doc. No. 136, p. 300:13-15. Ryan advanced toward the Officers and stood only a few feet away from them. Id. at p. 299:9-20; Doc. No. 136-9, 10:58-11:00. Officer Sandland asked Officer Webb to cover him as he attempted to take Ryan into custody, holstering his service rifle in the process. Doc. Nos. 136-4, p. 12:16. However, when Officer Sandland approached Ryan, Ryan stepped back, took a bladed stance[4] and, according to the Officers, balled his right hand into a fist. Doc. Nos. 136, pp. 299:21-300:21; 135-5, p. 173:23-25; 136-9, 11:00-11:04. After this, Ryan

---

[4] A bladed stance is when the individual puts one foot forward and angles toward someone in an aggressive or fighting stance. See Teas v. Ferguson, 608 F. Supp. 2d 1070, 1083 (W.D. Ark. 2009); see also State v. McGowen, 2020 ND 121, ¶ 11, 943 N.W.2d 817.

took a step towards Officer Sandland, and this step caused Officer Webb to lose sight of Ryan's hands. Doc. No. 136, pp. 301:17; 303:16-17.

[¶7]    It is at this time Officer Webb believed, based on his own observations, Ryan had also committed the offense of hindering law enforcement, resisting arrest, and disorderly conduct. Doc. No. 136, p. 350:2-10. Ryan's hands going out of sight of Officer Webb resulted in Officer Webb discharging his taser two separate times at Ryan. Doc. Nos. 136, pp. 301:18, 308:4-16; 136-11. Neither discharge had its intended effect as Ryan was not incapacitated and instead ran toward the back of Officer Sandland's cruiser. Doc. Nos. 136, p. 312:17-23; 136-1, p. 17:12-17; 136-9, 11:02-11:12; 136-11, 0:00-03.

[¶8]    At this point, there is no longer video evidence of the incident as the remainder of the events occur behind Officer Sandland's Cruiser. However, there is some audio that can be deciphered from the video recordings. That, combined with the witnesses' recounting of events provide the remaining details below.

[¶9]    Once Ryan got behind the cruiser, he went into a half crouching position and was doing quick peeks out from behind the cruiser to view the Officers. Doc. Nos. 136-1, pp. 17:21-18:3; 136-7, p. 22:16-18. Officers knew Ryan still had something heavy weighing down his hoodie pocket, and Officer Webb still believed Ryan had a firearm in the pocket. Doc. No. 136-7, p. 16:7-11. It was dark outside, and Officers only had the illumination of the emergency lights of their cruisers from where Ryan was located. See Doc. No. 136-9. Officer Webb observed what he believed to be Ryan chambering a round into a firearm while fidgeting with his hoodie pocket. Doc. Nos. 136-1, pp. 17:18-19:3; 136-7, p. 22:1-4. There is audio where Officers are yelling at Ryan to show and give them his hands. Doc. Nos. 136-9, 11:10-11:15; 136-10, 11:10-11:15. Officer Webb states he saw Ryan draw something out of his hoodie pocket and was positioning

himself to shoot at Officer Sandland. Doc. Nos. 136-1: p. 18:16-17; 136-7, p. 22:18-23. In response, Officer Webb fired his service rifle at Ryan until he believed the threat posed by Ryan was eliminated, resulting in a total of 17 rounds being fired in roughly 4 seconds. Doc. Nos. 136-1, pp. 21:22-22:15; 136-9, 11:15-11:20; 136-10, 11:15-11:20.

[¶10]    Officer Sandland called for medical assistance and then apprehended Ryan. Doc. No. 136-5, p. 210:16-19. However, Ryan continued to be noncompliant and Officers can be heard saying "stop [ ] messing around" and "give me your hands." Doc. Nos. 136-5, p. 210:5-8; 136-9, 11:25-11:28; 136-10, 11:25-11:28. Once Ryan was handcuffed, Officer Sandland pulled several items out of Ryan's front hoodie pocket, including a black 7.5-inch AR-15 socket wrench. Doc. Nos. 136-5, pp. 213:9-214:1; 136-13, pp. 23-24. A folding knife was pulled out of Ryan's pants pocket. Doc. Nos. 136-1, p. 23:6-9; 136-13, p. 20. A black 12-gauge shotgun shell and a lighter were also discovered behind Sandland's cruiser where Ryan was previously located. Doc. Nos. 136-5, pp. 211:24-212:10; 136-13, pp. 14-16. Ryan was pronounced dead at the emergency room. Doc. No. 120-6.

## **DISCUSSION**

### I.    **Standard of Review**

[¶11]    Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-movant, indicates there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). A fact is material if it may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. Id. "[W]e give the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707

6

(8th Cir. 2016) (internal quotations omitted). The Court does not weigh the evidence nor make credibility determinations, rather it only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. See Anderson, 477 U.S. at 252; see also Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004) (noting that because the court views the facts in the light most favorable to the nonmoving party, the court does not weigh the evidence or attempt to determine the credibility of the witnesses).

[¶12]    The purpose of summary judgment is to determine whether the evidence presents sufficient disagreement as to warrant submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The movant bears the burden of informing the Court of the basis for its motion and must identify portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-movant may not rely on allegations or denials made in its pleading. Rather its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1)(A). There is no genuine issue for trial and summary judgment is proper when the record, taken as a whole and viewed in the light most favorable to the non-movant, could not lead a rational trier of fact to find in favor of the non-movant. Diesel Mach., Inc., 418 F.3d at 832.

## II.    Use of Force.

[¶13]    The Plaintiffs bring two claims under the Federal Torts Claims Act ("FTCA"), assault/battery and negligence. This ordinarily means that "courts apply the substantive law of the state in which the events giving rise to the complaint occurred." Shanner v. United States, 998 F.3d 822, 825 (8th Cir. 2021) (citing 18 U.S.C. § 1346(b)). However, the use of force by Officer Webb will be analyzed under the Fourth Amendment reasonableness standard, which both parties

acknowledge as the correct approach. Doc. Nos. 118, p. 22; 128, p. 16; see Dundon v. Kirchmeier, 577 F. Supp. 3d 1007, 1067 (D.N.D. 2021), aff'd, 85 F.4th 1250 (8th Cir. 2023) (finding if the use of force was deemed reasonable under the Fourth Amendment, it would also be justified under North Dakota law); see also Graham v. Connor, 490 U.S. 386, 388 (1989) (holding the constitutional standard governing law enforcement's use of excessive force when seizing a person is properly analyzed under the Fourth Amendment objective reasonableness standard). This applies to both deadly and non-deadly excessive force claims against law enforcement officers. Graham, 490 U.S. at 395; see also Smith v. Kilgore, 926 F.3d 479, 485 (8th Cir. 2019) (noting an officers' use of deadly force was a seizure subject to Fourth Amendment reasonableness requirements).

[¶14]     The Supreme Court in Graham explains:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. [Tennessee v. Garner, 471 U.S. 1, 8 (1985)], quoting United States v. Place, 462 U.S. 696, 703 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S. 1, 22-27 (1968). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.[5] See Tennessee v. Garner, 471 U.S. 1, 8–9 (1985) (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

---

[5] These will be referred to as the "Graham Factors." The first factor is "the severity of the crime at issue." Graham, 490 U.S. at 396-97. The second factor is "whether the suspect poses an immediate threat to the safety of the officers or others." Id. The third factor is whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." Id.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S. at 20-22.
>
> . . .
>
> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139 (1978); see also Terry v. Ohio, supra, 392 U.S. at 21 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard").

Graham, 490 U.S. at 396-97 (footnote added). "An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." Loch v. City of Litchfield, 689 F.3d 961, 966 (8th Cir. 2012).

## III.   The United States' Summary Judgment Motion

[¶15]    The United States argues it is entitled to summary judgment because Officer Webb's use of force regarding his use of a taser and deadly force was justified under the circumstances. It also argues the Plaintiffs cannot proceed on both and intentional and negligent tort claims. The Plaintiffs claim Officer Webb's use of force was excessive and unreasonable for both the tasering and use of deadly force. The Plaintiffs also claim they can proceed on both of their tort claims. The Court will discuss the use of the taser and the use of deadly force. The Court will then decide whether the Plaintiffs can proceed on both of their intentional and negligent tort claims.

### A.   Taser Use

[¶16]    The United States argues Officer Webb was justified in discharging his taser under the facts and circumstances of this case. The Plaintiffs claim Officer Webb's use of the taser amounted

to excessive force and was unreasonable. As discussed below, there is not a genuine issue of material fact regarding the reasonableness of Officer Webb's use of the taser.

### 1. Severity of the Crime

[¶17]     When analyzing the first <u>Graham</u> factor, the severity of the crime at issue here was sufficiently serious and thus weighs in favor of the United States. At the time the taser was discharged, Officer Webb knew shots had been fired at Hagel's by one of the Gipp's, potentially at a victim. From Officer Webb's perspective, Ryan's reckless disregard of Officer Webb's commands and strange behavior made Officer Webb believe Ryan had also committed the offenses of hindering law enforcement, resisting arrest, and disorderly conduct. The shooting alone is severe enough under these circumstances, but when also considering the other potential crimes, it firmly establishes the first <u>Graham</u> factor weighs in favor of the United States.

### 2. Whether the Suspect Poses an Immediate Threat to the Safety of the Officers or Others.

[¶18]     The second <u>Graham</u> factor similarly weighs in favor of the United States because Ryan posed an immediate threat to the safety of the Officers. When Officer Webb tasered Ryan, Ryan was only a few feet away from Officer Sandland and Webb. Officer Webb reasonably believed the object weighing down Ryan's hoodie pocket could be a firearm. Ryan took a bladed stance when Officer Sandland attempted to place Ryan in custody. When Ryan stepped back, Officer Webb lost sight of Ryan's hands. Ryan could have accessed the object in his hoodie pocket and used it to harm Officer Sandland and Webb. These facts sufficiently show Ryan posed a potential threat to Officers Webb and Sandland when Officer Webb deployed his taser.

### 3. Whether the Suspect is Actively Resisting Arrest or Attempting to Evade Arrest by Flight.

[¶19]     The third Graham factor also weighs in favor of the United States as Ryan was resisting arrest. The Eighth Circuit in Kohorst v. Smith stated:

> The use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public. Jackson [v. Stair], 944 F.3d [704], 711 [(8th Cir. 2019)]. "When a suspect is passively resistant, somewhat more force may reasonably be required." Wertish v. Krueger, 433 F.3d 1062, 1066–67 (8th Cir. 2006). The failure to follow police instruction may constitute passive resistance. See Ehlers [v. City of Rapid City], 846 F.3d [1002,] 1011 [(8th Circuit 2017)]; see also Jackson, 944 F.3d at 711. Whether a suspect's resistance is intentional does not impact how a reasonable officer would interpret the suspect's behavior. Ehlers, 846 F.3d at 1011. An officer is entitled to use the force necessary to effect an arrest where a suspect "at least appears to be resisting." Id. We have upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement. See Jackson, 944 F.3d at 711.

968 F.3d 871, 877 (8th Cir. 2020). "Noncompliance and arguing do not amount to active resistance." Tatum v. Robinson, 858 F.3d 544, 549 (8th Cir. 2017).

[¶20]     The video evidence of this incident indisputably shows the extent of Ryan's disregard of Officer Webb's instructions, which the Court construes as resisting arrest. The Court finds Ryan resisted arrest in a variety of ways, including; (1) failing to exit the vehicle promptly when instructed; (2) picking up the car keys off the ground; (3) retreating back to his vehicle on two occasions and opening the car door; (4) not having his hands visible to the Officers when he approached by continuously fidgeting with an object in his hoodie pocket; (5) walking front-facing towards the Officers when instructed to walk backwards; (6) coming within only a few feet from the Officers without any sort of restraint; (7) taking a step back into a bladed stance when Officer Sandland tried to apprehend Ryan; and (8) taking a step towards Officer Sandland after entering a bladed stance.

11

[¶21]    These facts clearly establish Ryan was not complying with Officer Webb's commands. From Officer Webb's perspective, Ryan was at the very least passively resisting arrest when confronted by Officers Webb and Sandland. This means Officer Webb was justified is using the force necessary to effect the arrest of Ryan. <u>Ehlers</u>, 846 F.3d at 1011. The use of a taser is appropriate force under these circumstances, especially considering Ryan was non-compliant with instructions and ignoring commands of law while passively resisting arrest. <u>See</u> <u>Jackson</u>, 944 F.3d at 711 (holding the use of non-deadly force against a non-compliant defendant who was resisting arrest and ignoring commands of law was justified). As a result, the Court finds this factor weighs in favor of the United States.

### 4.  Weighing the Graham Factors in Totality.

[¶22]    When viewing the evidence in the light most favorable to the Plaintiffs, the Court holds Officer Webb's use of his taser in this situation was objectively reasonable. From Officer Webb's perspective, Ryan had committed a serious crime by discharging a firearm within 100 feet of an occupied building and carrying a loaded firearm in his vehicle. <u>See</u> Standing Rock Sioux Tribal Code of Justice, Criminal Offenses §§ 4-703,[6] 4-706.[7] Officer Webb also reasonably believed Ryan had also committed the crimes of hindering law enforcement, resisting arrest, and disorderly conduct. Ryan posed an immediate threat to Officer Webb's and Sandland's safety by ignoring commands, having a heavy object weigh down his front hoodie pocket, and standing only a few

---

[6] Standing Rock Sioux Tribal Code of Justice, Criminal Offenses § 4-703 is titled "<u>Carrying a Loaded Firearm in a Motor Vehicle</u>," and reads "[a]ny person, other than a law enforcement officer when acting as such, who carries a firearm with a round in the chamber on a public highway and in a motor vehicle, is guilty of carrying a loaded firearm in a motor vehicle.

[7] Standing Rock Sioux Tribal Code of Justice, Criminal Offenses § 4-706 is titled "<u>Unlawful Discharge of Firearms</u>," and reads "[w]hoever discharges firearms within 100 yards of an occupied building or structure, unless the defendant is entitled to possession of the building or structure or is authorized to do so by a person entitled to such possession, is guilty of unlawful discharge of firearms. . . ."

feet away from Officers with his hands free. Officer Webb lost sight of Ryan's hand when he advanced and stood close to Officer Sandland. Finally, Ryan was blatantly ignoring the various commands of Officer Webb, which the Eighth Circuit has found to be at the very least passive resistance to arrest, which justifies the use of force. See Ehlers, 846 F.3d at 1011; Jackson, 944 F.3d at 711.  From the perspective of Officer Webb and in light of the facts and circumstances, it was objectively reasonable for Officer Webb to discharge his taser at Ryan and this action did not violate the Defendant's Fourth Amendment rights. See Loch, 689 F.3d at 966. The United States has carried its burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law regarding the reasonableness of Officer Webb deploying his taser.

**B. The Plaintiffs' Arguments that use of the Taser Amounted to Excessive Force is Unpersuasive.**

[¶23]     The Plaintiffs put forth several arguments that Officer Webb's deployment of his taser amounted to excessive force. They include (1) Ryan did not walk aggressively towards Officers, (2) Ryan did not ball his hand into a fist, (3), Officer Webb's failure to give a warning and deploying his taser multiple times amounted to excessive force, (4) Officer Webb provided inconsistent testimony regarding when he deployed his taser, and (5) Plaintiffs' use of force expert Seth Stoughton's ("Stoughton") testimony establishes the taser discharge violated police practices. The relevant arguments will be discussed in turn below.[8]

---

[8] The Court will not address the first two arguments. This is because there is sufficient evidence for the Court to find Officer Webb's deployment of his taser was justified under these circumstances without finding Ryan walked aggressively towards the Officers or balled his hands into a fist. When considering the totality of the circumstances, those two issues do not create a genuine issue of material fact even when viewed in the light most favorable to the Plaintiffs due to the overwhelming evidence to the contrary.

1. **Officer Webb's Failure to Warn Ryan Before Deploying his Taser Twice was Reasonable Under the Circumstances.**

[¶24]     The Plaintiffs aver because Officer Webb discharged his taser twice without warning, each discharge must be analyzed and the Court should find each discharge was unreasonable. The Court agrees each discharge can be analyzed but does not accept Officer Webb was required to administer a warning and that the discharges were unreasonable under these circumstances.

[¶25]     To begin, the Plaintiffs argue Officer Webb's failure to warn Ryan he would discharge his taser amounts to excessive force. Doc. No. 128, p. 18. That is simply not the case. Although timing and warning are "among the many factors relevant to determining whether use of a taser amounts to excessive force in a particular situation, [the Eighth Circuit] ha[s] eschewed a bright-line rule requiring officers to issue a warning before deploying a taser against a suspect." Boudoin v. Harsson, 962 F.3d 1034, 1043 (8th Cir. 2020) (internal citations omitted).

[¶26]     There are numerous cases where the Eighth Circuit has found the lack of a warning by an officer before employing deadly force does not amount to excessive force, especially when officers have their weapons drawn as Officers Webb and Sandland did here.[9] That Officer Webb had to deploy his taser twice is of little consequence. The video shows the first discharge was ineffective at incapacitating Ryan, so it was reasonable for Officer Webb to fire his taser again.

---

[9] See e.g., Rogers v. King, 885 F.3d 1118, 1122 (8th Cir. 2018) (holding officers should warn suspect before using deadly force when feasible, but when officers have their firearms drawn and pointed at a suspect it provides adequate notice escalation of the situation could result in the use of deadly force); Est. of Morgan v. Cook, 686 F.3d 494, 497 (8th Cir. 2012) (holding an officer does not need to issue a warning before using deadly force when the defendant stood only a few feet away from the officer, especially when the defendant should have been put on notice escalation of the situation would result in the use of a firearm because the officer had their pistol drawn and ordered the defendant to drop their weapon); Cook v. City of Bella Villa, 582 F.3d 840, 851 (8th Cir. 2009) (holding an officer's use of his taser without warning during a "rapidly escalating situation" was reasonable when the individual had stepped out of his vehicle and taken a step toward the officer). While these cases primarily deal with section 1983 claims, much of the analysis is applicable to the facts of this case.

Doc. Nos. 136-9, 11:02-12; 136-11, 0:00-03. The video similarly shows Officers Webb and Sandland had their service rifles drawn throughout the encounter. See Doc. No. 136-9. This should have put Ryan on notice that escalation of the situation would result in the use of deadly force. See King, 885 F.3d at 1122. Only two seconds elapsed from when Ryan took a bladed stance and Officer Webb discharging his taser. Id. at 11:02-11:04. This was a rapidly escalating, tense, and uncertain situation, and due to that there was insufficient time for Officer Webb to issue a warning to Ryan. See Cook, 582 F.3d at 851 (officers use of a taser without warning during a rapidly escalating situation was justified given the circumstances); Graham, 490 U.S. at 396-97 (noting there must be allowance of officers when making split second decisions in tense, uncertain, and rapidly evolving circumstances about the amount of force that is necessary in a particular situation); see also Est. of Morgan, 686 F.3d at 497 (finding use of force justified when the officer failed to give warning because the defendant was only a few feet away from the officer).

[¶27]    The Plaintiffs cite Jackson v. Stair as favorable authority for finding multiple discharges of a taser without a warning each time amounts to excessive force. 944 F.3d at 704. However, the facts of Jackson are distinguishable from this case. The officers in Jackson deployed a second taser shortly after the incapacitation of a defendant from the first successful taser discharge. See id. While Officer Webb did discharge his taser twice in quick succession, it was only because the first deployment did not have the intended effect of incapacitating Ryan. Officer Webb then deployed his taser a second time to effect the arrest of Ryan. For those reasons, the Court does not find Jackson as persuasive authority for finding firing a taser twice without warning amounts to excessive force.

**2. Officer Webb has Provided Consistent Testimony, and Uncontroverted Video Evidence Shows Officer Webb Discharged his Taser Before Ryan Fled.**

[¶28]     The Plaintiffs state Officer Webb provided inconsistent testimony when questioned about when he deployed his taser. The testimony at issue is as follows:

> So [Ryan]'s coming around, and Gary's talking to him, and he does, he looks around like the family (ph) look  of trying to take off or seeing what's going on or seeing if anybody's looking around, and Gary's talking to him, and I had the Taser out, and now I can't see his hands, and Gary's yelling at him, was aggressive towards him, and I see him *leaning towards taking off*, so I deployed my Taser at him.
> . . .
>
> So assuming that [Ryan] has the gun in his pocket, *when [Ryan] comes around and takes off*, I, I taser him. . . .

Doc. No. 136-1, pp. 15:16-16:2, 10-12 (emphasis added). Officer Webb stated this during his initial FBI interview. However, in Officer Webb's and Sandland's deposition, in addition to Officer Sandland's FBI interview, both Officers stated Ryan ran after Officer Webb deployed his taser. Doc. Nos. 136, p. 108: 21-23; 136-4, p. 28:2-7; 136-5, p. 188:4-11. This is accurately depicted in the videos of the incident. Doc. Nos. 136-9; 136-11. The Court does not believe the initial statement of Officer Webb is evidence of untrustworthiness. Rather, Officer Webb has provided consistent testimony after the initial interview that coincides with what the Court sees in the video; Ryan took off after the unsuccessful discharge of the taser. As a result, the Court finds this singular mention of Ryan "taking off" is incredible when considering the totality of Officer Webb's testimony.

**3. Stoughton's Testimony Regarding the Taser Does not Persuade the Court.**

[¶29]     The Plaintiffs argue their use-of-force expert Stoughton establishes Officer Webb's taser discharge was unreasonable, excessive, and contrary to generally accepted police practices. Doc.

No. 128, p. 19. The United States claims Stoughton's opinion does not coincide with the law regarding the deployment of the taser. Doc. No. 133, p. 6. The Court agrees with the United States.

[¶30]     [I]t is excessive force to use a taser on a nonfleeing, nonviolent misdemeanant." Franklin v. Franklin Cnty., Arkansas, 956 F.3d 1060, 1062 (8th Cir. 2020) Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force. Cravener v. Shuster, 885 F.3d 1135, 1140 (8th Cir. 2018) (citing Ehlers, 846 F.3d at 1011). "An expert's after-the-fact opinion that danger was not 'imminent' in no way establishes that there was no danger, or that a conclusion by the officers that it was imminent would have been wholly unreasonable." Whitley v. Albers, 475 U.S. 312, 323 (1986).

[¶31]     According to Stoughton, Officer Webb's taser discharge was "unreasonable, excessive, and contrary to generally accepted police practices" because Ryan did not present an imminent threat of escape or physical harm at the time of discharge. Doc. Nos. 120-3, p. 20; 128, p. 19. The Court has already established Officer Webb's deployment of his taser was reasonable. Stoughton himself claims Ryan was passively resisting arrest. Doc. No. 120-3, p. 30. Stoughton's claim Officer Webb was unreasonable in discharging his taser or that his use of his taser amounted to excessive force is unpersuasive given the Eighth Circuit has determined the use of a taser in these circumstances is reasonable. Cravener, 885 F.3d at 1140. That Stoughton believed the danger posed by Ryan was not imminent does not establish there was no danger or that it was unreasonable for officers to believe danger was imminent. Albers, 475 U.S. at 323. Even when viewed in the light most favorable to the Plaintiffs, there is enough evidence to establish Ryan was at the very least passively resisting arrest and Officer Webb's response of firing his taser was reasonable under the circumstances. Therefore, Stoughton's report does not create a genuine issue of material fact.

### C.  Deadly Force

[¶32]     The United States contends Officer Webb's use of deadly force was reasonable and justified. The Plaintiffs argue Officer Webb's use of deadly force was unreasonable. The Court agrees with the United States and finds there are no genuine issues of material fact regarding whether Officer Webb's use of deadly force against Ryan was objectively reasonable.

[¶33]     "The use of deadly force is constitutionally reasonable under the Fourth Amendment 'if an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" McElree v. City of Cedar Rapids, 983 F.3d 1009, 1017 (8th Cir. 2020). "An officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." Thompson v. Hubbard, 257 F.3d 896, 899 (8th Cir. 2001) (citing Ryder v. City of Topeka, 814 F.2d 1412, 1419 n. 16 (10th Cir.1987) (concluding that, because a requirement that a suspect actually have a weapon would place police in "a dangerous and unreasonable situation . . . whether a particular seizure is reasonable is dependent on the 'totality of the circumstances,' and not simply on whether the suspect was actually armed"). "The visible presence of an item that appears consistent with a weapon and an inability to see a suspect's hands, are relevant to the reasonableness of a police officer's use of deadly force." Loch v. City of Litchfield, 837 F. Supp. 2d 1032, 1041 (D. Minn. 2011), aff'd, 689 F.3d 961 (8th Cir. 2012). Even if a suspect is ultimately "found to be unarmed, a police officer can still employ deadly force if objectively reasonable." Billingsley v. City of Omaha, 277 F.3d 990, 995 (8th Cir. 2002).

[¶34]     After Officer Webb discharged his taser, Ryan took off out of the view of Officer Sandland's camera. Doc. No. 136-9, 11:02-11:12. Ryan's hands were not visible to the officers and Ryan did not comply with the officers' commands to show them his hands. Doc. Nos. 136-9,

11:10-11:15; 136-10, 11:10-11:15. Ryan was doing quick peeks behind the cruiser. Doc. Nos. 136-1, pp. 17:21-18:3; 136-7, p. 22:16-18. It was dark outside. Officer Webb believed Ryan had a gun, and no facts had been presented to Officer Webb to prove the contrary. While it was later revealed Ryan did not have a firearm, he was not unarmed. Officer Webb saw a black object in Ryan's hands. Evidence photos show a black shotgun shell and a lighter were recovered where Ryan was crouched behind the cruiser. Doc. No. 136-5, pp. 211:24-212-10. This supports Officer Webb's position that he believed Ryan was charging a gun, and Officer Webb did not need to wait to see Ryan with the gun to deploy deadly force. Doc. Nos. 136-1, pp. 17:18-19:3; 136-7, p. 22:1-4; Hubbard, 257 F.3d at 899. Further, a black AR-wrench was pulled out of Ryan's hoodie pocket, and a folding knife was found in Ryan's pants pocket. Doc. Nos. 136-1, p. 23:6-9; 136-13, p. 20; 136-5, pp. 213:9-214:1; 136-13, pp. 23-24.

[¶35]     Officer Webb shooting 17 times was also reasonable given the circumstances. Officer Webb shot several times until Ryan fell to the ground. When Ryan was on the ground, he did a sit-up position and was reaching into his hoodie pocket. Doc. No. 136-1, p. 22:5-7. Based upon these facts and circumstances, it was objectively reasonable for Officer Webb to use deadly force to subdue Ryan because Officer Webb had probable cause to believe Ryan posed a threat of serious physical harm to himself and Officer Sandland. See City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 613 (2015) ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds."); McElree v. City of Cedar Rapids, 983 F.3d at 1017.

### D.  The Plaintiffs' Arguments That Deadly Force was Unreasonable is Unpersuasive.

[¶36]     The Plaintiffs argue the following issues create a genuine issue of material fact making Officer Webb's use of deadly force unreasonable and require a factfinder to determine; (1) Officer

Webb's testimony is incredible because the sequence of events described by Officer Webb could not occur in five seconds; (2) Ryan did not have a gun and the black object in Ryan's hand could not be mistaken for a gun; (3) whether Ryan's actions could realistically be interpreted as a threat; and (4) Officer Webb's intent is relevant towards weighing credibility.[10] The United States argues against each of these points. The relevant arguments will be addressed in turn.

### 1. Officer Webb's Testimony

[¶37]     The Plaintiff's claim Officer Webb's description of events is incredible because they all could not occur within five seconds. The United States contends it is possible for these events to occur and the Plaintiffs do not have an evidentiary basis to say these events did not occur according to Officer Webb's recounting of events. The Court agrees with the United States.

[¶38]     The sequence of events described by Officer Webb are: (1) Officer Webb moved into the ditch alongside Sandland's cruiser; (2) Officer Webb observed Ryan peeking over the tailgate; (3) Officer Webb observed Ryan manipulating something with his hands; (4) Officer Webb commanded Ryan to show him his hands; (5) Ryan looked at Officer Webb in response to the command; (6) Ryan began to pull something out of his hoodie pocket; (7) Officer Webb began firing at Ryan. What the Plaintiffs fail to provide is an evidentiary basis supporting their position. The Plaintiffs only provide their own doubts the events could occur within the timeframe, however, an attack on credibility without supporting facts in the record is insufficient to undermine Officer Webb's credibility. See Thompson, 257 F.3d 899 (holding absent evidence in the record, the

---

[10] The Court rejects this argument. Officer Webb did not know Ryan prior to this event. Doc. Nos. 113-8, p. 28; 113-9, p. 62:5-8. Plaintiffs partially cite Graham to claim a factfinder may consider whether an officer harbored ill-will toward a citizen. 490 U.S. at 399, n. 12. However, the end of the cited footnote reads "[s]ince no claim of qualified immunity has been raised in this case, however, [the Supreme Court] express[es] no view on its proper application in excessive force cases that arise under the Fourth Amendment." Id. Because a qualified immunity claim has not been raised here, the court will not apply this principle to the present claims.

plaintiffs' attack on officer credibility did not undermine the officers' credibility). For those reasons, the Plaintiffs' argument fails.

### 2. The Black Object

[¶39]     Next, the Plaintiffs argue Ryan did not have a gun and whether the black object in Ryan's hands could be mistaken for a gun is a question for the factfinder, citing N.S. v. Kan. City Bd. Of Police Comm'rs, 35 F.4th 1111, 1114 (8th Cir. 2022)[11] and Capps v. Olson, 780 F.3d 879, 885 (8th Cir. 2014) as favorable authority. However, each of those cases are distinguishable from this case.

[¶40]     First, the citation to N.S. II is misplaced. While the quote is accurately cited in the Plaintiffs' brief[12], the Plaintiffs fail to consider the facts of that case for why the Eighth Circuit had to assume the individual did not have a gun. That quote has a citation to N.S. v. Kansas City Bd. of Police Commissioners, 933 F.3d 967, 969 (8th Cir. 2019)[13], which was the case the Eighth Circuit remanded to the District Court, leading to the 2022 decision the Plaintiffs cite. In N.S. I, the suspect was running away from an officer and reached a parked vehicle, which the suspect attempted to enter. Id. The officer who fatally shot the defendant claimed he saw the suspect with a gun. Id. A search of the vehicle did reveal a firearm in the vehicle. Id. However, the owner of the car stated the gun was his and that the gun had been there all night, meaning the suspect did not possess the gun nor place it there. Id. For those reasons, the Eighth Circuit stated on summary judgment that it must assume the suspect did not have gun. Id. That is distinct from the facts of

---

[11] This case will be referred to as N.S. II.
[12] The Plaintiffs' exact quote is as follows: "[a]t this stage, however, '[e]ven if Officer [Webb] insists he saw a gun in [Ryan's] hand' it 'must be assumed that he did not have one.'" Doc. No. 128, p. 27 (citing N.S. II).
[13] This case will be referred to as N.S. I.

this case, as the Plaintiffs fail to establish someone else possessed the firearm or quell the suspicions of the Officers that Ryan did not have a gun.

[¶41]     This case is more analogous to Loch where an officer learned the defendant had a firearm but did not witness the defendant dispose of the firearm before arriving. 689 F.3d at 966. Witnesses at the scene yelled at the officer that the suspect was unarmed, but the officer did not hear them. Id. The Eighth Circuit concluded that even if the officer had heard the suspect was unarmed, a reasonable officer in the same position would be on alert the suspect could possibly be armed. Id. Here, the Gipps disposed of the shotgun before the encounter with Officers Webb and Sandland. George was hesitant in answering Officer Sandlands' questions regarding if the Gipps still possessed the firearm. Doc. No. 136-4, p. 9:13-15. Officer Webb believed during the encounter that Ryan still possessed a firearm. Ryan was manipulating a black item in his hand. It was dark outside. There was a black shotgun shell where Ryan was crouched in addition to the AR wrench in his hoodie pocket. The Plaintiffs are unable to provide any evidence to dispute a reasonable officer in the same position would not believe Ryan was armed with the facts laid out above. Therefore, this case is unpersuasive to the Court.

[¶42]     The Plaintiffs next cite to Capps as favorable authority for this Court to find whether Officer Webb reasonably believed the black object in Ryan's hand was a gun is a question for the factfinder. 780 F.3d at 885. In Capps, the Eighth Circuit affirmed the district court's decision that a factual dispute existed regarding whether a reasonable officer would have believed the suspect was armed. Id. The Eighth Circuit held whether the suspect was holding the driftwood and whether it could reasonably be mistaken for a weapon is a factual question for a jury. Id. This is especially true considering the officer did not see the driftwood and the driftwood been overgrown in grass. Id. The Eighth Circuit concluded a reasonable jury could find the driftwood was not in the

suspect's hand and the officer did not actually mistake the driftwood for a weapon. Id. Here, there is no such doubt, as the Court has already determined it was reasonable for Officer Webb to believe Ryan had a weapon. Because there is no doubt present like in Capps that Ryan could have had a firearm in his hand, the Court finds this case unpersuasive.

### 3. Reasonable Belief Ryan Posed a Threat

[¶43]    Plaintiffs argue whether Officer Webb reasonably believed Ryan was about to attack the Officers in a way that could be interpreted as a realistic threat is a question for the factfinder, citing Brown v. City of Golden Valley as favorable authority for their position. 574 F.3d 491, 497 (8th Cir. 2009). The Court finds Brown is distinguishable from this case for multiple reasons. First, the Eighth Circuit found the suspect in Brown to be a minimal threat to officer safety, whereas the Court here finds Ryan posed a significant threat to officer safety. See id. Second, the Eighth Circuit found officers in Brown were not faced with the need to make a split-second decision in a rapidly evolving, tense situation. Id. Here, this Court finds Officer Webb was faced with a tense and rapidly evolving situation because Ryan was resisting arrest and fleeing from Officers. Third, the Eighth Circuit found there was no indication the suspect would use an item to harm officers, which is distinct from here as Ryan was consistently fidgeting with an item in his hoodie pocket that Officer Webb reasonably believed was a gun. Id. For those reasons, the Court finds Brown is distinct from this case.

## IV.    Whether Plaintiffs can Proceed on Both Intentional and Negligent Tort Claims is Moot.

[¶44]    The United States next argues the Plaintiffs cannot proceed on both their intentional tort claims of assault and battery and their negligence because the claims are mutually exclusive. Doc. No. 118, pp. 34-35. The Plaintiffs agree they cannot prevail on both of their claims but argue both theories can be submitted to the fact-finder for them to decide if the acts were intentional or

negligent. Doc. No. 128 p. 34. Because the Court finds the United States is entitled to Summary Judgment, whether the Plaintiffs can proceed on one or both of their tort claims is now moot.

**V.    Plaintiffs Motion for Partial Summary Judgment**

[¶45]    The Plaintiffs move for Partial Summary Judgment on the ground that the United States relies on North Dakota Century Code section 29-06-13 as an affirmative defense to say Officer Webb could use any force whatsoever to effect the arrest of Ryan. Doc. No. 120. The Plaintiffs seek partial summary judgment to the extent it would foreclose consideration of the reasonableness of Officer Webb's use of deadly force. Id. The United States contends it does not argue Officer Webb could use any force whatsoever, but is premised on Officer Webb's use of force being objectively reasonable under the totality of the circumstances. Doc. No. 125. The Court agrees with the United States.[14]

[¶46]    A statutes' constitutionality can be challenged in two ways, a facial challenge and an as-applied challenge. State v. Anderson, 2022 ND 144, ¶ 7, 977 N.W.2d 736. The Plaintiffs only bring an as-applied challenge. Doc. No. 120, p. 8, n. 7. "An 'as-applied' challenge is a claim that the statute is unconstitutional in a particular case." See State v. Morris, 331 N.W.2d 48, 58 (N.D. 1983). "Generally, a party may only challenge the constitutionality of a statute as applied to that party." State v. Nice, 2019 ND 73, ¶ 7, 924 N.W.2d 102 (quoting State v. Dvorak, 2000 ND 6, ¶ 28, 604 N.W.2d 445). "[A] plaintiff generally cannot prevail on an as-applied challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him. McCullen v. Coakley, 573 U.S. 464, 485 n.4 (2014).

---

[14] As discussed previously, claims under the FTCA are governed by the law of the state in which the alleged tortious conduct occurred, which in this case is North Dakota. See Shanner, 998 F.3d at 825.

[¶47]    The language of the statute in question is as follows: "[i]f, after notice of intention to arrest the defendant, the defendant either flees or forcibly resists, *the officer may use all necessary means* to effect the arrest." N.D.C.C. § 29-06-13 (emphasis added). The Plaintiffs cite <u>Tennessee v. Garner</u> as favorable authority for finding this statute to be unconstitutional as applied in this case. 471 U.S. 1, 4-5 (1985).[15] In <u>Garner</u>, an officer used deadly force to prevent the escape of the defendant. <u>Id.</u> at 3-4. However, the officer was reasonably sure and figured the defendant was unarmed, though it was uncertain at the time. <u>Id.</u> at 3. Despite believing this, when the officer saw the defendant begin to climb over a fence, the officer shot at the defendant fearing that he would escape. <u>Id.</u> at 4. Under these circumstances the Supreme Court held:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. *The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.*

<u>Id.</u> at 11 (emphasis added).

[¶48]    The facts of this case are sufficiently distinct from <u>Garner</u>. Unlike the officer in <u>Garner</u>, Officer Webb reasonably believed Ryan was armed and could possibly be carrying a gun. This caused Officer Webb to believe Ryan posed a threat of serious physical harm to himself and Officer Sandland. Officer Webb employed a reasonable use of force by discharging his taser to try and effect the arrest of Ryan. This stands equally true regarding Officer Webb's use of deadly force.

---

[15] The language of the statute in <u>Garner</u> reads: "[i]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest." Tenn. Code Ann. § 40-7-108 (1982).

For those reasons, the Court finds North Dakota Century Code Section 29-06-13 is constitutional as applied to this case regarding Officer Webb's discharge of his taser.

## CONCLUSION

[¶49]     For the reasons set forth above, the Court **GRANTS** the United States Motion for Summary Judgment (Doc. No. 117) regarding Officer Webb's use of taser being objectively reasonable, and that it was objectively reasonable for Officer Webb to use deadly force; Plaintiff's Motion for Partial Summary Judgment (Doc. No. 119) is **DENIED**; Plaintiffs request for a hearing regarding the summary judgment motions (Doc. No. 127) is hereby **MOOT**. The three pending nondispositive motions filed by the United States (Doc. Nos. 126; 140; 142) are hereby **MOOT**.

[¶50]     **IT IS SO ORDERED.**

DATED January 25, 2024.

Daniel M. Traynor, District Judge
United States District Court